## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 0007335-07 |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, on this 26th day of November 2007, Defendant Potomac

Electric Power Company filed a Notice of Removal of the above-referenced action with the

Clerk for the United States District Court for the District of Columbia. A copy of the Notice of

Removal is attached hereto.

Respectfully submitted,

_____

Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

Counsel for Defendant

November 26, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BENJAMIN RAMEY,                          )
4251 Clay St., N.E.                      )
Washington, D.C.  20019,                 )
                                         )
              Plaintiff,                 )
                                         )
        v.                               )      Case No. 0007335-07
                                         )
POTOMAC ELECTRIC POWER                   )
COMPANY,                                 )
701 9th Street, N.W.                     )
Washington, D.C. 20068,                  )
                                         )
              Defendant.                 )

## NOTICE OF REMOVAL

        Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant Potomac Electric Power Company

("Pepco") hereby removes to this Court a civil lawsuit filed in the Superior Court of the District

of Columbia, Civil Division, Case No. 0007335-07.  In support of its Notice of Removal, Pepco

states:

        1.      On or about November 1, 2007, Plaintiff filed a one-count Complaint alleging

"Wrongful Termination" against Pepco in the Superior Court of the District of Columbia, Civil

Division, Case No. 0007335-07 (the "Superior Court Action").  Pepco was served with a copy of

the Complaint on November 7, 2007.  No further pleadings have been filed in this action.  A

copy of the Complaint and Summons is attached hereto as Exhibit A.

        2.      This action is removable because Plaintiff's wrongful termination claim falls

within the original federal question jurisdiction of this Court under 28 U.S.C. § 1331 and 28

U.S.C. § 1441.  As explained in detail below, Plaintiff's state law claim is founded upon, and

necessarily will require the Court to interpret, the collective bargaining agreement ("CBA")

between Pepco and Plaintiff's Union.  Consequently, Plaintiff's state law claims are preempted by

section 301 of the Labor Management Relations Act (29 U.S.C. § 185) and properly removed to this Court. See Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 561 (1968) (case properly removed to federal court on basis of section 301 preemption where heart of complaint alleged breach of CBA); Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 47-50 (D.D.C. 2003) (wrongful discharge and tortious interference with contract claim preempted by section 301 because resolution required interpretation of CBA).

3.      It is well-settled that section 301 "provides federal-court jurisdiction over controversies involving collective-bargaining agreements" and directs federal courts to "fashion a body of federal law for the enforcement of" them. Sokos, 283 F. Supp. 2d at 46 (citing Lingle v. Norge Div. of Magic Chef, Inc., 483 U.S. 399, 403 (1988)). As the Supreme Court has observed, the "preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violations of [a CBA]." Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1 (1983); see also Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8 (2003); Bush v. Clark Const. & Concrete Corp., 267 F. Supp. 2d 43, 45-46 (D.D.C. 2003). The dismissal of preempted claims advances section 301's goal of "ensur[ing] uniform interpretation of collective bargaining agreements, and thus. . . promot[ing] the peaceable, consistent resolution of labor-management disputes." Lingle, 486 U.S. at 413. Thus, if a state law claim depends upon the meaning or requires the interpretation of a CBA, the claim is preempted. Sokos, 283 F. Supp. 2d at 46; Grandison v. Wackenhut Services, Inc., 2007 WL 2781892, *3 (D.D.C. 2007). Put succinctly, when the "heart of the [state law] complaint [is] a . . . clause in the collective bargaining agreement, that complaint arises under federal law." Caterpillar, Inc. v. Williams, 482 U.S. 386, 394 (1987).

4.    Consistent with these well-established standards, state tort claims are preempted by section 301 if the determination of an element of the tort, such as whether the employer's actions were "wrongful," requires reference to a CBA. As the Fourth Circuit recognized in <u>Foy v. Giant Food Inc.</u>, the determination of "whether an employer's actions in dealing with and terminating an employee are wrongful is determined ***not in the abstract but necessarily by reference to the collective bargaining agreement which governs the employment relationship***." 298 F.3d 284, 288 (4th Cir. 2002) (emphasis added); <u>see also</u> <u>Hanks v. General Motors Corp.</u>, 859 F.2d 67, 69 (8th Cir. 1988) (wrongful discharge claim based on employee's discharge for failing to return to work after leave of absence preempted because court would be required to interpret CBA's discharge provisions); <u>Grandison v. Wackenhut Servs., Inc.</u>, 2007 WL 2781892,*4 (D.D.C. 2007) (section 301 preempted employee's state law claims that employer violated handbook issued pursuant to CBA); <u>Chester v. Washington Metropolitan Area Transit Authority</u>, 335 F. Supp. 2d 57, 64-65 (D.D.C. 2004) (employee's breach of contract and wrongful discharge claims preempted by section 301); <u>Sokos</u>, 283 F. Supp. 2d at 47 (section 301 preempted plaintiff's wrongful discharge claim because it necessarily required the court to examine the meaning of his CBA); <u>Brown v. Gino Morena Enters.</u>, 44 F. Supp. 2d 41, 44 (D.D.C. 1999) (employee's wrongful discharge claim subject to section 301).

5.    Plaintiff's wrongful termination claim is clearly preempted by section 301 under these well-established standards. As a Pepco employee employed in the bargaining unit represented by Local 1900 of the International Brotherhood of Electrical Workers ("Union"), the terms and conditions of Plaintiff's employment were governed by the CBA between the Union and Pepco. <u>See</u> Local 1900 CBA, the relevant portions of which are attached as Exhibit B. Article 1 of the CBA contains a management rights provision that vests in Pepco's management

the right to supervise and control its operations and workforce. Ex. B, Art. 1. Moreover, Articles 1 and 16 of the CBA afford Pepco the right to suspend and discipline employees and to terminate them for "just cause." Ex. B, Arts. 1, 16. Articles 17 and 18 of the CBA provide extensive grievance and arbitration procedures for the resolution of disputes between Pepco and members of the bargaining unit concerning the CBA. Ex. B, Arts. 17-18.

6.      Pursuant to these provisions of the CBA, Pepco also adopted and published a drug and alcohol testing policy. See Pepco's Drug and Alcohol Policy, attached hereto as Exhibit C; Agreement between Pepco and Local 1900 (dated Dec. 16, 1996), attached hereto as Exhibit D. The policy stated that employees "in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property." Ex. C at 2. Pepco could require an employee to submit to a breathalyzer test to detect alcohol or drugs in his system "when there is a triggering event or reason to believe drugs or alcohol may have been used." Id. at 5. The policy also identified the discipline that would be applied for violations of the policy. Id. Moreover, any disputes concerning the policy were resolved pursuant to the grievance and arbitration provisions of the CBA.

7.      The resolution of Plaintiff's wrongful termination claim will require the Court to interpret and apply these provisions of the CBA and the drug and alcohol policy incorporated into it. In his Complaint, Plaintiff alleges that, on September 1, 2003, Pepco ordered him to take a breathalyzer test to determine whether he was intoxicated when he reported to work. Comp. ¶¶ 1-2. As alleged by Plaintiff, the test results indicated that his blood alcohol level was 0.065%, a level that exceeded the limits of Pepco's policy. Id. Plaintiff further alleges that, because he

tested positive for alcohol, Pepco required him to enroll in a alcohol treatment program and that he was discharged from the program because he "had taken sick" because of the alcohol testing and placement in the program.  Comp. ¶¶ 2-3.  Plaintiff further alleges that Pepco wrongfully terminated him "for being accused of being intoxicated."  Comp. ¶ 6.  Based on these allegations, Plaintiff asserts a common law claim against Pepco for wrongful discharge.

8.    This claim is unquestionably founded upon and will require the interpretation of the CBA between Pepco and Plaintiff's Union.  To prevail on his tort claim, Plaintiff must prove that Pepco's alleged conduct was wrongful.  Thus, this Court will have to examine the CBA and the policy to determine whether Pepco had the right under them to (1) order Plaintiff to take a breathalyzer test; (2) administer the testing in the manner that it did; (3) discipline him pursuant to the CBA and the policy as a consequence of the test results; and (4) terminate him for failing to comply with the terms of that discipline.  As with the situation presented in Foy, these determinations cannot be made "in the abstract," but necessarily must be made by reference to the management, discipline and termination provisions of the CBA and the drug and alcohol testing policy adopted pursuant to it.  Foy, 298 F.3d at 288; see also Chapple v. National Starch & Chem. Co.,178 F .3d 501, 504 (7th Cir. 1999) (301 preempted state law claims based on claimed wrongful application of employer's drug policy); Flibotte v. Pennsylvania Truck Lines. Inc., 131 F.3d 21, 27 (1st Cir. 1997) (301 preempted state law claims because the determination of whether employer "was within its rights to require [Plaintiff] to take a drug test at the designated site . . . necessitates examination of the [CBA]"); Clark v. Newport News Shipbuilding & Dry Dock Co., 937 F.2d 934, 938 (4th Cir. 1991) (301 preempted state tort claims because the "rights of [employee and employer] with respect to drug testing can be resolved only by reference to the [CBA] and its express and implied provisions").

9.    The intersection between Plaintiff's state tort claim and the CBA is vividly demonstrated by the arbitrators' rulings on Plaintiff's two grievances pursuant to the CBA.  The first grievance challenged the "decision making leave" ("DML") that Plaintiff received as a consequence of his alcohol testing.  The second grievance challenged Pepco's decision to terminate Plaintiff in November 2004 for violating the terms of that discipline.  These grievances were founded upon the exact factual allegations set forth in Plaintiff's Complaint in this case.

10.    In the December 14, 2004 and July 11, 2005 rulings rejecting these grievances, the arbitrators interpreted a number of the provision of the CBA, including the drug and alcohol testing policy and the discipline and termination provisions.  See Arbitration Decision Number 16 300 00643 04 issued on December 14, 2004, attached hereto as Exhibit E; Arbitration Decision Number 16 300 E 00137 05 issued on July 11, 2005, attached hereto as Exhibit F.  The arbitrators, for instance, ruled that:

(1)    Pepco had reasonable cause to test Ramey on August 30, 2003;

(2)    The testing was accurate and proper and was consistent with the CBA;

(3)    Pepco had the right to issue the DML to Ramey pursuant to the CBA;

(4)    The allegations regarding the conduct of Pepco managers during the testing, even if true, did not warrant overturning the DML;

(5)    Plaintiff's failure successfully to complete the rehabilitation program required by the DML constituted "just cause" to terminate Plaintiff; and

(6)    The delays in terminating Plaintiff did not warrant overturning the termination decision.

Id.  There is no question that the Court will be required to examine and interpret the CBA in resolving these very same allegations and claims in this lawsuit.

11.    Pepco will provide written notice of the filing of this Notice of Removal to the Clerk of the Superior Court of the District of Columbia.

WHEREFORE, Pepco hereby removes the pending state court action to the United States District Court for the District of Columbia pursuant to 28 U.S.C. §§ 1441 and 1446.

Respectfully submitted,

Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)

Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)

Counsel for Defendant

DC:537392.3

Exhibit A



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

BENJAMIN RAMEY
    Vs.                                 C.A. No.
POTOMAC ELECTRIC POWER COMPANY

RECEIVED
NOV 0 7 2007
LEGAL SERVICES

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to:  Judge JENNIFER M ANDERSON
Date:  November 2, 2007
Initial Conference: 9:30 am, Friday, February 08, 2008
Location:  Courtroom A-50
                515 5th Street N.W.
                WASHINGTON, DC  20001

Caio.doc

# ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

RECEIVED
NOV 0 7 2007
LEGAL SERVICES

CA Form 1

# Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

BENJAMIN RAMEY-Pro Se
42 POTOMAC ELECTRIC POWER COMPANY (PEPCO)
WASH. D.C. 20019

0007335-07

*Plaintiff*

vs.     BENJAMIN RAMEY - Pro Se

POTOMAC ELECTRIC POWER Co. (PEPCO)
701-9TH ST. N.W.
WASH. D.C. 20068

Civil Action No. _____

*Defendant*

3,000,000.00

## SUMMONS

To the above named Defendant:     COURT OF APPEALS

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

BENJAMIN RAMEY-PRO SE
Name of Plaintiff's Attorney

4251 CLAY ST. N.E.
Address
WASH. D.C. 2001

(202) 213-8154
Telephone

By _____
Deputy Clerk

Date _____

**PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170**

**YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170**

NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

CV(6)-456/May 03

**IMPORTANT:** IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (624-1161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

BENJAMIN RAMEY - PRO SE
4251 CLAY ST. N.E.
WASH. D.C. 20019

*Plaintiff*

U007335-07

POTOMAC ELECTRIC POWER CO. (PEPCO)
701 - 9 TH ST. N. W.
WASH. D.C. 20068

CIVIL ACTION NO. _____

7335-07

*Defendants*

RECEIVED
Civil Clerk's Office
NOV 0 1 2007
Superior Court of the
District of Columbia
Washington, D.C.

3,000,000.00          **COMPLAINT**

1. **Jurisdiction of this court is founded on** D.C. Code Annotated, 2001 edition, as amended, Sec. 11-921.

BENJAMIN RAMEY    SEE ATTACHMENT    Benjamin Ramey

Benjamin Ramey

**Wherefore, Plaintiff demands judgment against Defendant in the sum of $ 3,000,000.00 with interest and costs.**

Phone: _____

**DISTRICT OF COLUMBIA, SS**

BENJAMIN RAMEY _____, being first duly sworn on oath deposes and says that the foregoing is a just and true statement of the amount owing by defendant to the plaintiff, exclusive of all set-off and just grounds of defense.

_____
(Plaintiff)                                             Agent)

**Subscribed and sworn to before me this** 1 st **day** November **20** 07.

_____
(Notary Public/Deputy Clerk)

FORM CV-1013/ Nov. 00

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

BENJAMIN RAMEY PRO-SE

4251 CLAY ST. N.E.

WASHINGTON, D.C. 20019

PLAINTIFF

V.

POTOMAC ELECTRIC POWER CO.

701 9TH ST. N.W.                    0007335-07

WASHINGTON, D.C. 20068

DEFENDANT

COMPLAINT
( WRONGFUL TERMINATION )

1. I, BENJAMIN RAMEY WAS ACCUSED OF BEING INTOXICATED ON SEPT. 1, 2003 WHEN ARRIVED FOR WORK AT 12 MID NIGHT.

2. A BREATH TEST WAS TAKEN ELEVEN HRS. AFTER AT 11:36 AM AND THE TEST RESU WAS 0.065.

3. I WAS FORCE BY PEPCO TO ENROLL IN A ALCOHOL PROGRAM AND ON OCT. 28, 2003, I WAS DISCHARGE FROM THE PROGRAM BECAUSE I HAD TAKEN SICK FOR REASONS ASSOCIATED WITH THE ALCOHOL TEST AND THE PLACEMENT IN THE PROGRAM.

3. MY DOCUMENTS SHOW AND PROVE THAT PEPCO FORCE ME TO ENROLL IN THE PROGRAM AND THE TERMINATION OF MY EMPLOYMENT WAS BECAUSE I TESTED POSITIVE FOR ALCOHOL ON BOTH OCCASIONS.

4. On July 11, 2005 at an Arbitration Hearing For Wrongful Termination, Mr. Sigafoose, Pepco's Manager and Mr. Duarte, Manager For Human Resources, Both Denied under Oath Terminating Me, So as of Today, I Have No Idea Who Terminated Me and For What Reason.

5. On Aug. 17, 2005 at a Formal Hearing For Workers Compensation, Pepco Submitted the Alcohol Test That I Took on Sept. 1, 2003 to Prove That I Was Intoxicated In Order To Discredit My Testimony, So For That Reason, I Was Denied Workers Compensation And Remain Terminated After 13 Yrs. of Service With Pepco.

6. I Knew That I Was Being Wrongfully Terminated For Being Accused of Being Intoxicated, But I Had No Income To Hire An Attorney For Some Assistance up Until Early Aug. 2007.

7. On July 11, 2005 Was the Only Time That a Hearing Was Held For Wrongful Termination That I Requested.

8. Through My Investigator and a Expert Alcohol Tech. Employed out of The D.C. Sup. Ct., I Should Have Never Been Terminated Because The Alcohol Test Was Forensically Invalid.

Ex. 1  The Alcohol Test That Pepco Presented as My Test.

Ex. 2. Letter From a D.C. Sup. Ct. Alcohol Tech. Traffic Panel Member.

This Outrageous Behavior of a Large Corporation Is Unbelievable and I Should Be Compensated For Compensatory and Punitive Damages.

## Certificate of Service

I, Benjamin Ramey Certify That I Served a Copy of the Foregoing Postage Pre-Paid or By Hand Delivery on The 1st Day of Nov. 2007 To:

Jill Flack (Pepco's Atty.)
701-9th St. N.W.
Wash. D.C. 20068

*Benjamin Ramey*
Benjamin Ramey
4251 Clay St. N.E.
Wash. D.C. 20019
Tel. No. (202) 213-8154



# Bryan W. Brown

**Attorney at Law**

400 Fifth Street, NW
Suite 300
Washington, DC 20001
(202) 639-0221
attorney@bryanwbrown.com

*Ex. 2*

To:   William Bach
From: Bryan W. Brown   *Bryan W. Brown*
Re:   Benjamin Ramey
Date: July 19, 2007

    I am currently an attorney barred to practice law in the District of Columbia and the Commonwealth of Virginia. I am a member of the D.C. Superior Court Traffic Panel and a Duty Attorney in D.C. Superior Court. I have been practicing in the area of criminal defense with a primary focus on defense of alcohol related driving offenses for over 5 years. I attend annual trainings regarding breath testing and the potential errors associated with breath testing. With the knowledge I have gained in my legal practice and educational seminars I have evaluated the documents presented. Those documents included an "Alcohol Testing Form" with a printout from a Breathalyzer 7419 xeroxed onto it, a Memo from Pepco dated September 30, 2003, a Employee Grievance Form, a Certificate of Training, a two page Delcaration of Laman Dudley, and a statement by Benjamin Ramey. After reviewing the materials, it is apparent that the breath test conducted on Mr. Ramey is not forensically valid. The test was not conducted sufficiently close in time to the incident for the results to be valid. The U.S. Capital Police Breath Testing Training manual requires two tests to be conducted no more then 10 minutes apart so that accuracy can be demonstrated. That was not done with Mr. Ramey's test. Capital Police standards also require the testing to be done within two hours, which was also not done in Mr. Ramey's case.

    A test so far after an individual could have possible had a drink is highly unreliable. There are many factors to consider some of which include whether the individual was in the absorption, distribution, or elimination phase. That is to say was any alcohol consumed being absorbed into his blood, distributed throughout his blood, or eliminated from his blood. Generally, once an elimination phase is reached, the body eliminates alcohol at a rate of approximately .015% per hour. This number, however, can vary dramatically depending on the individual. Furthermore, the time a person remains in the three phases also varies dramatically. These factors make using a test so remote in time highly unreliable.

    A number of other factors also make breath machine readings unreliable. The inherent margin of error for most machines is around 10%. This error is added to a potentially 15% margin of error that can result from an improper breath pattern near the time of testing. Also added to the total margin of error can be an 8.6% margin of error per 1 degree Celcius difference between actual core body temperature and the assumed core body temperature. Also, Hematocrit level can result in an additonal 14% margin of error. When combined, the total margin of error

of a breath machine can approach 47.6%. This margin of error assumes a test taken shortly after the period when you want to know the Blood Alcohol Content. Additional causes of error can result from partition ratio error, mouth alcohol error, and extrapolation error. Because of the many potential causes of error in breath testing, a direct test of the blood is the most appropriate method for determining actual blood-alcohol levels.

In conclusion, the results of the test used on Mr. Ramey on August 30, 2003 are not forensically valid, and should be of no evidentiary value in determining Mr. Ramey's Blood Alcohol Content while he was on the job some 12 hours prior to the test. The test was taken far too remotely from the time Mr. Ramey was on the job, the two test that were taken were not taken within 10 minutes of each other, and the results of breath test without controls to eliminate potential causes of error make the results unreliable. As such, the results of the breath test should not have been used in the decision of whether or not to take action against Mr. Ramey for alleged violation of PEPCO policy.

EX. I

# Alcohol Testing Form

*(The instructions for completing this form are on the back of Copy 3) —*

---

## ► STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN

A. Employee Name ___BENJAMIN F. RAMEY___
               **(PRINT) (First, M.I., Last)**

B. SSN or Employee ID No. ___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___

C. Employer Name ___PEPCO___
   Street ___701 9TH ST NW___
   City, ST ZIP, ___WASHINGTON DC 20001___

   DER Name and ___NEGUSSIE BIRRATU___
   Telephone No.   **DER Name**        ___(202) 872-36___
                                 **DER Phone Number**

D. Reason For Test: ☐ Random ☒ Reasonable Susp ☐ Post-Accident ☐ Return to Duty ☐ Follow-up ☐ Pre-employment

---

## ► STEP 2: TO BE COMPLETED BY EMPLOYEE

I certify that I am about to submit to alcohol testing and that the identifying information provided on the form is true and correct.

Signature of Employee                                           Date   8   30   0
                                                       Month  Day  Ye

---

## ► STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN

...he technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing on the above named individual, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☒ BAT ☐ STT   DEVICE: ☐ SALIVA ☒ BREATH* ☐ 15-Minute Wait: ☐ Yes ☐ No
SCREENING TEST: *(For BREATH DEVICE* write in the space below only if the testing device is not designed to print.*

| Test # | Testing Device Name | Device Serial # OR Lot # & Exp Date | Activation Time | Reading Time | Result |
|---|---|---|---|---|---|

CONFIRMATION TEST: Results MUST be affixed to each copy of this form or printed directly onto the form.

Remarks: _____

Alcohol Technician's Company ___MID ATLANTIC DRUG TESTING___    Company Street Address ___13615 BENT TREE CIRCLE___

(PRINT) Alcohol Technician's Name (First, M.I., Last) ___THOMAS HYDE___    Company City, State, Zip ___CENTREVILLE VA 20121___   Phone Number ___703 802-22__

Signature of Alcohol Technician                                               Date   8   30  0
                                                             Date   Month  Day  Ye

---

## ► STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS 0.02 OR HIGHER

...tify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand ...at I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are 0.02 or greater.

Signature of Employee                                            Date   8   30  0
                                                       Date   Month  Day  Ye

---

*(right margin printout, partially cut off)*

BREATHALYZER 7410
SERIAL # : ARHK-

BREATHALYZER PRIN
SERIAL # : ARHL-
PRINTER LOG #: 00

MM.DD.YY HH:MM
08.30.03 11:09

**********************
* TEST NUMBER: 012
* AIR-BLANK TEST:
*    0.000 PERCENT
* BREATH TEST:
*    0.070 PERCENT
**********************
DATA ACCEPTED

BREATHALYZER 7410
SERIAL # : ARHK-10

BREATHALYZER PRINTE
SERIAL # : ARHL-04
PRINTER LOG #: 0050

MM.DD.YY HH:MM
08.30.03 11:32

**********************
* TEST NUMBER: 0125
* AIR-BLANK TEST:
*    0.000 PERCENT B
* BREATH TEST:
*    0.065 PERCENT B
**********************
DRY-GAS ACCURACY TEST

BREATHALYZER 7410
SERIAL #  : ARHK-1031
TEST #    : 01254

BREATHALYZER PRINTER
SERIAL # : ARHL-0498
PRINTER LOG #: 00503

MM.DD.YY HH:MM
08.30.03 11:59

**********************
* LABELED BAC VALUE:
*    0.040 PERCENT BAC
* CORRECTED BAC VALUE
* .040    PERCENT BAC
* ACCURACY TEST RESULT
*    0.039 PERCENT BAC
TECHNICIAN SIGNATURE:

Mr. Sentins, Ernest
Dickinson, Charles Executives of Pepco
        I am a independant
criminal investigator that is now
assisting other former employees
of Pepco of the injustice and
wrongful termination, that two
of Pepco Technicians Larry Huff and
Thomas Hyde conducted. Back
in 2006 I tryed to see you
and Bill Flack and Carter Delarme
Attorneys for Pepco. Stopped me
from seeing you. Attorney Delarme
said he had to go out of Town.
It's only because they had
alot to cover up. As you can see
by this document. Mr. Roney's
test was invalid and it's
possible others were too.

10-2-08

OCT - 4 2007

Exhibit B

# CONTENTS

| | | Page Number |
|---|---|---|
| Preamble | | 1 |
| Article 1 | Management | 1 |
| Article 2 | Bargaining Unit | 1 |
| Article 3 | Union Membership and Dues Deduction | 2 |
| Article 4 | Union Business | 4 |
| Article 5 | Pay Progression, Work Assignments and Job Classifications | 5 |
| Article 6 | Special Premiums | 10 |
| Article 7 | Overtime | 13 |
| Article 8 | Seniority | 18 |
| Article 9 | Reduction In Working Forces | 22 |
| Article 10 | General Provisions | 24 |
| Article 11 | Holidays | 25 |
| Article 12 | Vacations | 26 |
| Article 13 | Sickness Disability Allowances | 29 |
| Article 14 | Leave of Absence | 33 |
| Article 15 | Limited Services | 36 |
| Article 16 | Suspension and Discharge | 37 |
| Article 17 | Grievance Procedure | 38 |
| Article 18 | Arbitration | 40 |
| Article 19 | Application Laws and Regulations | 41 |
| Article 20 | Safety and Health | 41 |
| Article 21 | Unauthorized Work Stoppages, Slowdown, or Lockouts | 42 |
| Article 22 | Benefit Plans | 42 |
| Article 23 | Identify of Parties and Complete Agreement | 45 |
| Article 24 | Duration, Reopening and Renewal | 45 |

i

## PREAMBLE

THIS COLLECTIVE BARGAINING AGREEMENT IS MADE BY AND BETWEEN POTOMAC ELECTRIC POWER COMPANY (HEREINAFTER REFERRED TO AS THE "COMPANY") AND LOCAL UNION #1900 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (HEREINAFTER REFERRED TO AS THE "UNION").  THE PARTIES DO HEREBY AGREE AS FOLLOWS:

## ARTICLE 1

### MANAGEMENT

**Section 1.01.**  By reason of the nature of the business of the Company it is essential, and is therefore agreed, that the management of the Company, the supervision and control of all operations and the direction of the working forces, including, but not limited to, the right to hire, suspend, furlough, discipline, discharge for cause, promote, demote, or transfer employees, and the right to operate the Company, shall be vested in, and reserved to, the Company, except as herein limited.

## ARTICLE 2

### BARGAINING UNIT

**Section 2.01.**  The Union is recognized as the sole collective bargaining agent for the bargaining unit, which is composed of all employees of the Company at all work locations, regardless of the method of pay, excluding only confidential employees, property protection employees (guards), and professional, supervisory and management employees.

**Section 2.02.**  Regular employees are employees whose employment is reasonably expected to be permanent at the time they are employed, and it is contemplated that they will work in each calendar week a normal workweek.

**Section 2.03.**  Temporary employees are employees whose employment is with the definite understanding that the employment is not of a permanent nature, but it is contemplated that they will work a normal workweek while employed. The Company will inform the Union of the employment and assigned Department of such employees and the expected duration of their employment.

**Section 2.04.**  Whenever the terms "employee" or "employees" are used in this Agreement, they shall refer only to employees in the bargaining unit as identified herein unless specifically stated otherwise.

**Section 2.05.**  Casual employees are employees who are employed to work part-time of less than a normal workday or a normal workweek.  They may be assigned to bargaining unit work but are not in the bargaining unit or subject to this Agreement.  These employees will not in any instance deprive qualified regular employees of overtime work.  The Company will inform the Union of the employment and assigned Departments of such employees.

**Section 2.06.**  Any existing bargaining unit job moved from bargaining unit to non-bargaining unit will be negotiated with the Union by the Company.

**Section 2.07.**  The Union and the Company shall keep each other informed as to the individuals authorized to act in Union-Management relationships.

1

determined by the Company's Medical Director, he/she shall be returned to the job in question. Concerning a job in a higher classification or a job in another Occupational Group, if the employee is found to be capable of performing the duties of such job as determined by the Medical Director, the employee shall be given consideration on the next job vacancy.

## ARTICLE 16

### SUSPENSION AND DISCHARGE

**Section 16.01.** The maintenance of discipline is the responsibility of the Company and to that end the Company may discipline employees for cause. A copy of all disciplinary actions issued to Bargaining Unit employees will be forwarded to the Union. This includes all Oral Reminders, Written Reminders, Decision Making Leaves (DML), and notices of meetings regarding continuation of employment (and resulting determinations from such meetings).

**Section 16.02.** In the event the Company believes that a Bargaining Unit employee's problems regarding work performance, conduct & safety, or attendance appears to warrant discharge, a meeting will be scheduled for that employee before his/her General Manager (or designated representative); other Company representatives may also be present.

(a)     The employee and the Union will be notified, in writing, at least two (2) days prior to the meeting. The notification will include the date and time of the meeting, a statement describing the employee's performance problem(s), and a statement to the employee advising of his/her right to Union representation (also included will be the Union's telephone number).

(b)     The Company will endeavor to assure that a Union Steward is available when an employee is notified of the meeting. In the event a Steward is not available, the Union office will be notified as soon as reasonably possible.

(c)     The purpose of the meeting is to assure that an appropriate decision is made regarding the Bargaining Unit employee's continued employment with the Company. A representative of the Union may attend that meeting. If desired, the employee may allow that Union official to represent him/her at that meeting. During this meeting, all parties will make all relevant facts available. Further, the Company may allow witnesses with relevant information to testify at the meeting.

(d)     After the meeting, and after the Company has completed any additional investigation that it deems appropriate, the employee will be advised, in writing, of the Company's final determination. A copy of that determination will be forwarded to the Union. It is understood that employees will remain at work pending the Company's final determination, unless that employee has been placed on Crisis Suspension or Excused With Pay.

**Section 16.03.** In the event a Bargaining Unit employee is placed on Crisis Suspension or Decision-Making Leave, the Company will endeavor to assure that a Steward is present when the employee is notified. In the event a Steward is not available, or it is impractical to have a Steward present, the management representative who places the employee on Crisis Suspension or Decision-Making Leave is responsible for ensuring that the Union office is notified as soon as possible. Additionally, the employee will be provided with the Union's telephone number.

(a)     It is understood and agreed that a Crisis Suspension does not necessitate a meeting before the employee's General Manager (or designated Representative) unless that suspension is expected

37

to be converted to discharge. However, in the event a Crisis Suspension extends past five (5) days, the Union shall have the right to request a hearing. In the event of such request, the parties shall, within two (2) days, arrange to meet and discuss the employee's employment status.

Section 16.04. In the event the Union disagrees with a Company decision to discharge a Bargaining Unit employee, the Union may, within five (5) working days after the determination, appeal the discharge directly to Arbitration in accordance with Article 18. However, prior to Arbitration, the Union may request that a Step 2 meeting be held to discuss the matter.

Section 16.05. Crisis Suspensions may be appealed directly to Step 2 of the Grievance Procedure, Article 17.

## ARTICLE 17

### GRIEVANCE PROCEDURE

Section 17.01. It is considered by the parties that all grievances should be presented promptly, discussed without delay and answered within a reasonable time. A grievance is defined as a violation of a specific term(s) or provision(s) of this Agreement or of an established precedent in terms and/or conditions of employment. It is also considered that grievances should be settled whenever possible at the levels where the greatest familiarity with the subject matter exists. Any individual employee or group of employees shall have the right to present grievances and to have them considered for adjustment, provided any adjustments are not inconsistent with the terms of this Agreement and a Union representative has been given an opportunity to attend as provided in this procedure. Therefore, it is agreed that all grievances shall be subject to the following grievance procedure.

Section 17.02. Any employee who believes that he/she has a grievance shall, within one (1) week after the cause of the grievance is alleged or known to have taken place, discuss it with his/her immediate supervisor. The employee may, if he/she desires, have his/her Steward present during the discussion. The supervisor shall within three (3) workdays after the discussion, notify the employee or Steward (if present at the discussion) of his/her disposition of the matter.

Section 17.03. Step 1—If the appropriate supervisor's response does not resolve the grievance, then within two (2) weeks after the cause for the grievance is alleged or known to have taken place, the grievance shall be stated in writing on forms available from the Company or the Union, listing facts, reasons, Agreement provisions in question, and/or established precedent in terms and conditions of employment. The grievance must be numbered (by the Local Union Office), dated and signed and one (1) copy shall be delivered to the Department Head and one (1) copy shall be delivered to Employee Relations and Communications Center. If a grievance is not delivered to the Department Head within two (2) weeks after occurrence of cause for the grievance, it will no longer exist.

Section 17.04. Within one (1) week of delivery of the aforesaid grievance to the Department Head, the appropriate supervisor(s), the grievant, Steward, and/or Chief Steward shall meet to resolve the grievance. Within one (1) week after the meeting, the appropriate supervisor(s) shall give written notice to the Steward, with a copy to the Local Union President, of the determination of the grievance. If the grievance is not resolved, it may be taken to Step 2.

Section 17.05. Step 2—If the grievance is not resolved in Step 1, the President of the Local Union (or his/her designated representative) may, within two (2) weeks after receipt of the written determination in

38

Step 1. submit in writing to the Manager - Employee Relations and Communications Center (or his/her designated representative) a request for a meeting to resolve the grievance. Within one (1) week after receipt of such request from the Local Union President (or his/her designated representative), the Manager - Employee Relations and Communications Center (or his/her designated representative) shall arrange to meet with the Union's Grievance Committee (grievant, Steward, Chief Steward, and/or Local Union President or his/her designated representative) to resolve the grievance. Such meeting will be held within four (4) weeks of the receipt of the request unless mutually agreed otherwise. The Union and the Company may have present and eligible to participate in the discussion any persons they so desire. Within two (2) weeks after the meeting, the Manager - Employee Relations and Communications Center (or his/her designated representative) shall give written notice to the Local Union President (or his/her designated representative) of the determination of the grievance. If the grievance is not resolved in Step 2, it may be taken to arbitration as provided in Article 18.

**Section 17.06.** Discussions regarding grievances shall be conducted as far as practicable during the employee's working hours. Payment for discussions regarding grievances shall be compensated as outlined in Article 4 of this Agreement. All employees shall first obtain permission from their supervisor to be absent for such meetings and must report to him/her upon returning.

**Section 17.07.** Grievances relating to matters which extend beyond a single Department, Division, or Group may originate in the Step of the grievance procedure where management authority to settle the matter exists, but no grievance may be taken to arbitration until it has been presented in Step 2, except where time limits as described in Section 17.05 have been exceeded and then only if the party seeking to move the matter to arbitration has not caused or contributed to the time limits being exceeded or except as otherwise provided for in Section 16.05 regarding discharges.

**Section 17.08.** Whenever a grievance involves a group of employees, a committee of not more than three persons, which shall include the appropriate Steward and at least one of the employees affected, may be substituted for an employee wherever the word "employee" is used in the grievance procedure.

**Section 17.09.** It is agreed that the grievance procedure or time limits may be varied at anytime by agreement of the parties when such action appears to be necessary or desirable.

**Section 17.10.** The Union and the Company shall inform each other of persons authorized to represent them in grievance matters.

**Section 17.11.** Grievances of the Company or Union shall originate in the lowest step where authority to take appropriate action exists.

**Section 17.12.** The grievance procedure is applicable to all employees in the bargaining unit except as otherwise restricted elsewhere in this Agreement, provided, however, that terminations of regular employees during their first year of continuous service and terminations of temporary employees at anytime may not be the subject of a grievance.

**Section 17.13.** Failure to comply with the time limit provisions by employees or Union representatives shall invalidate the grievance. Failure to comply with the time limit provisions by Management representatives shall permit the grievance to be advanced to the next Step of the grievance procedure.

39

## ARTICLE 18

## ARBITRATION

**Section 18.01.** Any grievance not resolved in Step 2 of the grievance procedure may be submitted to impartial arbitration.

**Section 18.02.** The Company or the Union shall notify the other party of its desire to proceed to arbitration within two (2) weeks of receipt of the Step 2 answer. Such notice shall be in writing and shall specify the grievance to be arbitrated and state the issue(s) involved.

**Section 18.03.** An impartial Arbitrator shall be selected by mutual consent of the Company and the Union as soon as practicable after receipt of the request for arbitration. If the parties do not agree on the selection of an Arbitrator within two (2) weeks after receipt of the request for arbitration, the American Arbitration Association shall select from a standing panel (agreed to by the parties in the Memorandum of Understanding by which this Agreement was established) the five Arbitrators least recently selected under this Article and shall provide a list thereof to each party. Within one (1) week following receipt of the list of Arbitrators, the parties shall meet and alternate in striking names from the list with the loser of a coin toss striking first. The remaining name, after each party has struck twice, shall be the impartial Arbitrator.

**Section 18.04.** The arbitration hearing shall be held as quickly as possible. The award of the Arbitrator shall be final and binding upon both parties and upon the employee(s) involved. The fees and expenses of the Arbitrator, and any other expenses agreed to by the parties prior to the arbitration hearing, shall be shared equally by the Company and the Union. The Arbitrator shall have power and authority to arbitrate only those matters expressly made subject to arbitration by the terms of this Agreement and shall rule only on the issues submitted to him/her. The Arbitrator shall have power only to interpret this Agreement and shall not have the power to alter or amend it.

**Section 18.05.** At the request of either party, a grievance involving the discharge or discipline of an employee shall be submitted to Expedited Arbitration (as defined below). The Arbitrator for such Expedited Arbitrations shall be appointed from a standing panel of at least ten (10) Arbitrators agreed to by the parties in the Memorandum of Understanding by which this Agreement was established. As soon as practicable after receipt of the arbitration request referred to in Section 18.02 above, the parties shall try to agree on a date(s) to arbitrate the case. If agreement is reached, the parties shall notify the American Arbitration Association (hereinafter "AAA") of the desired date(s). The AAA will then appoint an Arbitrator from the parties' standing panel who is available on the requested date(s). Prior to the parties' selection of a mutually acceptable date(s), neither party shall be informed of the availability of a named Arbitrator on a particular date. If the parties are unable to agree on a date within two (2) weeks after receipt of the request for arbitration, either party may so notify the AAA, requesting that the AAA appoint an Arbitrator who will set the time and date(s) after considering the parties' positions on when the case should be heard. In appointing Arbitrators under this Section, the AAA shall make every effort to evenly distribute the cases among the standing panel of Arbitrators. The Expedited Arbitration will be conducted according to the Expedited Arbitration rules in effect July 1, 1983, except to the extent inconsistent with this Section.

40

# 1999 General Memorandum of Understanding

Whereas, the Potomac Electric Power Company (the "Company" or "Pepco") and Local 1900 of the International Brotherhood of Electrical Workers (the "Union") by mutual agreement conducted early negotiations to establish a successor Collective Bargaining Agreement to the 1998 Collective Bargaining Agreement and,

Whereas, the Company and the Union have agreed to a successor Collective Bargaining Agreement (hereinafter referred to as the "Agreement" or "CBA"), whose terms are set forth below;

It is, therefore, further agreed and understood between the Company and Union that:

I.    **Contract Duration**

The 1999 Agreement shall be effective upon ratification except as provided otherwise in this Agreement. The term of this Agreement shall be to and including May 31, 2003 and it shall thereafter continue in full force and effect for succeeding periods of 12 calendar months each, unless either party, prior to April 1, 2003, or April 1 of any year thereafter, shall serve written notice upon the other party of its desire to amend and/or terminate the Agreement as of the following June 1. The Contract shall read as set forth in the 1993 Collective Bargaining Agreement except to the extent modified herein or modified through other written agreements between the parties. The Annex shall be modified consistent with written agreements between the parties since the signing of the 1993 Collective Bargaining Agreement.

II.   **General Wage Increases**

A.    The Company shall provide a general wage increases (GWI) of 3% in 1999, 3% in 2000, and 3% in 2001 to eligible employees. In 2002, there will also be a 3% increase unless either party, for any reason, provides 60-days notice prior to June 1, 2002 of its intention to reopen the contract. Any such reopener will be limited to wages and benefits. If no agreement is reached regarding wages and benefits by June 1, 2002, either party may terminate the agreement at any time by giving 48 hours written notice thereof to the other party.

B.    The 1999 increase shall be effective as soon as practicable after ratification. If the Agreement is ratified in December 1998, the Company shall endeavor to place the GWI in effect by the payroll period beginning February 14, 1999. The Company further agrees that if the Agreement is ratified in December 1998, each employee employed in the bargaining unit from January 3, 1999, to the beginning of payroll period in which the 1999

Exhibit C

*Ramey case*

# HUMAN RESOURCES
# CORPORATE PERSONNEL POLICIES

### Click Below To Return

Corporate Personnel Policies All | Corporate Personnel Policies Recent Changes

| | |
|---|---|
| Policy Section: | 80: Personnel - General |
| Policy Title: | Drug and Alcohol |
| Policy Number: | 80.200 |
| Effective Date: | 12/23/1999 |
| Issued Date: | 03/01/2000 |
| Supersedes Policy: | Corporate Personnel Policy No. 80.200 dated 1/1/95 |

▼Policy Information:

## PURPOSE

The purpose of this policy is to establish and maintain a safe workplace and a healthy and efficient workforce free from the effects of substance abuse.

## GENERAL

A copy of this Corporate Personnel Policy No. 80.200, Drug and Alcohol, should be posted in a conspicuous place in each department and each employee should receive a copy of this Policy.

## INTRODUCTION

The Company is firmly committed to providing a safe workplace and promoting high standards of employee safety and health. Employee involvement with drugs or alcohol, on or off the job, can take its toll in the workplace by increasing absenteeism, by lowering productivity and morale, by undermining public confidence in the Company, and most importantly, by undermining the safety of employees and the public. The use or possession of illegal drugs is particularly unacceptable because, among other things, it involves criminal activity under state and federal laws. A comprehensive policy concerning drugs and alcohol is necessary to ensure that the Company continues to fulfill its special responsibility to provide energy in a safe, economical and reliable manner, and to ensure that employees are made aware of the Company's rules in this area.

### Employee Advisory Service

Early identification and treatment of a substance abuse problem is the best method for protecting the interests of all concerned. Since 1976, the Company has provided an avenue for seeking professional assistance to deal with such problems: the Employee Advisory Service.

Pepco's Employee Advisory Service is available to any employee who needs counseling or assistance in dealing with a drug or alcohol problem. Ultimately, however, it is the employee's responsibility to take the first step. While Pepco encourages voluntary participation in the Employee Advisory Service, such participation will not prevent, or lessen the extent of disciplinary action for violations of the rules set

forth in this or any other policy.

## STANDARDS REGARDING DRUGS AND ALCOHOL

The following minimum action shall occur where an employee has not lived up to the standards set forth below. More severe discipline, however, may be necessary where circumstances warrant it. For instance, if while unfit for duty, an employee is involved in an accident, altercation, or otherwise causes damage to person or property, more severe discipline may be imposed. Previous violations of this or other policies or rules will be considered in determining appropriate discipline and may result in more severe discipline.

### Alcohol Standards

### Use, Possession, Distribution

Employees must not bring alcohol onto Company property or places where they are on duty at any time. An employee who uses, possesses, or distributes alcohol while on duty or on Company property will be subject to appropriate discipline (from Written Reminder to Termination), depending on the circumstances involved.

### Fitness for Duty/Alcohol in System

Employees must report to work and while on duty or on Company property must remain in a condition to perform their duties safely and with maximum efficiency.

- An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property. An employee found to have a to have a blood-alcohol concentration of less than 0.05% (or its equivalent) shall be considered in violation of this standard where it can be determined based on accepted medical ranges that the employee had a concentration of 0.05% or more (or its equivalent) while on duty or on Company property. In either of these circumstances, the employee shall be placed on Decision-Making Leave (DML).

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license may not have a blood-alcohol concentration of 0.02% or more while on duty or on Company property. An employee who has a blood-alcohol concentration of 0.02% but less than 0.04% (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be given an Oral Reminder. In such cases, the employee is unable to work for 24 hours pursuant to federal regulations and shall be placed on crisis suspension absent other arrangements.

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license who has a blood-alcohol concentration of .04% but less than 0.05% (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be given a Written Reminder. In such cases, the employee will be unable to work until certain conditions are met pursuant to federal regulations and shall be placed on crisis suspension. The employee must see a medical health care professional recommended by the Company and must follow his/her recommendations before the employee can return to duty. In

addition, the employee must pass a return-to-work alcohol test. During the next 12 months, the employee will be required to submit to at least 6 random tests for alcohol.

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license who has a blood-alcohol concentration of 0.05% or greater (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be placed on crisis suspension until certain conditions are met pursuant to federal regulations. The employee must see a medical health care professional and must follow his/her recommendations before the employee can return to duty. In addition, the employee must pass a return-to-work alcohol test and will be subject to 2 years of drug and alcohol testing as set forth in the paragraph below

- An employee who tests positive in violation of any of the standards described above shall initially be placed on crisis suspension until the Company completes its investigation of the matter which normally involves obtaining test results. If as a result of that investigation the Company determines that the employee violated the standards set forth above, the employee will be disciplined accordingly. An employee testing positive in violation of this policy shall not be paid for any time missed due to crisis suspension. Notwithstanding the deactivation periods for disciplinary actions set forth in the Positive Discipline Policy, Pol. No. 30.100, any employee who violates this policy and is not discharged shall be placed on drug/alcohol policy probation for three (3) years and shall be subject to periodic, unannounced drug and alcohol testing during the first two (2) years of probation. If the employee violates any rules set forth in this policy during his or her probationary period, he/she shall be discharged. In addition, consistent with the Positive Discipline Policy, if an employee receives Decision-Making Leave (DML) for violating the Drug & Alcohol Policy, discharge will occur if any performance problem (work performance, conduct & safety or attendance) warranting formal discipline takes place during the 18-month period the DML is active.

## Drug Standard

## Purchase, Sale, Use, Possession, Distribution

Except in cases involving properly prescribed medication, employees may not bring drugs onto Company property or places where they are on duty at any time. An employee who buys, sells, uses, possesses, or distributes drugs while on duty or on Company property shall be discharged on the first occurrence. Illegal substances will be confiscated and turned over to the appropriate law enforcement agency. The law enforcement agency will also be informed of the circumstances under which the drugs were seized and the identity of the individuals involved.

## Drugs in System

The well-known hazards associated with the use of drugs, together with Pepco's policy of providing a safe workplace and a healthy and efficient workforce that is free from the effects of substance abuse, require a policy designed to ensure a drug-free environment. Accordingly, it is the Company's policy that, except for properly prescribed medication, employees may not be at work or on Company property with drugs (or drug metabolites) in their system – regardless of when and where the drugs were taken. Employees should be aware that drugs (or drug metabolites) are present and detectable in the human body for a substantial period of time after each use.

When there is a triggering event or a reason to believe drugs may have been used or in other circumstances necessitating testing, the Company will use diagnostic tests, including blood and/or urine tests, to detect drugs or drug metabolites in an employee's system. When time and circumstances permit, this process may involve a preliminary urine screen. The urine samples collected will also be sent to an independent laboratory for further analysis. If the preliminary urine screen shows the presence of marijuana (or its metabolites), a blood sample will be drawn. This sample will also be sent to the independent laboratory for analysis.

If any such test reveals drugs (or drug metabolites) in an employee's system, the employee will be subject to disciplinary action as set forth below:

- Heroin, Cocaine, Morphine, PCP an Hallucinogens

  An employee found to have any detectable concentrations of heroin, cocaine, morphine, phencyclidine (PCP), or hallucinogens (or metabolites of any such drugs) in his or her system shall be discharged on the first occurrence.

- Other Drugs

  An employee found to have any detectable concentrations of marijuana in his or her system, as established by a blood test, shall be discharged on the first occurrence.

    o Where a blood test is not conducted for marijuana or where such a test is conducted but is negative, an employee found to have any detectable concentrations of marijuana (or its metabolites) in his or her system as established by a test other than a blood test (for instance, by urinalysis) or an employee found to have any detectable concentrations of any other illegal drug or drug metabolites (except those listed above) in his or her system as established by any test shall be disciplined as follows:

    o Where there is corroborating evidence that the employee was unfit for duty, the employee shall b discharged on the first occurrence.

    o Where there is no corroborating evidence that employee was unfit for duty, the employee shall be placed on (or continued on) crisis suspension pending further investigation. The employee will be retested five (5) working days from the date of the test. Depending on the results of the test, the following action will be taken:

    o If the employee tests negative for all drugs or drug metabolites, he/she shall be placed on Decision-Making Leave and shall receive no back-pay for time missed due to crisis suspension; or

    o If the employee tests positive for any drug or drug metabolites, he/she shall be discharged except in circumstances set forth in the paragraph immediately below; or

    o If the employee tests positive for marijuana (and negative for other drugs), the Company will determine whether, based on the concentrations detected, there is sufficient evidence that the employee has consumed marijuana since his/her initial test. If the Company determines that there is sufficient evidence of such consumption, the employee shall be discharged. If the Company determines there is insufficient evidence of such consumption since the initial test, the employee shall be continued on crisis suspension and subject to

retesting in another five (5) working days. Assuming the employee ultimately returned to work, he or she shall receive no back pay for time spent on crisis suspension.

An employee who is returned to work under this section shall be placed on Decision-Making Leave (Code 64). Upon his/her return, the employee shall meet with his/her supervisor to discuss the employee's commitment to follow Pepco's standards. Additionally, an employee who is returned to work under this section shall be placed on probation for three (3) years and shall be subject periodic, unannounced drug and alcohol testing during the first two (2) years of probation. If the employee fails to meet any of the standards set forth in this policy during his or her probationary period, he/she shall be discharged. In addition, the Decision-Making Leave shall remain active for 18 months, consistent with the Positive Discipline Policy.

## Other Rules

### Testing

Employees will be required to submit to blood, urine, breathalyzer or other diagnostic tests to detect alcohol and/or drugs (or drug metabolites) in their system under any of the following circumstances:

- When there is a triggering event or a reason to believe drugs or alcohol may have been used;

- When an employee is subject to periodic, unannounced testing in the following circumstances:

- During his/her first year of continuous service with the Company;

- When such testing is required under local or federal legislation, regulation or administrative rule;

- During the first two years following any infraction of this policy that causes an employee to be placed on Decision-Making Leave.

- At any other time required under local or federal legislation, regulation or administrative rules.

An employee who refuses to submit to any such test or adulterates or substitutes a specimen during the test shall be discharged on the first occurrence.

Employees suspected of violating the standards set forth in this policy who are tested may be placed on crisis suspension pending completion of the Company's investigation. If test results establish a violation of the standards of this policy, appropriate disciplinary action will be taken. In no case where such a violation has been established will the employee be paid for time missed due to crisis suspension.

### Searches

Under this policy, the Company will conduct searches for drugs or alcohol when there is a triggering event or when the Company has a reasonable belief that a search would reveal prohibited items. Searches will be conducted in a manner that provides employees with as much privacy as possible, consistent with the circumstances involved. An employee who refuses to submit immediately to a search of his or her person, vehicle or other property shall be discharged on the first occurrence. Employees are

reminded that under this policy, employee lockers, desks, tool boxes, etc., are subject to search for drugs and alcohol and refusal to cooperate fully with such a search would also result in discharge on the first occurrence.

## Drug Paraphernalia

Employees are prohibited from bringing drug paraphernalia onto Company property or places where they are on duty at any time. An employee who possesses or distributes such paraphernalia while on duty or on Company property is subject to discharge on the first occurrence.

## Off-Duty Arrests/Convictions

An employee who is arrested for, or convicted of (including a guilty plea or plea of 'Nolo Contendere'), a drug offense which involves the off-duty or on-duty sale, distribution, or possession with intention to distribute illegal drugs, or manufacture them must inform the Company as soon as possible of his/her arrest, the nature of the charges, and the ultimate disposition of the charges, including any conviction. In no case should such a report be made more than three (3) calendar days beyond the date of the triggering event. Failure to timely report such information to area management is grounds for discharge on the first occurrence. Assuming the information is timely provided, the Company's action (if any), disciplinary or otherwise, shall be based on consideration of the facts and circumstances involved.

## Reporting Use of Medications

Employees who take over-the-counter or prescribed medication must promptly report to appropriate personnel in the Medical Department the use of medication which they are aware is likely to impair their ability to do their job. An employee who fails to do so is subject to appropriate action (Coaching to Written Reminder), depending on the circumstances.

## Taking Medication Contrary to Instructions

Employees who take over-the-counter or prescribed medication contrary to instructions will be subject to appropriate action, from Written Reminder to Decision-Making Leave, if such action causes an employee to be unfit for duty and such misuse was knowing or intentional.

## Drug or Alcohol Infractions Not Directly Covered by This Policy

This policy is not intended to address all circumstances where involvement with drugs or alcohol warrants disciplinary action. Accordingly, nothing in this policy shall be considered as limiting the Company's right to take administrative action or disciplinary action for involvement with drugs or alcohol not specifically addressed in this policy.

## DEFINITIONS

## Drug or Drugs

For purposes of this policy, the words 'drug' or 'drugs' include, but are not limited to: amphetamines, barbiturates, and other hypnotics, cocaine, narcotics (opiates such as heroin, morphine, codeine and methadone), phencyclidine (PCP), hallucinogens, marijuana, or other substances that alter one's senses or could affect one's ability to function on the job, including medicines for which the employee does not have a proper prescription where one is required by law.

## On Duty

For purposes of this policy, the term 'on duty' means when an employee is on Company property or time. Employees are reminded that if use of drugs or alcohol while not on duty results in a prohibited concentration of such substances being present while on duty, the employee will be subject to disciplinary action as set forth in this policy.

## On Company Property

For purposes of this policy, the term 'on Company property' shall include, but not be limited to: land owned or leased by the Company, work sites in the field, and Company vehicles or equipment, including vans used for commuting to and from work.

## Corroborating Evidence that an Employee Was Unfit for Duty

For purposes of this policy, the term 'corroborating evidence that an employee was unfit for duty' shall include, but not be limited to: observation of an employee acting or appearing in a manner which suggests drug or alcohol use, such as by slurred speech, glassy eyes, unsteady walk, significant or repeated lapses of concentration, emotional outbursts, substantial mood changes, etc.

## Marijuana in System

For purposes of this policy, employees will be found to have marijuana in their system if metabolites of the principal active component of marijuana, delta-9-tetrahydrocannabinol (THC), are detected in their urine or if delta-9-tetrahydrocannabinol itself is detected in their blood.

## Regular Employees During Their First Year of Employment

Notwithstanding any other provision of this policy, employees with less than one (1) full year of continuous service shall be discharged for drugs or alcohol on the first occurrence for failing to act in accordance with the rules and standards set forth in this policy. Employees are reminded that it is a term and condition of their employment that the employee is subject to periodic, unannounced testing during that first year of employment.

## ENSURING COMPLIANCE WITH POLICY

Employees are advised that the Company will take action, consistent with this policy, to detect and deter violations of the rules and standards set forth in this policy. Such actions may include, but are not limited to: conducting searches for drugs or alcohol or Company property (with or without assistance), conducting undercover operations, closely scrutinizing whether employees are fit for duty, and testing employees for drugs or alcohol. We regret having to take such measures but feel they are necessary if we are to achieve our goal: a safe workplace and a healthy and efficient workforce free from the effects of substance abuse.

---

Corporate Personnel Policies
All | Recent Changes

**Drug and Alcohol**                                                         Page 8 of 8

**Employee Benefits Information**
All (Exempt) | Recent Changes (Exempt) | All (Non-Exempt) | Recent Changes (Non-Exempt)

HR Home Page

Exhibit D

# AGREEMENT

This Agreement is between the Potomac Electric Company (hereinafter, "Company"), the International Brotherhood of Electrical Workers (hereinafter, "Union"), Local 1900 and provides as follows:

1.  Effective January 1, 1995, the Company has incorporated the breathalyzer as part of the testing process for the following tests:

    *   Any and All CMV Required Tests as mandated by Department of Transportation (DOT);

    *   When there is a triggering event or a reason to believe drugs or alcohol may have been used;

    *   When an employee is subject to periodic, unannounced testing in the following circumstances:

        a.   During his/her first year of continuous service with the Company;

        b.   When such testing is required under local or federal legislation, regulation or administrative rule;

        c.   During the first two years following any infractions of the drug and alcohol policy that causes an employee to be placed on Decision-Making Leave.

    *   At any other time required under local or federal legislation, regulation or administrative rules.

2.  With the incorporation of the breathalyzer in the above tests the Company and the Union agree to the following for purposes of applying PEPCO's drug and alcohol policy, which will be used for any and all tests when extrapolation is warranted:

    a.   The human body metabolizes "burns off" alcohol at a rate of 0.01 to 0.03g/dL per hour. The Company will use 0.015g/dL per hour for all extrapolations when deemed necessary. When the test is performed one (1) hour or less after an employee has reported to work an extrapolation will not be done.



RECEIVED

DEC 16 1996

INDUSTRIAL RELATIONS

**Extrapolation Agreement**
**December 6, 1996**
**Page 2**

_____          12-11-96
For the Company                               Date

_____          12-11-96
For the Union                                 Date

Exhibit E

DEC. 21. 2004

NO. 4523    P. 4/14

---

POTOMAC ELECTRIC POWER
COMPANY

and

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
LOCAL 1900

AAA No. 16 300 00643 04

President's Grievance
Benjamin F. Ramey

_Appearances_

For the Company

Jill D. Flack, Esq.
David A. Duarte

For the Union

Joseph E. Hawkins
John A. Coleman
Benjamin F. Ramey, Grievant

Arbitrator

Charles Feigenbaum

The parties to this dispute are the Potomac Electric Power Company [Company], and the International Brotherhood of Electrical Workers, Local 1900 [Union]. The Arbitrator was selected under the procedures contained in the parties' collective bargaining agreement. The hearing was held in Washington, D.C., on December 10, 2004.

Both parties were represented and had full opportunity to examine and cross-examine witnesses, to offer evidence, and to set forth their positions. All witnesses were sworn. Both parties made oral closing argument at the hearing. Based on the evidence, the positions argued by the parties, and the observation of witnesses while testifying, I make the following findings and Award.

## ISSUE

The parties stipulated the issue as:

Did the Company have just cause to issue the Grievant Decision Mak-

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 2 of 10

ing Leave? If not, what shall be the remedy?

## RELEVANT GOVERNMENT REGULATIONS AND COMPANY RULES

### I.  U.S. DEPARTMENT OF TRANSPORTATION FEDERAL MOTOR CARRIER SAFETY REGULATIONS

**§40.225  What form is used for an alcohol test?**

(a) The DOT Alcohol Testing Form (ATF) must be used for every DOT alcohol test beginning February 1, 2002. . . .

**§40.227  May employers use the ATF for non-DOT tests, or non-DOT forms for DOT tests?**

(a) No, as an employer, BAT, or STT,[1] you are prohibited from using the ATF for non-DOT alcohol tests. You are also prohibited from using non-DOT forms for DOT alcohol tests. Doing either subjects you to enforcement action under DOT agency regulations.

**§382.307  Reasonable suspicion testing**

(a) An employer shall require a driver to submit to an alcohol test when the employer has reasonable suspicion to believe that the driver has violated the prohibitions of subpart B of this part concerning alcohol. The employer's determination that reasonable suspicion exists to require the driver to undergo an alcohol test must be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the driver.

(c) The required observations for alcohol and/or controlled substances reasonable suspicion testing shall be made by a supervisor or company official who is trained in accordance with §382.603. The person who makes the determination that reasonable suspicion exists to conduct an alcohol test shall not conduct the alcohol test of the driver.

(d)  Alcohol testing is authorized by this section only if the observations required by paragraph (a) of this section are made during, just preceding, or just after the period of the work day that the driver is required to be in compliance with this part. A driver may be directed by the employer to only undergo reasonable suspicion testing while the driver is performing safety-sensitive functions, just before the driver is to perform safety-sensitive functions, or just after the driver has

---

[1] BAT (Breath Alcohol Technician), STT (Screening Test Technician).

ceased performing such functions.

(e)(1) . . . If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

## II.  HUMAN RESOURCES -- CORPORATE PERSONNEL POLICIES -- NO. 80.200  DRUG AND ALCOHOL

## Alcohol Standards

### Fitness For Duty/Alcohol in System

Employees must report to work and while on duty or on Company property must remain in a condition to perform their duties safely and with maximum efficiency.

> An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property. An employee found to have a to have a blood-alcohol concentration of less than 0.05% (or its equivalent) shall be considered in violation of this standard where it can be determined based on accepted medical ranges that the employee had a concentration of 0.05% or more (or its equivalent) while on duty or on Company property. In either of these circumstances, the employee shall be placed on Decision-Making Leave (DML).

## Other Rules

### Testing

Employees will be required to submit to blood, urine, breathalyzer or other diagnostic tests to detect alcohol and/or drugs (or drug metabolites) in their system under any of the following circumstances:

> When there is a triggering event or a reason to believe drugs or alcohol may have been used;

- When such testing is required under local or federal legislation, regulation or administrative rule;

NO. 4523          7/14

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 4 of 10

## BACKGROUND

The Grievant, Benjamin F. Ramey, is employed by the Company as a Conduit Installer A. His work requires him to drive commercial vehicles and he has a Commercial Driver's License (CDL). He is covered by the U.S. Department of Transportation (DOT) Federal Motor Carrier Safety Regulations.

He worked the midnight to noon shift on August 30, 2003. His supervisor was Gregory M. Johnson. Shortly after the Grievant reported for work at the Benning Service Center, he asked Mr. Johnson if he could go off-site and buy cigarettes; Mr. Johnson permitted him to do so. Mr. Johnson testified that he saw nothing unusual about the Grievant at this time.

At or about 2 a.m., Mr. Johnson needed the Grievant to operate a 26,000 pound dump truck. Mr. Johnson asked some of the Grievant's fellow employees to find him and have him report to Mr. Johnson so he could give him the assignment. They could not locate him at first and Mr. Johnson told them to look for him in the parking lot. After a little while, first one employee, and then a second, told Mr. Johnson that the Grievant was in no condition to drive. One of them described him as being "out of it."

The Grievant came into Mr. Johnson's office some 15 minutes later. Mr. Johnson said he smelled of alcohol, his speech was slurred and incoherent, he was unsteady on his feet and his eyes were very bloodshot.

Mr. Johnson concluded that the Grievant was under the influence of alcohol. He called his general manager for instructions and also spoke to other Company officials. Eventually, he spoke with Senior Business Partner David A. Duarte, who told him to bring the Grievant with him and report to Company headquarters at Edison Place. When they arrived, Mr. Duarte and Union steward Loman Dudley were there. They were joined by Human Resources Business Partner Negussie B. Birratu at about 5 to 5:30 a.m. Both Mr. Duarte and Mr. Birratu have Labor Relations responsibilities.

PEPCO/IBEW 1900
AAA 16 300 00643  04 (Benjamin Ramey)
Page 5 of 10

Mr. Duarte stated that it was about 3:30 to 4 a.m. when the Grievant and Mr. Johnson arrived at Edison Place. He spoke with the Grievant at this time and said there was a very strong odor of alcohol about him. He had trouble maintaining his balance, his speech was slurred and his eyes "were very, very bloodshot." He asked the Grievant if he had been drinking and said that the Grievant told him that he had had "a couple of beers" before coming to work. Mr. Johnson corroborated that the Grievant made this statement. Mr. Duarte decided that there were grounds for reasonable suspicion that the Grievant had been drinking and that testing was appropriate.

Mr. Birratu testified that he considered the Grievant to be under the influence of alcohol based on his observation of his unsteady gait, slurred speech and very bloodshot eyes. He, Mr. Duarte and Mr. Johnson, all testified that they had been trained in alcohol and controlled substance use as specified in DOT regulation §382.603.

Mr. Duarte attempted to contact the Company's on-duty tester so that the Grievant could be tested. There was no response. He tried some three or four times without success. He called a Benefits Department supervisor and said there was need to make some alternative arrangement for testing. She told him she would make calls and get back to him, which she did about an hour later. She gave him a location in Northern Virginia where she said the testing could be conducted. Mr. Duarte then arranged for Mr. Birratu, Mr. Johnson, Mr. Dudley and the Grievant to drive from Edison Place to that location. By this time it was about 6 a.m.

The trip was one misadventure after another. First, the men got lost. Then, when they arrived, it was at the wrong location. They had gone to Inova Hospital; it did not administer tests. They were told they should have gone to its clinic, a satellite facility. There were administrative problems at the clinic and no testing was done there. All of this took some hours, during which time they kept in telephone contact with Mr. Duarte. It was decided that they

PEPCO/IBEW 1900
AAA 16 300 00643  04 (Benjamin Ramey)
Page 6 of 10

would all meet at Edison Place and the men drove back there.

When it was evident that the trip to Northern Virginia had been unsuccess-
ful, the benefits supervisor attempted to arrange for someone to come to Edi-
son Place to test the Grievant there. She was able to get Thomas Hyde, a self-
employed certified Drug Screen Collector and Breath Alcohol Technician. He
arrived at Edison Place at about 10 a.m. It took some time before he was
ready to administer the tests. There was a problem with getting the correct
forms and he did not begin testing until after 11 a.m.

The Company's original intention had been to have the Grievant tested under
the DOT rules. However, it was now more than eight hours since Mr. John-
son and Mr. Duarte had reached their "reasonable suspicion" conclusions. Mr.
Hyde stated, as the others were already aware, that it was now too late for
application of DOT testing. Based on Corporate Personnel Policy No. 80.200,
Mr. Duarte told Mr. Hyde to give the Grievant non-DOT tests.[2]

Mr. Hyde tested the Grievant twice. The first Breathalyzer result was
0.070%. This was at 11:09 a.m. He did a confirmatory test at 11:32 a.m., with
a score of 0.065%. The Grievant was issued Decision-Making Leave (DML)
based on the 0.065% Breathalyzer result. DML is the disciplinary step one
level below termination. It is required by Policy No. 80.200 when an employee
has a concentration of 0.050% or more while on duty or Company property.

At the hearing, the Grievant vigorously denied that he had been drinking be-
fore coming to work or that he had said anything about having a couple of
beers. He also stated he had not had anything to drink while on his shift. Mr.
Dudley testified that he did not see signs of alcohol impairment and said that
a doctor at the clinic had told him that the Grievant didn't look drunk to him.

Both the Grievant and Mr. Dudley said that the Grievant had not been al-

---

[2] Mr. Hyde tested the Grievant for both drugs (urine test) and alcohol (Breathalyzer). How-
ever, because the discipline given him was based solely on the results of the Breathalyzer
test there is no need for further mention of the drug test.

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 7 of 10

lowed to go to the bathroom while at Edison Place before going to Virginia.
Mr. Dudley said he was allowed to go at the second location only after Mr.
Dudley protested when Mr. Birratu refused the Grievant's request. The
Grievant said he was never *allowed* to go. He took it upon himself to do so in
Virginia when he felt he could no longer hold himself in. He also said Mr.
Duarte had shouted "Shut up" at him when he made a second request at Edi-
son Place.

Mr. Duarte denied having told the Grievant to shut up, but agreed that he
had not allowed him to visit the bathroom at Edison Place when he first re-
quested to do so. That was when he was still hoping that they could reach the
on-duty tester and have DOT tests performed. He reasoned that allowing the
Grievant to relieve himself at the time might result in a lengthy wait for him
to provide another urine sample when the tester arrived. He said, however,
that once it was apparent that the tester was not coming, the Grievant was
permitted to go to the bathroom. Mr. Birratu stated that the Grievant had
gone to the bathroom twice; once at Edison Place and then at the second Vir-
ginia location.

Mr. Dudley testified that Mr. Hyde told the group that he did not have the
correct forms and it would be illegal to administer the test under the circum-
stances. Then, after Mr. Hyde and Mr. Duarte met separately, Mr. Hyde pro-
ceeded to conduct the test. When Mr. Dudley questioned him about this, Mr.
Hyde reiterated that this was illegal, but said he was going to do it anyway.
The Grievant testified that after Mr. Hyde stated there was a problem, Mr.
Duarte motioned for him to follow him and they went into a separate room
and closed the door. They came out after about five minutes and he was told
to take the Breathalyzer test.

Both Mr. Duarte and Mr. Hyde denied any separate meeting. Mr. Hyde also
denied having said that testing would be illegal. He testified that the testing
had been legally performed. He stated that the DOT regulations recognize

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 8 of 10

that non-DOT testing can be done so long as non-DOT forms are used.

## DISCUSSION AND FINDINGS

There are two key questions here. The first is, was the testing of the Grievant improper, making the results of the Breathalyzer null and void? In the event that the testing was not improper, the second question is, was he in violation of Corporate Personnel Policy No. 80.200? The answers to these questions are "No" and "Yes." That is, there was nothing improper in the administration of the Breathalyzer test, and the Grievant was in violation of Corporate Personnel Policy No. 80.200. For that reason, there was just cause for the DML.

The Company stipulated at the hearing that more than eight hours had elapsed between the time when Mr. Duarte and Mr. Johnson reached their "reasonable suspicion" conclusions and when the Grievant was given the Breathalyzer test. Because of this, a DOT alcohol test could not be administered, see §382.307(e)(1).

The Union concludes from this that this provision made it impermissible to test the Grievant for alcohol concentration. Period. It argues that once the eight hours had passed, he should not have been tested and the test result is null and void. The record does not support this reasoning.

The DOT regulations specify the circumstances under which DOT alcohol testing is to be done. Nothing that has been brought to my attention indicates that if the requirements for DOT testing are not met, other, non-DOT alcohol testing, is also prohibited.

It is true that the last sentence of §382.307(e)(1) states:

> If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

However, the context makes it plain that the mandate to employers to cease

PEPCO/IBEW 1900
AAA 16 300 00643  04 (Benjamin Ramey)
Page 9 of 10

attempts to administer an alcohol test after eight hours applies *to a DOT alcohol test*. The regulations, §40.227(a), recognize that an employer may administer a non-DOT test. The only prohibition in this regard is that the DOT alcohol testing form (ATF) may not be used for a non-DOT alcohol test. Conversely, a non-DOT form may not be used for a DOT alcohol test.

The Grievant was given a non-DOT alcohol test and Mr. Hyde used a non-DOT form. I find, therefore, that there was nothing illegal about conducting the Breathalyzer test as Mr. Hyde did and I credit his testimony that he never said that it was.

Corporate Personnel Policy No. 80.200 furnishes authority, separate from the DOT regulations, for conducting "reasonable suspicion" alcohol tests. It does not contain time limits.

There was a valid basis for the Company to require the Grievant to undergo "reasonable suspicion" alcohol testing under this policy. Mr. Duarte, Mr. Johnson and Mr. Birratu all testified credibly that they observed that the Grievant's speech was slurred, his eyes were very bloodshot and he was unsteady on his feet. These were observations any layman could make. In addition, all three had received training under §382.603.

Mr. Hyde testified credibly about the manner in which he administered the test and the calibrations he made. I find that the test was accurate and that, at 11:32 a.m. on August 30, 2003, the Grievant had an alcohol concentration of 0.065%. That being the case, the discipline of DML was required under Policy No. 80.200.

Finally, there is disputed testimony about whether Mr. Duarte shouted "Shut up" at the Grievant and the degree to which the Company barred him from going to the bathroom to relieve himself. I make no finding about these matters because, even if the testimonies of the Grievant and Mr. Dudley on these points are fully credited, the Company's alleged actions would not warrant

EC. 21. 2004                                   NO. 4523     13/14

PEPCO/IBEW 1900
AAA 16 300 00643 04 (Benjamin Ramey)
Page 10 of 10

overturning the DML in these circumstances. The overwhelming evidence in this case is that the Grievant was under the influence of alcohol while on duty and on Company property.

## **AWARD**

This grievance is denied.

_____
Charles Feigenbaum

December 14, 2004
Date

Exhibit F

In the Matter of the Arbitration )

Between )

POTOMAC ELECTRIC POWER )
COMPANY )

and )

LOCAL UNION NO. 1900, )
INTERNATIONAL BROTHERHOOD )
OF ELECTRICAL WORKERS )

AAA No. 16 300 E 00137 05
Grievant: Benjamin F. Ramey
Issue: Termination

Post-it® Fax Note 7671  Date 7-19-05  pages 15
To ANGELA BARL   From JEROME ROSS
Co./Dept.   Co.
Phone #   Phone #

Before:

Jerome H. Ross, Arbitrator

Date of Hearing:

July 11, 2005

Appearances

For the Company:

Jill D. Flack, Esq.

For the Union:

Joseph E. Hawkins

Statement of the Case

In this grievance, dated November 4, 2004, the Union protests the termination of Benjamin F. Ramey, a Conduit Installer A, with a seniority date of October 7, 1991. As a remedy, the Union requests that the grievant be reinstated and made whole for all lost wages and benefits.

In the early morning hours of August 30, 2003, the grievant's supervisor on the midnight shift informed Dave Duarte, a Sr. Business Partner in human resources, that the grievant appeared under the influence of alcohol or drugs. Duarte determined to have the grievant tested for drugs and alcohol under the U.S. Department of Transportation (DOT)

2

regulations.  The grievant's job duties involve the operation of commercial motor vehicles in excess of 26,000 pounds, and he is required to hold a commercial drivers licence (CDL).  Due to the holiday weekend and a storm, difficulties were encountered in arranging for the tests.  When the tests were finally administered, the grievant tested positive with a blood-alcohol concentration (BAC) of 0.065.  The Company's Drug and Alcohol Policy states:

> *An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more...while on duty or on Company property.  In...these circumstances the employee shall be placed on Decision-Making Leave (DML).

On September 10, 2003, after retesting negative and determined to be drug-free, the grievant was returned to work with no driving duties.  An appointment was made for him to discuss entry into a rehabilitation program with the Corporate Nurse, Stacy Saucier.

On September 15, 2003, the grievant met with Russ Wade, a licensed psychiatric social worker, who serves as a substance abuse professional for the Company and other companies in the Washington, D.C. metropolitan area.  Wade is referred through a managed care company, Value Options, which provides employee assistance program services to employers.  Wade's role is to meet with an individual to assess and match up the person with an appropriate treatment or educational facility.  After two-to-four weeks in a treatment or educational program, Wade again sees the person to ensure that he or she is "doing what they are supposed to do."  He sees the person a third time after the program has ended to ensure satisfactory completion of its requirements.  During the course of the program, Value Options is in touch with the program provider and alerts Wade if a person does not complete the program.

3

By letter dated September 15, 2003, Wade informed Saucier that he had evaluated the grievant in accordance with the DOT Substance Abuse Guidelines after the grievant's violation of DOT rules with a positive substance abuse screen on August 30, 2003. Wade recommended enrollment at the Kolmac Clinic in an intensive outpatient alcoholism treatment program.[1]

In a memorandum dated September 30, 2003, and titled Decision-Making Leave, Bill Sigafoose, then the Division Manager for Underground Maintenance and Construction, confirmed for the grievant the events that led up to placement on the DML on September 10, 2003.[2] The memorandum further states:

> ...While you are on DML, the final level of Positive Discipline, it is necessary for you to maintain your total job performance at a fully acceptable level in every area, since any further problem in the next eighteen (18) months in any performance category (work performance, conduct and safety, or attendance) that require disciplinary action, will result in your discharge.

>      ■       ●       ♦

> You are also being placed on drug and alcohol probation for a period of three (3) years and shall be subjected to random drug and alcohol testing during the first two (2) years of the probation period. This testing is in addition to the CMV Drug Testing of Policy 10.00. If you fail to meet any of the provisions set forth during the probationary period, you will be discharged.
> You must meet and consult with the Corporate Nurse as to an appropriate rehabilitation program. You must make a good faith and successful effort to complete any recommended rehabilitation program, including counseling. If you fail to attend, participate in or complete rehabilitation activities which are required by the health care professionals to whom you are referred, you shall be discharged.

---

[1] DOT regulations and Company policy require enrollment in a rehabilitation program before an employee who has violated DOT rules is allowed to drive a commercial motor vehicle.

[2] An arbitration award, dated December 14, 2003, denied the Union's grievance protesting the issuance of the DML in connection with the incident on August 30, 2003.

4

Although the grievant continued to report to work and perform duties that did not involve the operation of commercial motor vehicles, he did not contact Kolmac. After Duarte and Saucier learned that the grievant had not enrolled in the program, Saucier sent the grievant a memorandum, dated October 8, 2003, stating:

> In response to recent information regarding your recommended treatment program, Pepco has been informed that you have refused to schedule and [sic] appointment at the KOLMAC.
> At this time, you are required to schedule and [sic] appointment with the KOLMAC program that has been recommended to you by Mr. Russ Wade. Once you have scheduled an appointment, you are to call me to give me the date and time of the appointment.
> Once you have attended the first appointment you are also required to call to notify me that you have attended the appointment and provide the dates of subsequent schedule of sessions in the KOLMAC program....
> Upon receipt of this requested information, I will notify the Compliance department and they will be in contact with you regarding return to work.

On October 13, 2003, the grievant tested negative on a urine drug screen, as reported on October 16, 2003, in connection with entry into the Kolmac program. Kolmac's intake sheet for the grievant, which appears to have been completed by a Kolmac interviewer, states under "Reason for seeking treatment at this time": "Pt took breathalyzer 12 hours after admitting to employer that he had been drinking....Referred here by employer (PEPCO)." The sheet further states under "Problems and stresses including work": "Work Went to work drunk – EAP Stacey Saucier – Cannot return to work until completes Program. Denies all other stressors. Denies he is alcoholic." The grievant's Kolmac medical file notes indicate that he began taking antabuse in conjuction with his treatment.

While continuing to work and perform non-DOT related duties, the grievant attended all scheduled evening sessions at Kolmac during the two-week of period October 13-27, 2003 (excluding Saturday and Sunday), after which he was discharged

5

from the program. The Session Notes, which are completed by the Kolmac counselor at each session, indicate that the grievant reported having been abstinent on all dates except before the October 20 and 27 sessions. The counselors' narrative notes for each session, which are not totally legible, state:

> October 13 – introduced [illegible] himself to the group
> October 14 – not clear of necessity of [illegible]
> October 15 – doesn't see himself as a recovering alcoholic[.] Hopes to take advantage of the treatment.
> October 16 – hasn't admitted his alcoholism yet, probably [because] hasn't had typical withdrawal symptoms – any [illegible] these sessions interfere with his routines
> October 20 – relapsed over weekend; doesn't see himself as "alcoholic"
> October 21 – different outlook than before – more energized with abstinence & likes the feeling – has some alcohol in the house but doesn't bother him [-] usually drank on weekends – so far so good
> October 22 – admits he is a "recovering alcoholic" – last weekend didn't drink & it was OK
> October 23 – doing alright. Evenings are full around home
> October 27 – drank on feelings of reacting to others.

On October 28, 2003, at about 1:00 a.m., the grievant went to the emergency room at Howard University Hospital, where he was diagnosed with high blood pressure and referred to his personal physician who, it appears, in turn referred him to a psychiatrist. The grievant called in to report off work and was on sick pay until the end of April 2004, after which he filed for workers compensation.

By letter dated November 10, 2003, Wade informed Saucier that the grievant was discharged from the Kolmac treatment program as of October 27, 2003. The letter further states that "Rhonda of Value Options in Texas" told Wade that she had received the copy of the termination letter, and the grievant was terminated for having a positive breathalizer reading while in attendance.

6

On March 4, 2004, the grievant was examined by Dr. Schulman, an occupational

psychiatrist, after referral by Colonial Health, the Company's health care administrator,

for an independent medical evaluation. Dr. Schulman's 11-page report, dated March 12,

2004, concludes with the following recommendations:

> A. Mr. Ramey is close to, but not quite yet at. [sic] maximum
> medical improvement (MMI). I recommend that he remain compliant
> with the treating psychiatrist's medical recommendations.
> B. In all medical likelihood, Mr. Ramey should recover without a
> residual impairment. I advise that he consult again with his treating
> psychiatrist, follow the doctor's recommendations for treatment, and then
> be released to return to work effective within the next two weeks.
> C. Finally, Mr. Ramey has had a long history of addiction. His
> recent violation of the company's drug and alcohol policy indicates that
> Mr. Ramey does require alcohol rehabilitation treatment as a condition of
> his return to work. I recommend he resume appropriate treatment.

By memorandum dated July 16, 2004, Sigafoose directed the grievant to report to

a Continued Employment Meeting on July 22, 2004. The memorandum states:

> On September 30, 2003, you were issued a Decision Making Leave
> (DML) for violating the Company's Drug and Alcohol Policy. At that
> time you were informed that you must enter into and successfully
> complete an approved rehabilitation program. You were also informed
> that failure to do so would result in your termination from the Company.
> This requirement was further documented in my memorandum to you of
> September 30.
> On November 10, 2003, the Company was notified that you had
> been discharged from the approved rehabilitation program that you had
> entered. You were terminated from the program for having a positive
> Breathalizer reading while in attendance. This was a program violation.
> As a result of the above incident, you have not fulfilled your
> obligation to successfully complete an approved rehabilitation program as
> required by your DML agreement, consequently, it appears discharge is
> warranted.

At the Continued Employment Meeting on July 22, 2004, John Coleman, the

Union President, produced the document dated October 16, 2003, which reflects the

grievant's negative test results for drugs. Duarte pointed out that the test was not for

7

alcohol. Coleman replied that it was the only test administered to the grievant while he was in the Kolmac program. The meeting was adjourned pending further investigation regarding the grievant's testing and documented results while in the program.

Duarte called Value Options and learned that people in rehab programs are tested frequently by breathalizer for alcohol, but the test results are not disclosed to employers or outsiders, because participants occasionally "fall off the wagon" and records are not kept. Value Options sent Duarte a copy of the grievant's Kolmac Clinic Discharge Summary, dated November 6, 2003, which states:

> **Significant Findings:** The patient had a 12 year history of pathological use of alcohol. Manifestations of this included:
> *Reduced internal control over use
> *Abnormally high tolerance
> *Continued use despite adverse consequences (continued drinking despite job suspension)
> **Course of Treatment:**
> **Detoxification and Medication:** Detoxification was not required. Antabuse was administered on a daily basis. No other medications were prescribed.
> **Rehabilitation Phase:** Attempts to stabilize the patient were unsuccessful because of repeated relapses.
> **Continuing Care Phase:** The patient did not enter this phase of the treatment program.
> **Discharge Description:** Did Not Complete Rehabilitation: Staff Initiated. The patient continued to deny an alcohol problem, did not feel that he needed treatment, and continued drinking alcohol.

By memorandum of November 8, 2004, Sigafoose informed the grievant that his employment was terminated. The memorandum states in part:

> Subsequent to the [Continued Employment] meeting the Company contacted Kolmac Clinic regarding your performance in the rehabilitation program. The clinic stated that you did not complete the Rehabilitation Phase due to repeated relapses. Consequently, you did not enter the Continuing Care Phase of the program. Further, they indicated that you continued to deny an alcohol problem, that you did not feel you needed treatment, and that you continued to drink alcohol. Consequently, it was

8

determined that you could not be successfully treated under the program at that time and your participation was terminated.

As you are aware, one of the conditions of the DML that was issued to you on September 30, 2003, is that you must enter into and successfully complete an approved rehabilitation program for drugs and alcohol. Additionally, failure to do so would result in your termination from the Company. As indicated above, you did not complete the program at Kolmac Clinic. Consequently, you have failed to meet your obligation to the Company as agreed to as a part of the DML.

On January 6, 2005, a Step Two meeting was held to discuss the instant grievance. Coleman produced a letter, dated July 27, 2004, from Kolmac Clinic to an investigator in the D.C. Defender Services Office, stating that the grievant "was given a random urinalysis on October 13, 2003. The results were negative." During the meeting, Coleman emphasized that the letter does not indicate the grievant's failure to pass a breathalizer test, as asserted in several other documents.

### Issue

Whether the grievant was discharged for just cause; and if not, what is the appropriate remedy?

### Company Position

The Company asserts that the grievant's testimony was incredible with regard to drinking one beer prior to reporting to work on August 30, especially because he tested positive at a BAC of 0.065 and admitted to heavier drinking in interviews with Kolmac, Dr. Schulman and Duarte. It further maintains that the grievant refused to enroll in the Kolmac Clinic, and he never contacted Wade. In this regard, it points out, the choice of a rehab program was Wade's. not the grievant's. The Company submits that the Union's

9

reliance on the grievant's October 13 urinalysis test results for entry into the Kolmac program means little, given that he did not successfully complete the program. Further, it contends, the grievant's testimony that he never admitted to being an alcoholic and did not drink while in the program is contrary to the Kolmac records, Wade's understanding and Dr. Schulman's report. The Company emphasizes that the grievant understood the DML terms concerning successful completion of the program to avoid termination of employment. Moreover, it notes, his job duties required a CDL in the operation of commercial motor vehicles. It points out that although initially there was confusion concerning the reasons for the grievant's discharge from the program, the Discharge Summary, which management later received, establishes the reason as his noncompliance with the program's requirements. The Company points to the grievant's contradictory testimony that he had determined to leave the program anyway when Kolmac coincidently had issued the termination action, yet he would have completed the program. It says that management gave the grievant numerous chances to enter and successfully complete a program. The Company observes that, notwithstanding the DML's clear admonition that further infractions within the next 18 months would result in termination, he violated the requirement to attend and successfully complete the Kolmac treatment program.

## Union Position

The Union contends that the grievant was attempting to complete his rehabilitation prior to his termination on October 27. It labels as coincidental his hospital visit on October 28, after which, it notes, he remained on sick pay under a doctor's care

10

through April 2004. Moreover, it says, Dr. Schulman released him to return to work. The Union emphasizes that Wade's letter to Saucier and the notice of Continued Employment Meeting dated July 16, 2004, are totally wrong in citing a positive breathalizer test as the reason for the grievant's discharge from the Kolmac program. The Union observes that management waited nine months after the grievant's discharge from the program to issue the Continued Employment Meeting letter, and then management waited another four months after that meeting to issue the termination letter -- totaling more than one year from the grievant's discharge from the program. During that period, it submits, Duarte learned of the information in Kolmac's letter to the D.C. Defender Services Office, stating that the grievant had no positive tests while in the program. The Union maintains that the Session Notes are contrary to the reasons for discharge that are given in the Discharge Summary and the Company's termination memorandum, because the notes reflect only one relapse, midway through his participation, and contain several positive comments concerning his progress. Additionally, it observes, a Kolmac counselor initially determined that his history was not so serious as to require detoxification. It rhetorically questions how the grievant could have relapsed in light of his testimony that he had stopped drinking prior to entering the program and absent a positive alcohol or drug test. For these reasons, the Union argues, the grievant was erroneously terminated from the program and never given an opportunity to complete rehabilitation. It concludes that had management fully investigated the matter and found these inconsistencies, the termination memorandum would not have been issued.

11

### Discussion and Findings

I find the grievant's testimony to have been inconsistent and generally incredible in the face of strong contradictory evidence. The grievant testified to having had "maybe a beer" at about 6:00 p.m. before reporting to work at 11:00 p.m., yet he tested positive with a BAC level of 0.065 on the morning of August 30, 2003, and Wade testified that he reported drinking after 7:00 p.m., and Dr. Schulman's report states: "Mr. Ramey acknowledged that he had been drinking prior to coming to work, in violation of company policy." The grievant testified that he waited several weeks for Wade to receive documents from the Company after the meeting on September 15, 2003, yet Wade testified that he expected the grievant to contact Kolmac after the meeting. The grievant testified that he drank one beer one time while in the Kolmac program before the October 20 session, yet the Session Notes for October 20 and 27 respectively state, obviously based on his self-reporting, that he "relapsed over weekend" and "drank on feelings of reacting to others." The grievant testified that he denied being a "recovering alcoholic" and said he was an "assumed alcoholic" in the Kolmac sessions, yet the Session Notes for October 21 – 23 reflect otherwise. The grievant's testimony that he refused management's offers to return to work after discharge from Kolmac because he didn't need the treatment program is supported by Dr. Schulman's report,[3] yet he testified that on October 27 his intent was to complete the rehab program.

---

[3] Dr. Schulman's report states, under a section titled "History of his Subsequent Alcohol Rehabilitation Treatment":

On October 20, 2003, Mr. Ramey began treatment at the Kolmac Clinic. Meanwhile, he was continuing to work during the day. He attended the program from 5:30 p.m. to 8:30 p.m. Although he felt that he did not have a problem with alcohol, he initially agreed to attend the program.

It was Mr. Ramey's contention, however, that he had to "get out of the program." On October 24, 2003, he advised program personnel that he had had a beer,

12

I further find that the assertions of the grievant and the Union mischaracterize the information contained in Kolmac's letter of July 27, 2004, to the D.C. Defender Services investigator. The letter states that "Mr. Ramey was given a random urinalysis on October 13, 2003." It does not address the frequency of breathalizer tests or other tests for alcohol. Accordingly, there is no basis for the assertion made in the Continued Employment Meeting held on July 22, 2004, five days before the date on the Kolmac letter, that the grievant had tested negative on all tests administered to him at Kolmac. In this regard, based on the inconsistencies and contradictions with other evidence in the grievant's testimony concerning other factual questions, I have not credited his testimony that he took one breathalizer test early in the program. Indeed, the grievant's inconsistent testimony reaches to this question, given his acknowledgement that in the Step Two meeting he "might have said" he'd taken a breathalizer test at every session. Finally, I find no evidentiary basis for the Union's assertion that Duarte knew the contents of the July 27 letter prior to the termination memorandum of November 8, 2004. In this regard, I find credible Duarte's hearsay testimony, based on a Value Options representative's statements to him during his inquiry following the Continued Employment Meeting on July 22, 2004, that in the interest of patient rehabilitation, the test results for group session participants are not disclosed or retained.

I also find of little moment the facts that Wade's letter and the notice of the Continued Employment Meeting wrongly cite a positive breathalizer test as the reason for

---

although when he began the program, he had been placed on Antabuse, a drug that interferes with the metabolism of alcohol, producing a rather adverse physiological response to drinking.

When Mr. Ramey returned to the program, on October 27, 2003, he was discharged because of noncompliance. It was his contention that drug addicts were allowed to continue in the program after they had experienced relapses. He felt that his dismissal was discriminatory.

13

the grievant's discharge from the treatment program. The Company's termination action ultimately was based upon the reasons contained in the Summary Discharge, dated November 6, 2003, and received by Duarte after July 22, 2004. The Union has not argued that it did not have a fair opportunity to defend the grievant against the actual grounds for the termination of his employment.

I find unconvincing the Union's assertion that the Session Notes are contrary to the reasons for discharge in the Discharge Summary and the Company's termination memorandum. Even the grievant has admitted his continuing denial, during the sessions, of an alcohol problem. Absent any expert testimony to support the Union's assertion, I shall not review determinations ultimately made, as Wade testified, by Kolmac medical staff in consultation with the counseling staff regarding an individual's continued participation in treatment sessions. My rendering of arbitral findings on medical questions based upon the brief Session Notes written by different counselors would not be appropriate.

In the same vein, I find unpersuasive the Union's contention that if management had conducted a thorough investigation, it would have uncovered the inconsistencies resulting in the grievant's erroneous discharge from the program. The original incorrect reason for the action stemmed from administrative error in the part of Value Options or Kolmac. As Duarte testified, the Company relies upon those organizations for the management of its employee assistance program and related operations.

The final question is whether the delays in issuing disciplinary action after Wade's notification to management of the grievant's discharge from the program violate notions of fairness or industrial due process. The Continued Employment Meeting

14

memorandum was issued nine months after the Kolmac discharge and four months after Dr. Schulman's report. The termination memorandum was issued almost four months after the Continued Employment Meeting.

The lengthy delay can be attributed to both management and the grievant. After discharge from the program, the grievant was on sick pay until the end of April 2004. During this period and before the DML arbitration award issued in mid-December 2003, management, the Union and the grievant were discussing settlement of the dispute. Also, the grievant, represented by private counsel, and management unsuccessfully attempted to resolve the dispute in mediation. Duarte testified without contradiction that he had called the Union over a period of time regarding two different Company offers of reinstatement which, the Union said, the grievant was still discussing. It appears that the parties' impasse concerned the implementation of Dr. Schulman's finding that the grievant "does require alcohol rehabilitation treatment as a condition of his return to work" and the recommendation that "he resume appropriate treatment."

Even assuming that the settlement discussions continued through April 30, 2004, while the grievant was out on sick pay, management took no action until July 16, 2004, when the Continued Employment Meeting memorandum was issued. Shortly after the meeting was adjourned on July 22, 2004, Duarte received a copy of the Discharge Summary, presumably before the end of July 2004. The record contains no specific explanation for management's delay of more than three months in issuing the termination memorandum.

Absent a specific showing, or even an argument, that the delays in implementing the discipline prejudiced the grievant in his defense, I find no basis for overturning the

15

termination on procedural grounds. The grievant understood the DML's terms and conditions regarding entry into and successful completion of a treatment program. Restoration of his CDL following completion of the program was required for the performance of his job duties. He failed to meet these requirements after discharge from the Kolmac treatment program. Accordingly, the termination of his employment must stand.

### AWARD

The grievance is denied.

_____
Jerome H. Ross, Arbitrator

July 18, 2005
McLean, Virginia

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Benjamin Ramey | Potomac Electric Power Company |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Washington, DC | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Delaware |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| | Connie N. Bertram<br>Winston & Strawn LLP<br>1700 K Street, NW<br>Washington, DC 20006 |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)*    OR    ○ F. *Pro Se General Civil* | | | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☒ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding   ◉ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

29 U.S.C. Section 185 (Breach of Collective Bargaining Agreement)

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** ⌐ 3,000,000 ¬    Check YES only if demanded in complaint    **JURY DEMAND:**    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

**DATE** 11/26/07    **SIGNATURE OF ATTORNEY OF RECORD** *(signature)*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

CLERK-S OFFICE

CO-932

UNITED STATES DISTRICT COURT

Rev. 4/96

FOR THE DISTRICT OF COLUMBIA

### NOTICE OF DESIGNATION OF RELATED CIVIL CASES PENDING
### IN THIS OR ANY OTHER UNITED STATES COURT

Civil Action No. _____
(To be supplied by the Clerk)

**NOTICE TO PARTIES:**

Pursuant to Rule 40.5(b)(2), you are required to prepare and submit this form at the time of filing any civil action which is related to any pending cases or which involves the same parties and relates to the same subject matter of any dismissed related cases. This form must be prepared in sufficient quantity to provide one copy for the Clerk-s records, one copy for the Judge to whom the cases is assigned and one copy  for each defendant, so that you must prepare 3 copies for a one defendant case, 4 copies for a two defendant case, etc.

**NOTICE TO DEFENDANT:**

Rule 405(b)(2) of this Court requires that you serve upon the plaintiff and file with your first responsive pleading or motion any objection you have to the related case designation.

**NOTICE TO ALL COUNSEL**

Rule 405(b)(3) of this Court requires that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify, in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

_____

The plaintiff , defendant or counsel must  complete the following:

I.    RELATIONSHIP OF NEW CASE TO PENDING RELATED CASE(S).

A new case is deemed related to a case pending in this or another U.S. Court if the new case:  [Check appropriate box(e-s) below.]

| | | |
|---|---|---|
| ☐ | (a) | relates to common property |
| ☒ | (b) | involves common issues of fact |
| ☒ | (c) | grows out of the same event or transaction |
| ☐ | (d) | involves the validity or infringement of the same patent |
| ☒ | (e) | is filed by the same pro se litigant |

2.    RELATIONSHIP OF NEW CASE TO DISMISSED RELATED CASE(ES)

A new case is deemed related to a case dismissed, with or without prejudice, in this or any other U.S. Court, if the new case involves the <u>same</u> parties and <u>same</u> subject matter.

Check box if new case is related to a dismissed case:   ☒

3.    NAME THE UNITED STATES COURT IN WHICH THE RELATED CASE IS FILED (IF OTHER THAN THIS COURT):

**U.S. District Court for the District of Columbia (assigned to Judge Leon)**

4.    CAPTION AND CASE NUMBER OF RELATED CASE(E-S).  IF MORE ROOM IS NEED PLEASE USE OTHER SIDE.

**Benjamin Ramey**                          **Potomac Electric Power Company, et al.**    C.A. No.  **04CV2088**

**11/26/07**
DATE                          Signature of Plaintiff /Defendant (or counsel)