## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-2132 (RJL) |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant Potomac Electric Power Company ("Pepco") hereby moves for the entry of an Order

dismissing Plaintiff's Complaint in its entirety.  In support of its Motion, Pepco respectfully

refers the Court to the attached Memorandum.


Respectfully submitted,


_____/s/_____
Connie N. Bertram (Bar No. 435840)
Winston & Strawn LLP
1700 K St., NW
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 (fax)


Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)


Counsel for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-2132 (RJL) |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendant Potomac Electric Power Company ("Pepco") submits its Memorandum in Support of

its Motion to Dismiss Plaintiff's Complaint.

**I.    <u>INTRODUCTION AND SUMMARY</u>**

In his Complaint, Plaintiff asserts a single claim for "Wrongful Termination" against his

former employer, Pepco.  Plaintiff alleges that on September 1, 2003, his manager accused him

of being intoxicated and required him to take a breathalyzer test.  Comp. ¶¶ 1-2.  He further

alleges that, because the test results indicated that his blood-alcohol level was 0.065, Pepco

required Plaintiff to enroll in an alcohol treatment program.  <u>Id.</u> at ¶ 3.  Plaintiff also alleges that

he was discharged from the program because he "had taken sick" because of the alcohol testing

and placement in the program.  <u>Id.</u> ¶¶ 2-3.  Plaintiff alleges that he was wrongfully terminated for

"being accused of being intoxicated."  <u>Id.</u> at ¶¶ 4-8.  Plaintiff seeks compensatory and punitive

damages for his alleged wrongful termination.  <u>Id.</u> at 2.

This is the eighth separate lawsuit or proceeding that Plaintiff has filed against Pepco

challenging his breathalyzer testing and Pepco's decision to discipline and termination him.

Pursuant to the collective bargaining agreement ("CBA") between Plaintiff's union and Pepco,

Plaintiff filed two grievances – the first challenging his "decision making leave" ("DML") and the second challenging his termination. Both of these grievances were denied by Pepco and the arbitrators, who found that Pepco lawfully and validly tested, disciplined and terminated Plaintiff.

Dissatisfied with the rulings against him, Plaintiff filed negligence and intentional infliction of emotional distress claims in this Court challenging his testing, discipline and termination. See Ex. 1 at ¶¶ 33-44. In its March 31, 2006 decision, this Court dismissed each of Plaintiff's claims and granted summary judgment in Pepco's favor. The Court held that Plaintiff's common law tort claims were barred by the D.C. Worker's Compensation Act ("WCA"). Ramey v. Potomac Elec. Power Co., 468 F. Supp. 2d 51 (D.D.C. 2006) (Leon, J.) ("Ramey I"). On the issue of WCA exclusivity, the Court held in its ruling on summary judgment that

> Plaintiff's common law claims are preempted by the District of Columbia Worker's Compensation Act, D.C. Code §§ 32-1504(a). Courts have consistently found that the common law claims brought by the plaintiff are the type of claims for which the Worker's Compensation Act is designed to be the exclusive remedy. Because the D.C. Worker's Compensation Act is the exclusive remedy for the common law claims brought by the plaintiff, these claims are dismissed.

Id. at 55-56. This ruling was summarily affirmed on appeal on December 18, 2006. See Ex. 2.[1]

In his most recent lawsuit, Plaintiff asserts a single common law tort claim for wrongful discharge. As explained in detail below, even if the allegations of Plaintiff's Complaint are taken as true for purposes of this motion, Plaintiff also cannot sustain this claim against Pepco for three distinct reasons. First, as with the claims asserted in Ramey I, Plaintiff's tort claim for wrongful discharge is barred by the WCA. Second, Plaintiff's claim is preempted by section 301 of the

---

[1] In addition to these proceedings, Plaintiff also filed a counterclaim and two additional lawsuits against Pepco in the Superior Court asserting additional tort claims, and workers' compensation and unemployment compensation claims. Each of these claims was also dismissed or denied.

Labor Management Relations Act because it is founded upon and requires interpretation of the CBA between Pepco and Plaintiff's union.  <u>Third</u>, even if Plaintiff's claim is not precluded by the WCA and preempted by section 301, it must be dismissed because Plaintiff fails to state a valid claim under the narrow public policy exception for wrongful discharge and because the claim is precluded by the doctrine of collateral estoppel.

Consequently, Plaintiff's Complaint should be dismissed in its entirety.

II.    <u>ARGUMENT</u>

A.    <u>Plaintiff's Tort Claim Is Barred By The Workers' Compensation Act</u>

Plaintiff's common law tort claim for wrongful discharge should be dismissed because it is barred by the WCA.

The WCA provides a comprehensive scheme for compensating employees for job-related injuries.[2]  Compensation under the WCA is intended to be the ***exclusive*** remedy for employees and precludes tort actions against an employer for work-related injuries.  <u>See</u> D.C. Code § 32-1504(a).  This statutory bar limits the jurisdiction of courts whenever there is a "substantial question" regarding whether the claimed injury is work related.  <u>Harrington v. Moss</u>, 407 A.2d 658, 661-62 (D.C. 1979).  A "substantial question" will be found unless the claimant satisfies the "heavy burden" of establishing that his injuries "were clearly not compensable" under the WCA. <u>Id.</u> (injury that resulted from workplace quarrel, even if sustained later as result of related assault, falls squarely within WCA's scope because dispute had its origin in work).

---

[2] D.C. Code § 32-1503(a)(1) covers any "injury or death of an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia."  The Code further states: " 'injury' means accidental injury or death arising out of an in the course of employment, . . . and includes an injury cause by the willful act of third persons directed against an employee because of his employment."  D.C. Code § 36-301(12).

Courts have repeatedly recognized that tort claims seeking damages for an employer's actions in disciplining or terminating an employee are barred by the exclusivity provisions of the WCA. In Tekle v. Foot Traffic, Inc., 699 A.2d 410, 411 (D.C. 1997), for example, the plaintiff alleged that her supervisor grabbed her, physically restrained her, and screamed at her during a termination meeting. Id. Plaintiff brought suit against her former employer and supervisor asserting a variety of intentional torts and a negligence claim. Id. The Court found that, because the tortious conduct "grew out of [the employer's] efforts to terminate" the plaintiff, there was a "substantial question" of WCA applicability. Id. at 416.

Much like the claims in Tekle, Plaintiff's wrongful termination claim clearly is barred by the WCA's exclusivity provisions. Plaintiff claims that Pepco injured him by terminating him based on invalid breathalyzer testing that it conducted. See Comp. ¶¶ 1-3, 5. Because Pepco's alleged tortious conduct "grew out of" Pepco's efforts to test, discipline, and terminate Plaintiff in connection with his employment, there is a "substantial question" regarding the WCA's applicability. Tekle, 699 A.2d at 416. Consequently, Plaintiff's wrongful discharge claim should be dismissed. See Tatum v. Hyatt Corp., 918 F. Supp. 5, 8 (D.D.C 1994) (dismissing common law claims, finding that the Act "provide[d] the exclusive remedy for [the] plaintiff's workplace injury" arising from alleged lewd and harassing conduct of supervisor).

Indeed, the dismissal of Plaintiff's claim is mandated by the rulings of this Court and the D.C. Circuit in Ramey I. It is axiomatic that judicial decisions operate as binding precedent on the same legal issues when raised in a court of concurrent or lower jurisdiction. As the D.C. Circuit has noted, "inconsistency is the antithesis of the rule of law. For judges, the most basic principle of jurisprudence is that '[judges] must act alike in all cases of like nature'." LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996).

In <u>Ramey I</u>, Plaintiff asserted negligence and intentional infliction of emotional distress claims that challenged Pepco's testing, disciplinary and termination of him.  In its motion to dismiss those claims, Pepco argued that Plaintiff's claims for injuries that he allegedly suffered in connection with his alcohol testing, discipline, and termination were barred by the WCA.  <u>See</u> Ex. 3 at 10-12.  This Court agreed and dismissed Plaintiff's claims because the WCA "is the exclusive remedy for the common law claims brought by plaintiff."  <u>Ramey I</u>, 468 F. Supp. 2d at 51.  The D.C. Circuit summarily affirmed this dismissal, also ruling that the WCA provided the exclusive remedy for Plaintiff's injuries arising during of the course of his employment.  <u>See</u> Ex. 2.

These prior decisions operate as binding precedent in this case because they address the very same legal issue – i.e., WCA preclusion of Plaintiff's workplace injuries – that is now before this Court.  Consistent with <u>Ramey I</u> and the other precedent discussed above, Plaintiff's wrongful termination claim should be dismissed.

**B.     Plaintiff's Common Law Claim For Wrongful Termination Is Preempted By Section 301 Of The Labor Management Relations Act**

Plaintiff's common law claim should also be dismissed because it is preempted by section 301 of the LMRA.

It is well-settled that section 301 "provides federal-court jurisdiction over controversies involving collective-bargaining agreements" and directs federal courts to "fashion a body of federal law for the enforcement of" them.  <u>Sokos v. Hilton Hotels Corp.</u>, 283 F. Supp. 2d 42, 46 (D.D.C. 2003) (citing <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399, 403 (1988)).  As the Supreme Court has observed, the "preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violations of [a CBA]."  <u>Franchise Tax Bd. v. Construction Laborers Vacation Trust</u>, 463 U.S. 1, 23 (1983); <u>see also</u> <u>Beneficial Nat'l Bank v.</u>

Anderson, 539 U.S. 1, 8 (2003); Bush v. Clark Const. & Concrete Corp., 267 F. Supp. 2d 43, 45-46 (D.D.C. 2003).

The dismissal of preempted claims advances section 301's goal of "ensur[ing] uniform interpretation of collective bargaining agreements, and thus. . . promot[ing] the peaceable, consistent resolution of labor-management disputes." Lingle, 486 U.S. at 413.  Thus, if a state law claim depends upon the meaning or requires the interpretation of a CBA, the claim is preempted.  Sokos, 283 F. Supp. 2d at 46; Grandison v. Wackenhut Servs., Inc., 2007 WL 2781892, *3 (D.D.C. 2007).  Put succinctly, when the "heart of the [state law] complaint [is] a . . . clause in the [CBA], that complaint arises under federal law." Caterpillar, Inc. v. Williams, 482 U.S. 386, 394 (1987).

Consistent with these well-established standards, state tort claims are preempted by section 301 if the determination of an element of the tort, such as whether the employer's actions were "wrongful," requires reference to a CBA.  As the Fourth Circuit recognized in Foy v. Giant Food Inc., the determination of "whether an employer's actions in dealing with and terminating an employee are wrongful is determined *not in the abstract but necessarily by reference to the collective bargaining agreement which governs the employment relationship.*"  298 F.3d 284, 288 (4th Cir. 2002) (emphasis added); see also Hanks v. General Motors Corp., 859 F.2d 67, 69 (8th Cir. 1988) (wrongful discharge claim based on employee's discharge for failing to return to work after leave of absence preempted because court would be required to interpret CBA's discharge provisions); Grandison, 2007 WL 2781892 at *4 (D.D.C. 2007) (section 301 preempted employee's state law claims that employer violated handbook issued pursuant to

CBA).[3]

      Plaintiff's wrongful termination claim is clearly preempted by section 301 under these well-established standards.  As a Pepco employee employed in the bargaining unit represented by Local 1900 of the International Brotherhood of Electrical Workers (the "Union"), the terms and conditions of Plaintiff's employment were governed by the CBA between the Union and Pepco.  <u>See</u> Appuglies Dec., Ex. A.  Article 1 of the CBA contained a management rights provision that vested in Pepco's management the right to supervise and control its operations and workforce.  <u>Id.</u> at Art. 1.  Moreover, Articles 1 and 16 of the CBA afforded Pepco the right to suspend and discipline employees and to terminate them for "just cause."  <u>Id.</u> at Arts. 1, 16. Articles 17 and 18 of the CBA provided grievance and arbitration procedures for the resolution of disputes between Pepco and members of the bargaining unit concerning the CBA.  <u>Id.</u> at Arts. 17-18.

      Pursuant to these provisions of the CBA, Pepco adopted a drug and alcohol testing policy.  <u>See</u> Appuglies Dec., Exs. B-C.  The policy stated that employees "in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property."  Appuglies Dec., Ex. B at 2.  Under the policy, Pepco could require an employee to submit to a breathalyzer test to detect alcohol or drugs in his system "when there is a triggering event or reason to believe drugs or alcohol may have been used."  <u>Id.</u> at 5.  The policy also identified the discipline that would be

---

[3] <u>See also</u> <u>Chester v. Washington Metropolitan Area Transit Auth.</u>, 335 F. Supp. 2d 57, 64-65 (D.D.C. 2004) (employee's breach of contract and wrongful discharge claims preempted by section 301); <u>Sokos</u>, 283 F. Supp. 2d at 47 (section 301 preempted plaintiff's wrongful discharge claim because it necessarily required the court to examine meaning of CBA); <u>Brown v. Gino Morena Enters.</u>, 44 F. Supp. 2d 41, 44 (D.D.C. 1999) (employee's wrongful discharge claim subject to section 301).

applied for violations of the policy.  <u>Id.</u>  Moreover, any disputes concerning the policy were resolved pursuant to the grievance and arbitration provisions of the CBA.

The resolution of Plaintiff's wrongful termination claim will require the Court to interpret and apply these provisions of the CBA and the drug and alcohol policy incorporated into it.  In his Complaint, Plaintiff alleges that, on September 1, 2003, Pepco ordered him to take a breathalyzer test to determine whether he was intoxicated when he reported to work.  Comp. ¶¶ 1-2.  As alleged by Plaintiff, the test results indicated that his blood-alcohol level was 0.065%, a level that exceeded the limits of Pepco's policy.  <u>Id.</u>; <u>see also</u> Appuglies Dec., Ex. B at 2-3. Plaintiff further alleges that, because he tested positive for alcohol, Pepco required him to enroll in a alcohol treatment program and that he was discharged from the program because he "had taken sick."  Comp. ¶¶ 2-3.  Plaintiff further alleges that Pepco wrongfully terminated him "for being accused of being intoxicated."  Comp. ¶ 6.

This claim is unquestionably founded upon and will require the interpretation of the CBA between Pepco and Plaintiff's Union.  To prevail on his tort claim, Plaintiff must prove that Pepco's alleged conduct was wrongful.  Thus, this Court will have to examine the CBA and the policy to determine whether Pepco had the right under them to (1) order Plaintiff to take a breathalyzer test; (2) administer the testing in the manner that it did; (3) discipline him pursuant to the CBA and the policy as a consequence of the test results; and (4) terminate him for failing to comply with the terms of that discipline.  As with the situation presented in <u>Foy</u>, these determinations cannot be made "in the abstract," but necessarily must be made by reference to the management, discipline and termination provisions of the CBA and the drug and alcohol

testing policy adopted pursuant to it.  Foy, 298 F.3d at 288.[4]

The intersection between Plaintiff's state tort claim and the CBA is vividly demonstrated by the arbitrators' rulings on the two grievances that Plaintiff filed pursuant to the CBA.[5]  Those grievances were founded upon the exact factual allegations set forth in Plaintiff's Complaint in this case.  See Flack Dec., Exs. A-B.  In the December 14, 2004 and July 11, 2005 rulings rejecting these grievances, the arbitrators interpreted a number of the provision of the CBA, including the testing policy and the discipline and termination provisions.  The arbitrators, for instance, ruled that:

(1)    Pepco had reasonable cause to test Ramey on August 30, 2003;

(2)    The testing was accurate and proper and was consistent with the CBA;

(3)    Pepco had the right to issue the DML to Ramey pursuant to the CBA;

(4)    The allegations regarding the conduct of Pepco managers during the testing, even if true, did not warrant overturning the DML;

(5)    Plaintiff's failure successfully to complete the rehabilitation program required by the DML constituted "just cause" to terminate Plaintiff; and

(6)    The delays in terminating Plaintiff did not warrant overturning the termination decision.

---

[4] See also Chapple v. National Starch & Chem. Co., 178 F.3d 501, 504 (7th Cir. 1999) (section 301 preempted state law claims based on claimed wrongful application of employer's drug policy); Flibotte v. Pennsylvania Truck Lines. Inc., 131 F.3d 21, 27 (1st Cir. 1997) (section 301 preempted state law claims because the determination of whether employer "was within its rights to require [Plaintiff] to take a drug test at the designated site . . . necessitates examination of the [CBA]"); Clark v. Newport News Shipbuilding & Dry Dock Co., 937 F.2d 934, 938 (4th Cir. 1991) (section 301 preempted state tort claims because the "rights of [employee and employer] with respect to drug testing can be resolved only by reference to the [CBA] and its express and implied provisions").

[5] The first grievance challenged the DML that Pepco issued to Plaintiff as a consequence of his alcohol testing.  The second grievance challenged Pepco's decision to terminate Plaintiff in November 2004 for violating the terms of that discipline.

See Flack Dec., Ex. A at 8-10, Ex. B at 11-15. There is no question that the Court will be required to examine and interpret the CBA in resolving these very same allegations and claims in this lawsuit.

Consequently, as this Court recognized in its March 31, 2006 ruling on Pepco's motion to dismiss,[6] Plaintiff's tort claims are preempted by section 301.

### C.     **Plaintiff's Section 301 Claim Is Time Barred**

When section 301 preempts state law claims, the Court has the option of dismissing the claims or converting them into section 301 claims. DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 169 (1983). Even if this Court elected to convert Plaintiff's common law claim into a section 301 claim, it would fail.

It is well-settled that section 301 actions must be commenced within six months of the date that the cause of action accrues. Id.; Cephas v. MVM, Inc., 403 F. Supp. 2d 17, 23-24 (D.D.C. 2005). A cause of action under section 301 accrues on the date that the underlying breach of the CBA allegedly occurred. Simmons v. Howard Univ., 157 F.3d 914, 917 (D.C. Cir. 1998). Claims that are not brought within the six month limitations period must be dismissed. Id. (upholding dismissal where alleged incidents underlying preempted claims fell beyond six-month limitations period); Cephas, 403 F. Supp. 2d. at 24 (employee's preempted section 301 claim dismissed as untimely under six-month limitation period). Because any alleged breach of

---

[6] In its March 31, 2006 ruling in Ramey I, this Court noted that "Defendants also argue that plaintiff's common law claims are preempted by Section 301 of the [LMRA].  *See* 29 U.S.C. § 185.  Although the Court tends to agree with defendants in the regard, because it has held that those claims are preempted under the D.C. Workers Compensation Act, the Court need not separately address defendants' Section 301 preemption argument."

the CBA here occurred well before six months prior to the filing of this lawsuit, Plaintiff's claim
is untimely and should be dismissed.[7]

### D. Even If It Were Not Preempted By Section 301 Or Barred By The WCA, Plaintiff Could Not Sustain His Claim For Wrongful Termination

Even if Plaintiff's wrongful discharge claim were not barred and preempted, Plaintiff
would not be able to sustain a claim for relief.

To prove a claim for wrongful discharge in the District of Columbia, a plaintiff must
establish either an "outright refusal to violate a specific law, with the employer putting the
employee to a choice of breaking the law or losing his job," Adams v. George W. Cochran &
Co., 597 A.2d 28, 30 (D.C. 1991), or that he was terminated in violation of a "clear mandate of
public policy," Carl v. Children's Hosp., 702 A.2d 159, 164 (D.C. 1997).  This limited public
policy exception to the doctrine of at-will employment has been construed very narrowly by
District of Columbia courts.  Such an action must be "firmly anchored in either the Constitution
or in a statute or regulation which clearly reflects the particular 'public policy' being relied
upon," and "there must be a close fit between the policy thus declared and the conduct at issue."
Id. at 162, 164.  Plaintiff has not – and indeed cannot – satisfy these essential elements of a claim
for wrongful discharge.

---

[7] Additionally, under the LMRA, an employee is bound by the result of any grievance
procedures provided by the CBA, subject to very limited judicial review.  Chester v. Washington
Metropolitan Area Transit Auth., 335 F. Supp. 2d 57, 64-65 (D.D.C. 2004); see also Chauffeurs,
Teamsters & Helpers, Local 391 v. Terry, 494 U.S. 558 (1990) (when CBA accords finality to
grievance or arbitration procedures, employee generally cannot bring a section 301 claim unless
he can show that his union breached its duty of fair representation in handling the grievance).
Plaintiff pursued *two* grievance proceedings, each of which resulted in a final decision in Pepco's
favor on the very issues now asserted by Plaintiff.  In relevant part, the arbitrators ruled that
Pepco had reasonable cause to test Plaintiff's blood-alcohol level, the testing was accurate and
proper, Pepco had the right to issue the DML to Plaintiff, and Pepco had "just cause" to
terminate Plaintiff.  See Flack Dec., Exs. A-B.  Plaintiff is bound by the results of these
grievance procedures and his section 301 claim therefore must fail.

1.      <u>**Plaintiff Failed To Plead A Clear Mandate Of Public Policy**</u>

Because Plaintiff does not allege that he was discharged for refusing to commit illegal acts, or that Pepco violated any "clear mandate of public policy," he cannot sustain a claim.

In his Complaint, Plaintiff simply recites the series of events leading to his termination, including his intoxication, his consequent enrollment in an alcohol treatment program, his subsequent termination, and his participation in an arbitration hearing for wrongful discharge. At no point does Plaintiff allege that he was asked to commit an illegal act or that he refused to violate any law. Similarly, Plaintiff does not even attempt to identify any public policy that Pepco allegedly violated by terminating his employment. In fact, he fails to cite a single statute, regulation, or other authority in support of his wrongful discharge claim.

Under these circumstances, his claim is facially invalid and must be dismissed. <u>See</u>, <u>e.g.</u>, <u>Wallace v. Skadden, Arps, Slate, Meagher & Flom</u>, 715 A.2d 873, 883-86 (D.C. 1998) (attorney's claim that she was terminated for refusing to violate rules of professional conduct insufficient to trigger public policy exception); <u>Mandsager v. Jaquith</u>, 706 A.2d 39, 42 (D.C. 1998) (wrongful discharge claim properly dismissed because employee's refusal to solicit financial contributions in states where employer had not registered as charitable organization did not fall within public policy exception).

2.      **Plaintiff Is Collaterally Estopped From Asserting A Wrongful Termination Claim**

Plaintiff's claim should also be dismissed because Plaintiff is collaterally estopped from asserting a claim for wrongful discharge.

The doctrine of collateral estoppel precludes re-litigation of an issue of fact or law determined in a prior proceeding that was essential to that judgment. <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979); <u>Ali Baba Co., Inc. v. WILCO, Inc.</u>, 482 A.2d 418, 421 (D.C. 1984).

Collateral estoppel bars the assertion of a claim when that claim or a fact essential to it has already been fully litigated and decided, and preclusion would not work an unfairness to the party bound by the first determination.  <u>Consolidated Edison Co. v. Bodman</u>, 449 F.3d 1254, 1257-58 (D.C. Cir. 2006) (<u>citing</u> Restatement (Second) of Judgments § 27); <u>Meng v. Schwartz</u>, 305 F. Supp. 2d 49, 57 (D.D.C. 2004).  Collateral estoppel applies to arbitration determinations as well as to judicial adjudications.  <u>See</u> <u>Schattner v. Girard, Inc.</u>, 668 F.2d 1366, 1368 (D.C. Cir. 1981) (per curiam) ("a party whose claims have been decided in arbitration may not then bring the same claims under new labels.")  Where an issue has been litigated and previously decided, it will be conclusive in all subsequent actions between the same parties, whether on the same or a different claim.  <u>Consolidated</u>, 449 F.3d at 1258; <u>Schattner</u>, 668 F.2d at 1371.

As noted above, a claim for wrongful discharge requires that Plaintiff prove either that he was terminated because of an outright refusal to violate a specific law or that he was terminated in violation of a clear mandate of public policy.  <u>Adams</u>, 597 A.2d at 30; <u>Carl</u>, 702 A.2d at 164.  Plaintiff alleges that he was wrongfully terminated because he was "accused of being intoxicated" and his blood-alcohol test was forensically invalid.  Comp. ¶¶ 6-8.  Yet, as Plaintiff himself notes in his Complaint, these issues were already addressed and decided in Pepco's favor in the numerous proceedings between Plaintiff and Pepco.  Comp. ¶¶ 4, 6-8.

For instance, in the first of two grievance hearings related to Plaintiff's discipline and termination, an arbitrator thoroughly reviewed Pepco's decision to administer a breathalyzer test, the process used, its conformity with requisite policies, and Pepco's ultimate decision to place Plaintiff on DML.  The arbitrator found that:

(1)     There was nothing improper in Pepco's administration of the breathalyzer test;

(2)     There was a valid basis for the Company to require Plaintiff to undergo

"reasonable suspicion" alcohol testing;

(3)      The test was accurate, and there was no time limit for issuing the test; and

(4)      Not only was there just cause for the DML, but the DML was required.

See Flack Dec., Ex. A at 8-10. In Plaintiff's second arbitration with Pepco, challenging his termination, the arbitrator found that Plaintiff was terminated for "just cause" because he failed to successfully complete the rehabilitation program required by the DML. See Flack Dec., Ex. B at 11-15.

Similarly, in Ramey I, this Court found that Plaintiff's termination was justified. In dismissing Plaintiff's tort and discrimination claims challenging his termination, the Honorable Judge Richard Leon noted:

> Ramey ***fails to rebut defendant's showing of a legitimate, nondiscriminatory reason for terminating his employment*** . . . What plaintiff appears to conveniently ignore in bringing this suit is the fact that defendants have produced evidence which demonstrates that, on the night of August 31, 2003, plaintiff showed up to work drunk – so drunk that when he was finally given a breathalyzer test, eleven to twelve hours after he was first confronted by his supervisor, his blood alcohol level still registered at 0.065% to 0.07%. ***This is not a close call.***

Ramey I, 468 F. Supp. 2d 51, 57 n.7 (D.D.C. 2006) (emphasis added). The D.C. Circuit upheld this ruling, finding that "a reasonable trier of fact could not infer intentional discrimination based on the evidence." See Ex. 2 at 2.

In addition, in a subsequent proceeding in the District of Columbia Superior Court, the Honorable Judge Judith Retchin presided over a full evidentiary hearing to determine whether to enjoin Plaintiff from further defaming Pepco with false statements, including statements that he was wrongfully terminated. As part of this hearing, Judge Retchin assessed whether Plaintiff's breathalyzer test was proper and valid, and reviewed whether Pepco properly tested and

disciplined Plaintiff.  These determinations were essential to the ultimate finding that Plaintiff's

statements were in fact defamatory.[8]  See Ex. 6 at 145:4-147:21.

Judge Retchin conclusively found that Pepco conducted a legal and valid breathalyzer

test:

> The next question is whether the – and this was not a question that
> I was specifically asked to address, but I will address it.  And that
> is whether that taking of the breath sample was illegal.
>
> I understand Mr. Ramey contends that it was illegal because it was
> outside of DOT guidelines that say that the breath sample should
> be taken within eight hours after there is a reasonable suspicion to
> believe that the person might be under the influence.
>
> But as I read the regulation, that did not preclude testing if it has
> reason to believe, or a reasonable suspicion that an employee is
> impaired….***So I don't believe there was any illegal taking of a
> breath sample from Mr. Ramey.***
>
> Now the question then becomes, were the test results altered?
> Because that is an allegation that Mr. Ramey is making.  . . .
>
> The results that have been presented consistently are that he first
> had a blood – or a breath test of .070.  And the subsequent test to
> verify that thereafter I believe was .065.  Yes, it was .065.  ***And
> there's been no indication that has been changed at all.*** Id.

---

[8] To prove defamation, a plaintiff must show that:  (1) that the defendant made a false and
defamatory statement concerning the plaintiff; (2) that the defendant published the statement
without privilege to a third party; (3) that the defendant's fault in publishing the statement
amounted to at least negligence; and (4) either that the statement was actionable as a matter of
law irrespective of special harm or that its publication caused the plaintiff special harm.  Beeton
v. District of Columbia, 779 A.2d 918, 923 (D.C. 2001); Crowley v. North American
Telecomms. Assoc., 691 A.2d 1169, 1173 n.2 (D.C. 1997).  Plaintiff had been distributing a flyer
that stated, in part, "After I was tested, PEPCO attempted to cover up the incident by using
incorrect and altered test forms, an uncertified technician and someone not employed by PEPCO.
PEPCO informed me that I tested positive and asked me to sign the alcohol test form….The copy
I was given for my record DID NOT match the copy placed in my file.  I NEVER tested positive
for the use of alcohol.  I was asked to leave PEPCO and not to return."

- 15 -

Consistent with her findings, Judge Retchin issued a preliminary injunction enjoining Plaintiff "from making, whether in writing or orally, false and defamatory statements against Pepco, including, but not limited to, statements that Pepco, or its employees, agents or attorneys kidnapped, falsely imprisoned, ***illegally altered his Breathalyzer results, used an uncertified technician to administer the Breathalyzer or committed any other illegal act against him in connection with his termination from Pepco*** or the filing of this action." See Ex. 7 (emphasis added). Judge Retchin subsequently granted summary judgment in favor of Pepco on its defamation claim and converted this preliminary injunction into a permanent injunction. See Ex. 8.

These factual and legal findings are final and determinative, and apply to all subsequent proceedings between Plaintiff and Pepco. Consolidated, 449 F.3d at 1258. Because these fact-finders held that Plaintiff's breathalyzer test was properly conducted and was valid and that his termination was justified, Plaintiff is precluded from now re-litigating those issues through his wrongful discharge claim. As such, he cannot now claim wrongful termination on grounds that his testing was invalid or that his termination was not justified. In fact, given these rulings, Plaintiff is unable to state any claim entitling him to relief. See Kovach v. District of Columbia, 805 A.2d 957, 963 (D.C. 2002) ("because principles of collateral estoppel preclude appellant from alleging a fact necessary to stating a claim, the trial court correctly granted appellee's motion to dismiss"). Plaintiff's claim should therefore be dismissed.

III.   **<u>CONCLUSION</u>**

For the foregoing reasons, Pepco respectfully requests that the Court enter an Order

dismissing Plaintiff's claim against it with prejudice.

                       Respectfully submitted,


                       _____/s/_____

                       Connie N. Bertram (Bar No. 435840)
                       Winston & Strawn LLP
                       1700 K St., NW
                       Washington, D.C. 20006
                       (202) 282-5000
                       (202) 282-5100 (fax)

                       Jill D. Flack (Bar No. 420020)
                       Associate General Counsel
                       Potomac Electric Power Company
                       701 9th Street, NW
                       Washington, D.C. 20068
                       (202) 872-2756
                       (202) 872-3281 (fax)

                       Counsel for Defendant

December 3, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December 2007, I caused a true and correct copy of the foregoing Motion to Dismiss and Memorandum in Support to be served by first class mail, postage prepaid on this 3rd day of December, 2007, on the following:

Benjamin Ramey
4251 Clay Street, NE
Washington, DC 20019


_____/s/_____
Connie N. Bertram

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

OF THE DISTRICT OF COLUMBIA

BENJAMIN RAMEY          )
     Plaintiff,          )
                     )        Case No. 1:04cv02088 (RJL)
     v.             )
                     )
POTOMAC ELECTRIC  POWER  )
COMPANY, et al.,          )

## AMENDED COMPLAINT

COMES NOW, the plaintiff Benjamin Ramey, by and through counsel Maria C.

Mendoza, Esq., and commences this action against Potomac Electric Power Company,

Mr. David Duarte in both his individual and official capacity and Gregory Johnson in

both his individual and official capacity.

## PARTIES

1.     Plaintiff, Benjamin Ramey is an African American male residing at 4251 Clay St.

       N.E., Washington, D.C.

2.     Defendant, Potomac Electric Power Company (herein after referred to as

       PEPCO) is an entity doing business in the District of Columbia.

3.     Mr. David Duarte is an employee (supervisor) of Potomac Electric Power

       Company. At all times relevant to this complaint, defendant was authorized, or

       had authority to make or recommend personnel decisions or actions regarding the

       terms and conditions of plaintiff's employment.  He is sued in his individual and

       official capacity.

4.    Mr. Gregory Johnson is an employee (supervisor) of Potomac Electric Power

Company. . At all times relevant to this complaint, defendant was authorized, or

had authority to make or recommend personnel decisions or actions regarding the

terms and conditions of plaintiff's employment.  He is sued in his individual and

official capacity.

## JURISDICTION

5.    This Court has jurisdiction over plaintiff's claims of Violation of Mr. Ramey's

Civil Rights, pursuant to 42 U.S.C. 1981, District of Columbia Code § 13-422 and

13-423, 1-2501, et seq., Negligent Hiring, Training and Supervision, Negligent

Infliction of Emotional Distress and Intentional Infliction of Emotional Distress.

## EXAUSTION OF REMEDIES

6.    On or about July 19, 2003 Plaintiff, Benjamin Ramey filed a complaint of

Discrimination with the District of Columbia Office of Human Rights.

7.    On or about July 19, 2004, the U. S. Equal Employment Opportunities

Commission issued a right to sue letter to Plaintiff, Benjamin Ramey. (ex. 1)

## FACTS

8.    On August 31, 2003, Plaintiff, Mr. Ramey was employed by Defendant, Electric

Power Company (PEPCO).  Plaintiff, Ramey is a dark skinned African American.

Plaintiff, Ramey has a condition peculiar to dark skinned people of African

descent where the whites of their eyes are reddish brown.

9.    On August 31, 2003, Plaintiff, Ramey arrived at the employment cite on Benning

Road at 11:45 p.m.. Shortly after Plaintiff arrived Defendant Johnson (a PEPCO

supervisor) accused Plaintiff, Ramey of being intoxicated because of his red eyes.

10.    Plaintiff, Ramey told Defendant Johnson that his eyes were red because of the

condition that is peculiar to dark skinned people of African descent.

11.    Defendant, Duarte (a PEPCO supervisor) told Defendant Johnson that the

Plaintiff had to take a breathalyzer test.  The breathalyzer could not be performed

at the Benning cite.  Plaintiff was then taken to 9th and G Street for the

breathalyzer to be performed.

12.    Plaintiff asked Defendant Duarte if he could use the bathroom.  Defendant Duarte

answered: "you [pause] shut up. By the infliction and tone of Mr. Duarte's voice

and the way he paused Plaintiff Ramey understood he was saying "you "Niger"

shut up".

13.    The test could not be performed at 9th and G Street either.  Plaintiff Ramey was

then ordered to get in a car.  Mr. Naguse Birratu, Defendant Johnson and Mr.

Dudley were in the car with him.

14.    They began driving.  Plaintiff did not know where they were taking him.  Plaintiff

asked: "where are you taking me?" and they refused to answer.  They were lost

for a long period of time.

15.    They then arrived at a hospital in Virginia and waited about one and half hours.

The hospital could not perform the test. They arrived at the first hospital after

midnight on September 1, 2003.  When they arrived at the hospital Plaintiff

Ramey asked again to use the bathroom.  Mr. Naguse Birratu told Plaintiff "You

[pause] no". By the infliction and tone of his voice Plaintiff understood Mr. Naguse Birratu was saying "you "Niger" no".

16. The test could not be performed at that facility so they then took Plaintiff to another facility to have the test performed. Plaintiff was forced to wait at the second facility four more hours. Plaintiff again asked permission to use the bathroom and for a drink of water. Again Mr. Naguse Birratu told Plaintiff "you [pause] no". Plaintiff was in extreme discomfort and pain. Plaintiff told Mr. Naguse Birratu that they were doing this to him because he was a black man and that they would never do this to a white man. Mr. Naguse Birratu did not deny this.

17. Plaintiff was in such pain and discomfort that he could not hold his urine any longer and he urinated on himself. Plaintiff was extremely humiliated.

18. Mr. Dudley told Mr. Naguse Birratu that being a white man they would never have done this to him. Mr. Naguse Birratu did not deny this.

19. They could not perform the test at the second facility either so they took Plaintiff back to 9th & G Street.

20. At the 9th & G Street location Mr. Thomas Hyde an unlicensed drug screen collector gave Plaintiff a breathalyzer. This was about eleven to twelve hours after the ordeal began.

21. Subsequently, The International Brotherhood of Electrical Workers Local 1900 filed a grievance on behalf of Plaintiff against Defendant PEPCO.

22.   Prior to the September 1, 2003, incident Plaintiff Ramey had requested leave. The leave had been approved by Defendant Johnson.  After Plaintiff's grievance was filed Defendant Johnson told Plaintiff that he had not approved his leave.

23.   After the grievance was filed, Plaintiff Ramey was confronted by Defendant Duarte.  Defendant Duarte again accused Plaintiff Ramey of drinking because his eyes were red.  Mr. Ramey informed Defendant Duarte that his eyes were red because of the condition that is peculiar to dark skinned people of African descent.

24.   Plaintiff was subjected to another breathalyzer test and it was negative.

25.   On February 25, 2004, at a meeting with the Department of Human Resources at 441 4th Street, N.W., WA, D.C.  Ms. Jill flack, PEPCO's attorney, told Mr. Ramey that if he dropped the grievance and the lawsuit he could return to work.

26.   On November 4, 2004, Ms. Jill flack, PEPCO's attorney told Mr. Joe Hawkins to tell Mr. Ramey that if he dropped the grievance and the lawsuit he could return to work.

27.   Plaintiff Ramey refused to do either and was terminated from his employment by Defendant PEPCO on November 9, 2004.

28.   Defendant PEPCO has a history of employing and or contracting the services of unqualified drug technicians.  Larry Huff a drug technician employed by Defendant PEPCO was under investigation for falsifying and tampering with drug and alcohol tests during the same time period that Plaintiff was tested. He has since been terminated for falsifying and tampering with drug and alcohol tests.

29.    The Drug Screen Collector, Mr. Thomas Hyde who performed the breathalyzer on

Plaintiff on September 1. 2003 was unlicensed at the time.  Plaintiff believes that

the test result Mr. Hyde attributed to him is not his, because it is dated August 30,

2003, and the incident took place on September 1, 2003.  Plaintiff further believes

that Mr. Hyde was not qualified to conduct the breathalyzer test on him as Mr.

Hyde did not have a license to conduct the test.

30.    Defendant Duarte has had a number of grievances filed against him and PEPCO

continues to employee him.

31.    Plaintiff Ramey applied for Workers' Compensation on January 28, 2004.

Defendant PEPCO filed a Notice of Controversion Memo of Denial of Worker's

Compensation Benefits on March 18, 2004.

32.    On April 22, 2005 an opinion in Plaintiff's favor was issued on his application for

Workers' Compensation Coverage.  On May 16, 2005 Defendants filed an

opposition to the decision.

## COUNT ONE

## (VIOLATION OF CIVIL RIGHTS)

33.    Plaintiff incorporates all of the allegations contained in paragraphs 1 through 32
of this complaint into this count by reference.

34.    The Actions taken by the Defendants constituted discrimination against Plaintiff
Ramey on the basis of race, (African American) Hostile Work Environment, and
Personal Appearance (red eyes) in the terms, conditions and privileges of his
employment.  Plaintiff was subjected to retaliation, after filing a complaint and
lawsuit.

33.    PEPCO is liable for the actions taken by its employees pursuant to the doctrine of
respondent superior.

## COUNT TWO

## (NEGLIGENT HIRING, TRAINING & SUPERVISION AND RETENTION

## FAILURE TO CREATE POLICY OR IMPLEMENT POLICIES)

34.    Plaintiff incorporates all of the allegations contained in paragraphs 1 through 32 of this complaint into this count by reference.

35.    Defendant PEPCO had a duty to properly hire, train, supervise its employees on the process of conducting a breathalyzer of its employees. Defendant Duarte has other charges made against him and PEPCO continues to retain him.

36.    Defendant PEPCO has failed to protect its employees from the conduct that would be likely to occur in the absence of proper hiring, training and supervision.

37.    Defendant PEPCO breached its duty by contracting with a Drug tester that was not licensed, therefore not qualified to perform the tests on Plaintiff Ramey and by employing a drug tester that engaged in acts of fraud.

## COUNT THREE

## (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

38.    Plaintiff incorporates all of the allegations contained in paragraphs 1 through 32 his complaint into this count by reference.

39.    With negligent indifference and reckless disregard for plaintiff, defendants, by the joint and several actions, or lack thereof caused plaintiff's physical harm and extreme emotional distress and mental anguish.

40.    As a direct and proximate result of the intentional, reckless, extreme and outrageous actions taken by the defendants, Mr. Ramsey suffered severe mental and emotional distress, pain and suffering and has been forced to incur medical bills.

41.    PEPCO is liable for the negligent infliction of emotional distress upon Mr. Ramsey, caused by the defendants pursuant to the doctrine of respondent superior.

## COUNT FOUR

## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

42.    Plaintiff incorporates all of the allegations contained in paragraphs 1 through 32 this complaint into this count by reference.

43.    The actions taken by the defendants against Mr. Ramsey on August 30, 2003 were intentional, reckless, extreme, and outrageous and done with malice.

44.    PEPCO is liable for the negligent infliction of emotional distress upon Mr. Ramsey, caused by the defendants pursuant to the doctrine of respondent superior.

## DEMAND

WHEREFORE, based on all of the foregoing the plaintiff demands that a judgment be entered in favor of the plaintiff on all causes of actions cited above against PEPCO in compensatory damages in the amount of $3,000,000.00 and punitive in the amount of $3,000,000.00 plus interest, cost and attorney fees.

Plaintiff demands that a judgment be entered in favor of the plaintiff against the defendants in compensatory damages in the amount of $3,000,000.00 and punitive in the amount of $3,000,000.00 plus interest, cost and attorney fees.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all of the facts, issues and counts raised in this complaint.

Respectfully submitted,

_____

Maria C. Mendoza
Bar # 430906
Counsels for Benjamin Ramey
216 "G" Street, N.E.
First Floor
Washington, DC 20002
(202) 675-8474

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, that I have served the foregoing motion by first class mail on the

defendants' attorneys  Robert G. Ames, Connie Bertram and R. Wesley Alexander

Venable LLP, 575 7th Street, NW, Washington, D.C. 20004, this 24, day of June, 2005.


_____

Maria C. Mendoza

# EXHIBIT 2

DEC 2 1 2006

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 06-7077**                                    **September Term, 2006**

04cv02088

**Filed On:**

Benjamin Ramey,
          Appellant

          v.

PEPCO, et al.,
          Appellees



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   DEC 1 8 2006

CLERK

**BEFORE:**    Randolph, Garland, and Brown, Circuit Judges

## O R D E R

Upon consideration of the "dispositive motion," construed as a motion for summary reversal, and the opposition thereto; and the motion for leave to file opposition to motion for summary reversal and the opposition thereto, construed as a reply in support of motion for summary reversal, it is

**ORDERED** that the motion for leave to file an opposition to the motion for summary reversal be granted. The Clerk is directed to file the lodged pleadings. It is

**FURTHER ORDERED** that the motion for summary reversal be denied, and that the district court's judgment, filed March 31, 2006, be summarily affirmed. Appellant's filing of a motion for summary reversal placed the merits of this appeal before the court. Because the appropriate disposition is so clear, summary action is warranted. See Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam).

Because appellant does not challenge the district court's dismissal of his common law claims on the basis that they are preempted by the D.C. Worker's Compensation Act ("WCA"), the argument is waived. See Doe v. District of Columbia, 93 F.3d 861, 875 n.14 (D.C. Cir. 1996) (appellant waived argument not raised on appeal). In any event, the district court was correct on this point. See Khan v. Parsons Global Services, Ltd., 428 F.3d 1078, 1083 (D.C. Cir. 2005) (WCA is employee's exclusive remedy against employer for injuries "arising out of" and "in the course of" employment).

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## No. 06-7077

## September Term, 2006

The district court also correctly disposed of appellant's claim of race discrimination because a reasonable trier of fact could not infer intentional discrimination based on the evidence. See Aka v. Washington Hospital Center, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1413 n.7 (D.C. Cir. 1988). Furthermore, appellant's hostile work environment claim likewise fails because he has not presented evidence of offensive conduct that was sufficiently severe or pervasive to alter the conditions of his employment. See Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006) (and cases cited therein). Finally, appellant's retaliation claims do not succeed because appellant has failed to establish a *prima facie* case of retaliation. See Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2415 (2006), citing Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc. See Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

**Per Curiam**

# EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BENJAMIN RAMEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:04CV02088 (RJL) |
| | ) |
| POTOMAC ELECTRIC POWER | ) |
| COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendants Potomac Electric Power Company ("Pepco"), David Duarte and Gregory

Johnson hereby move the Court for the entry of an Order dismissing Plaintiff's

Complaint in its entirety.  In support of this Motion, Defendants respectfully refer the

Court to the attached Memorandum of Points and Authorities.

Respectfully submitted,

_/s Connie N. Bertram_
Connie N. Bertram (Bar No. 435840)
Venable LLP
575 7th Street, NW
Washington, D.C. 20004
(202) 344-4000
(202) 344-8300 (fax)

Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)

Counsel for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BENJAMIN RAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:04CV02088 (RJL) |
| | ) | |
| POTOMAC ELECTRIC POWER | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN
## SUPPORT OF THEIR MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure,

Defendants submit their Memorandum in Support of their Motion to Dismiss Plaintiff's

Amended Complaint.

### I.    INTRODUCTION AND SUMMARY

In his Amended Complaint in this action, Plaintiff asserts tort and statutory claims

against his former employer, Potomac Electric Power Company ("Pepco"), and two

Pepco employees, David Duarte and Gregory Johnson.  Plaintiff alleges that, on August

30, 2003, Pepco managers ordered Plaintiff to take a breathalyzer test to determine if he

was intoxicated while he was on a job site. Am. Comp. ¶¶ 8-20.  Plaintiff contends that,

in connection with this testing, the managers drove him to various locations in the

Washington, D.C. area and held him against his will for twelve hours.  Id.  He further

alleges that Pepco required him to undertake additional testing in October 2003 and then

terminated his employment over a year later after he refused to compromise his grievance

against the Company challenging the testing.  Id. at ¶¶ 21-27.

Plaintiff purports to assert claims against Defendant Pepco under 42 U.S.C. § 1981, the District of Columbia Human Rights Act ("DCHRA"), and common law claims of negligent hiring, training and supervision, "failure to create or implement policies," and negligent and intentional infliction of emotional distress. Plaintiff also asserts claims against Duarte and Johnson under section 1981, the DCHRA and for negligent and intentional infliction of emotional distress. As explained in detail below, even if the allegations of the Amended Complaint are accepted as true for purposes of this Motion, Plaintiff cannot sustain any of his claims against Defendants for four distinct reasons.

First, Plaintiff's DCHRA claim and his common law claims are preempted by section 301 of the Labor Management Relations Act ("LMRA") because they are founded upon and require the interpretation of collective bargaining agreement between Plaintiff and his Union. Second, Plaintiff's negligent and intentional infliction of emotional distress claims are time-barred. Third, each of Plaintiff's common law claims is barred by the D.C. Worker's Compensation Act and, even if they were not procedurally barred, must be dismissed based on Plaintiff's failure to state a valid claim in his Amended Complaint. Fourth, Plaintiff's section 1981 and DCHRA claims must fail because (1) he cannot sustain a DCHRA claim against Duarte or Johnson and (2) Plaintiff fails to state a claim upon which relief can be granted for discrimination, harassment or retaliation against any of the defendants.

Consequently, Plaintiff's Amended Complaint should be dismissed in its entirety.

- 2 -

II.    **ARGUMENT**

A.    **Plaintiff's Common Law Claims And DCHRA Claim Are Preempted By Section 301 Of The LMRA**

Plaintiff's common law and DCHRA claims should be dismissed because they are preempted by section 301 of the Labor Management Relations Act ("LMRA").

It is well-settled that section 301 "provides federal-court jurisdiction over controversies involving collective-bargaining agreements" and directs federal courts to "fashion a body of federal law for the enforcement of these collective bargaining agreements." Sokos v. Hilton Hotel Corp, 283 F. Supp. 2d 42, 46 (D.D.C. 2003). As the Supreme Court has observed, the "preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violations of [CBAs]." Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 23 (1983). The dismissal of preempted claims advances section 301's goal of "ensur[ing] uniform interpretation of collective bargaining agreements, and thus . . . promot[ing] the peaceable, consistent resolution of labor-management disputes." Sokos, 283 F. Supp. 2d at 46. Thus, if a state law claim depends upon the meaning or requires the interpretation of a CBA, the claim is preempted. Put succinctly, when the "heart of the [state law] complaint [is] a . . . clause in the collective bargaining agreement, that complaint arises under federal law." Caterpillar, Inc. v. Williams, 482 U.S. 386, 394 (1987).

Consistent with these well-established standards, in situations where a plaintiff's employment is governed by the terms of a CBA, state tort claims are preempted by section 301 if the determination of an essential element of the tort, such as whether the employer's actions were "wrongful" or "extreme and outrageous," requires reference to the CBA. As the court recognized in Foy v. Giant Food, Inc., 298 F.3d 284, 288 (4th Cir.

2002) (emphasis added), in such a situation, the determination of "whether an employer's actions in dealing with and terminating an employee are wrongful is determined *not in the abstract, but necessarily by reference to the collective bargaining agreement which governs the employment relationship*." See also McCormick v. AT&T Techs., Inc., 934 F.2d 531, 537 (4th Cir. 1991) (section 301 preempted state tort claims because CBA determined whether the duty of care existed); Douglas v. American Info. Techs. Corp., 877 F.2d 565, 572 (7th Cir. 1989) (section 301 preempted state law claims because CBA determined what constituted extreme and outrageous conduct); Hanks v. General Motors Corp., 859 F.2d 67, 69 (8th Cir. 1988) (wrongful discharge claim based on employee's discharge for failing to return to work after leave of absence was preempted because, to resolve the plaintiff's claims, the court would be required to interpret CBA provisions pertaining to discharge).

Each of Plaintiff's state law claims is preempted under these well-established standards. As a Pepco employee employed in the bargaining unit represented by Local 1900 of the International Brotherhood of Electrical Workers ("Local 1900"), the terms and conditions of Plaintiff's employment were governed by the CBA between Local 1900 and Pepco. See Declaration of Eileen Appuglies ("Appuglies Decl."), Ex. A. Just like the CBA at issue in Foy, Article 1 of the CBA contains a management rights provision that vests in Pepco management the right to supervise and control its operations and workforce. Id. at Art. 1. Moreover, Articles 1 and 16 of the CBA afford Pepco the right to discipline employees and to terminate them for "just cause." Id. at Arts. 1, 16. Articles 17 and 18 of the CBA provide extensive grievance and arbitration procedures for

- 4 -

the resolution of disputes between Pepco and members of the bargaining unit concerning
the CBA. Id. at Arts. 17, 18.

Pursuant to these provisions of the CBA, Pepco has adopted and published a drug
and alcohol testing policy. See Appuglies Decl., Ex. B. That policy states that
employees "in any job classification may not have a blood-alcohol concentration of
0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as
determined by a different diagnostic test such as a Breathalyzer) while on duty or on
Company property." Id. at 4. Pepco may require an employee to submit to a
breathalyzer test to detect alcohol or drugs in his or her system "when there is a triggering
event or reason to believe drugs or alcohol may have been used." Id. The policy also
identifies the discipline that will be applied for violations of the policy. Id. Moreover,
any disputes concerning the policy that involve bargaining unit employees are resolved
pursuant to the grievance and arbitration provisions of the CBA. See, e.g., Appuglies
Decl., ¶ 6.

There is no question that each of the common law claims asserted in Plaintiff's
Complaint is founded upon or will require the Court to interpret and apply these
provisions of the CBA. As explained above, Plaintiff alleges in his Complaint that, on
August 30, 2003, Pepco ordered Plaintiff to undertake a breathalyzer test to determine if
he was intoxicated while he was on a job site. Am. Comp. ¶¶ 4-20. Plaintiff contends
that, in connection with this testing, Pepco managers drove him to various locations in the
Washington, D.C. area and held him against his will for twelve hours. Id. He alleges
that, after he returned to work after this incident, a manager denied Plaintiff leave that
had previously been approved and then, over a year later, Pepco terminated him after he

declined to accept a proposal to resolve his grievance challenging the alcohol testing. <u>Id.</u> at ¶¶ 25-27. Based on these alleged events, Plaintiff asserts common law claims against Pepco for negligent hiring, training, supervision and retention, the "failure to create . . . or implement" policies, and intentional and negligent infliction of emotional distress.

Each of these claims unquestionably is founded upon or will require the interpretation of the CBA between Pepco and Plaintiff's Union. These claims hinge upon the manner in which, pursuant to the policy and CBA, Pepco administered alcohol testing to Plaintiff and Pepco's decision to discipline and terminate Plaintiff. Plaintiff alleges that, through its testing, Pepco inflicted emotional distress on him and committed other tortious acts and that Pepco engaged in negligence in hiring, training and supervising the contractors who performed testing on him. Plaintiff further alleges that Pepco denied him leave to which he was entitled and terminated his employment after he declined to compromise his grievance challenging the testing. To prevail on these claims, Plaintiff must show that Pepco's alleged conduct (1) was "wrongful;" (2) was extreme and outrageous; and/or (3) breached a duty of care to Plaintiff. <u>See</u> <u>infra</u> at 27-28.

As with the situation presented in <u>Foy</u>, these determinations are not made "in the abstract," but necessarily must be made by reference to the management, discipline and termination provisions of the CBA and the drug and alcohol testing policy adopted pursuant to it. <u>Foy</u>, 298 F.3d at 288; <u>see also</u> <u>Chapple v. National Starch & Chemical Co.</u>, 178 F.3d 501, 504 (7th Cir. 1999) (section 301 preempted state tort claims based on claimed wrongful application of employer's drug policy); <u>Flibotte v. Pennsylvania Truck Lines, Inc.</u>, 131 F.3d 21, 27 (1st Cir. 1997) (section 301 preempted state law claims because the determination of whether employer "was within its rights to require

- 6 -

[Plaintiff] to take a drug test at the designated site . . . necessitates examination of the [CBA]"); Clark v. Newport News Shipbuilding & Drydock Co., 937 F.2d 934, 938 (4th Cir. 1991) (section 301 preempted state tort claims because "the rights of [employee] and [employer] with respect to drug testing can be resolved only by reference to the [CBA] and its express and implied provisions"). Consequently, they should be dismissed as preempted.

Similarly, Plaintiff's claim that Defendants violated the DCHRA is preempted by section 301. As noted above, Plaintiff claims that Defendants discriminated against him based on his race and personal appearance by testing, disciplining and terminating him pursuant to the CBA. In order to resolve this claim, the Court must interpret the numerous provisions of the CBA and the testing policy discussed above. Under these circumstances, Plaintiff's DCHRA claim is preempted by section 301. See, e.g., Reece v. Houston Lighting & Power Co., 79 F.3d 485, 487 (5th Cir. 1996) (employee's claims under state anti-discrimination statute were preempted because they concerned seniority, promotion and assignment to training programs that were addressed in the collective bargaining agreement); Davis v. Johnson Controls, Inc., 21 F.3d 866, 868 (8th Cir. 1994) (holding that plaintiff's discrimination claim was preempted by section 301 because it "would require an examination of the seniority rights of both [the plaintiff] and other employees under the collective bargaining agreement"); Wilhelm v. Sunrise Northeast, Inc., 923 F. Supp. 330, 336 (D. Conn. 1995) (plaintiff's claim that he was discharged in retaliation for engaging in union activities and on account of his sexual orientation was preempted by section 301 because CBA included a "just cause" provision).

The intersection between Plaintiff's state law claims and the CBA is vividly demonstrated by the recent arbitration rulings on Plaintiff's grievances pursuant to the CBA. The Union filed two grievances on Plaintiff's behalf. The first grievance challenged the "decision making leave" ("DML") that he received as a consequence of his August 30 alcohol testing. The second grievance challenged Pepco's decision to terminate Plaintiff in November 2004 for violating the terms of that discipline. These grievances were founded upon the exact factual allegations set forth in Plaintiff's Amended Complaint in this case.

In the December 14, 2004 and July 11, 2005 rulings rejecting these grievances, the arbitrators interpreted a number of the provisions of the CBA, including the drug and alcohol testing policy and the discipline and termination provisions of the CBA. See Declaration of Jill Flack ("Flack Decl."), Exs. A & B. The arbitrators, for instance, ruled that:

(1)     Pepco had reasonable cause to test Ramey on August 30;

(2)     The testing was accurate and proper and was consistent with the CBA;

(3)     Pepco had the right to issue the DML to Ramey pursuant to the CBA;

(4)     The allegations regarding the conduct of Pepco managers during the testing, even if true, did not warrant overturning the DML;

(5)     Plaintiff's failure successfully to complete the rehabilitation program required by the DML constituted "just cause" to terminate Plaintiff; and

(6)     The delays in terminating Plaintiff did not warrant overturning the termination decision. Id. at 8-10.

There is no question that the Court will be required to examine and interpret the CBA in resolving these very same allegations and claims in this lawsuit.[1]

**B.    Plaintiff's Emotional Distress Claims Are Time Barred**

Even if they were not preempted by section 301, Plaintiff would not be able to sustain the emotional distress claims alleged in Counts Three and Four of the Amended Complaint because they are barred by the one-year statute of limitations.

Although the D.C. Code does not specifically identify a limitations period for intentional or negligent infliction of emotional distress claims, under established precedent, emotional distress claims that are "intertwined with" claims that have a specific statutory limitations period assume the limitations period of those claims. See Hunter v. District of Columbia, 943 F.2d 69, 72 (D.C. Cir. 1991) (limitations period for emotional distress claim was the one-year period for assault and battery because alleged emotional distress was not caused by conduct independent from alleged assault and battery); Thompson v. Jasas Corp., 212 F. Supp. 2d 21, 27 (D.D.C. 2002) ("plaintiff's emotional distress claim, therefore, is restricted to incidents that occurred within the year," because her emotional distress was only "an element of her damages resulting from the employment discrimination and harassment").

In this case, there is no question that Plaintiff's emotional distress claims are "intertwined with" the assault, battery and false imprisonment claims that he asserted in

---

[1] Even if this Court converted Plaintiff's common law claims into section 301 claims, they must still fail. It is well-settled that section 301 actions must be commenced within six months of the date that the cause of action accrues. Del Costello v. International Bhd. of Teamsters, 462 U.S. 151, 169 (1983). A cause of action under section 301 accrues on the date that the underlying breach of the CBA allegedly occurred. Simmons v. Howard Univ., 157 F.3d 914, 917 (D.C. Cir. 1998). Because all of the alleged breaches of the CBA occurred more than six months prior to the filing of this lawsuit, Plaintiff's claims are untimely and should be dismissed for this reason as well.

his original Complaint. Plaintiff's emotional distress claims are based on actions allegedly taken by Pepco managers after they ordered Plaintiff to take a breathalyzer test. See Am. Comp. ¶¶ 4-20, 39-41, 43-44. In Count Four, Plaintiff specifically alleges that "the actions taken by the defendants against Mr. Ramey [in connection with this testing] on August 30, 2003 were intentional, reckless, extreme, and outrageous and done with malice." Am. Comp. ¶ 43.[2] These are exactly the same allegations on which the assault, battery and false imprisonment claims asserted in Plaintiff's original Complaint were based. See Comp. ¶¶ 1-6, 12-17, 28-32.

Because the emotional distress claims are clearly "intertwined with" Plaintiff's assault, battery and false imprisonment claims, they are subject to the one-year statute of limitations and, consequently, are time-barred.

### C.    Plaintiff's Common Law Claims Are Barred By The Workers' Compensation Act

The common law tort claims asserted in Counts Two through Four should also be dismissed because they are barred by the District of Columbia Workers' Compensation Act ("the WCA").

The WCA provides a comprehensive scheme for compensating employees for job-related injuries.[3] Compensation under the WCA is intended to be the *exclusive* remedy for employees and precludes tort actions against an employer for work-related injuries. See D.C. CODE § 32-1504(a). This statutory bar limits the jurisdiction of courts

---

[2] In Count Three, Plaintiff's negligent infliction of emotional distress claim, Plaintiff does not identify the specific incident upon which his claim is based. However, to the extent that Plaintiff purports to assert a claim against Defendants based upon his November 2004 termination, he cannot, as demonstrated below, sustain a claim for relief. See infra at 27-28.

[3] D.C. Code § 32-1503(a)(1) covers any "injury or death of an employee that occurs in the District of Columbia if the employee performed work for the employer, at the time of the injury or death, while in the District of Columbia."

- 10 -

to award damages whenever there is a "substantial question" regarding whether the claimed injuries were work related.  Harrington v. Moss, 407 A.2d 658, 661-62 (D.C. 1979).  A "substantial question" will be found unless the claimant satisfies the "heavy burden" of establishing that his injuries "were clearly not compensable" under the WCA.  Id.

This Court has held that claims founded upon workplace conduct, such as those alleged by Plaintiff here, are the type of claims that trigger the exclusivity provisions of the WCA.  In Tatum v. Hyatt Corp., 918 F. Supp. 5, 8 (D.D.C. 1994), for instance, the plaintiff brought sexual harassment, assault and battery and intentional and negligent infliction of emotional distress claims against her employer and a co-worker, and negligent hiring and supervision claims against her employer.  The plaintiff claimed that the co-worker grabbed the plaintiff, rubbed up against her in a lewd fashion, and made suggestive remarks to her.  Id. at 6.  The court dismissed the plaintiff's common law claims, finding that the Act "provide[d] the exclusive remedy for [the] plaintiff's workplace injury."  Id. at 8; see also Harrington, 407 A.2d at 662 (D.C. 1979) ("Courts generally have held that when there is a substantial question as to whether an employee's injuries are covered by an employment compensation statute, the employee must first pursue a remedy under the statute, thereby permitting the agency to make the initial decision concerning coverage.").

The same reasoning applies to this case.  Plaintiff claims that Pepco and its managers injured him in connection with alcohol testing that Pepco conducted on August 30, 2003 pursuant to its alcohol and drug testing policies, denied leave that he had previously requested and then terminated his employment.  See Am. Comp. ¶¶ 4-20, 34-

44. Plaintiff contends that Pepco managers inflicted emotional distress on and otherwise mistreated him in connection with these actions. See id. Plaintiff also alleges that Pepco injured him by negligently hiring, supervising and retaining the managers involved in these workplace incidents. See id. Because, as in Tatum, the WCA provides the exclusive remedy for these alleged workplace injuries, this Court should dismiss Plaintiff's tort claims as barred by the exclusivity provision of the Act.

### D.     **Plaintiff Fails To State A Claim Upon Which Relief Can Be Granted**

Even if Plaintiff could somehow overcome these procedural impediments to his claims, he has not – and cannot – state a valid claim for relief based on the allegations set forth in his Amended Complaint.

### 1.     **Plaintiff Does Not Plead A Claim For Race Discrimination**

Plaintiff cannot sustain a claim for race discrimination under either section 1981 or the DCHRA. To sustain a prima facie race discrimination claim, a plaintiff must prove that: (1) he is a member of a protected class; (2) he suffered an "adverse employment action;" and (3) the unfavorable action gave rise to an inference of discrimination. Taylor v. Small, 350 F.3d 1286, 1292 (D.D.C. 2003); Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).[4] If the employee satisfies his burden of proving a prima facie case of discrimination, the employer must then articulate a legitimate, non-discriminatory reason for the challenged employment decision. Taylor, 350 F.3d at 1292. Once the employer satisfies this burden of articulation, the burden shifts to the employee to prove by a

---

[4] In the District of Columbia, it is well recognized that claims under the DCHRA are analyzed under the same legal standards as the federal anti-discrimination laws and that the analysis of section 1981 claims mirrors that of Title VII race discrimination claims. See Price v. Washington Hospital Center, 321 F. Supp. 2d 38, 47 (D.D.C. 2004); Lewis v. American Foreign Serv. Assoc., 846 F. Supp. 77, 82 (D.D.C. 1993).

preponderance of the evidence that the reason articulated by the employer is a mere

pretext for intentional discrimination. Id. "In the burden-shifting context, 'pretext' is 'not'

shown not through evidence that an employer's proffered reasons are inaccurate or

incorrect, but through evidence that an employer's reasons are false or a lie." Hanna v.

Herman, 121 F. Supp. 2d 113, 118 (D.D.C. 2000).

Even accepting his allegations here as true, Plaintiff fails to allege the elements of

a prima facie case of race discrimination.

### a.    The Challenged Conduct Does Not Constitute An Adverse Employment Action

First, other than his allegation in Paragraph 27 that Pepco terminated his

employment, Plaintiff does not allege in his Amended Complaint that he suffered an

actionable "adverse employment action."  It is well established that "'[t]o establish an

adverse personnel action in the absence of diminution in pay or benefits,' plaintiff must

show an action with 'materially adverse consequences affecting the terms, conditions, or

privileges of employment.'"  See Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir.

2002); Sullivan-Obst v. Powell, 300 F. Supp. 2d 85, 96 (D.D.C. 2004).  Moreover, an

"employment decision does not rise to the level of an actionable adverse action . . . unless

there is a tangible change in the duties or working conditions constituting a material

employment disadvantage." Stewart, 275 F.3d at 1134.

Here, Plaintiff alleges in his Amended Complaint that Pepco subjected him to

testing, told him that he had not been approved for leave, and required him to undertake

additional testing. Am. Comp. ¶¶ 4-27.  These alleged events, even if accepted as true,

fall far short of the conduct necessary to establish an adverse employment action. See

Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999) (letter of admonishment did not

constitute an adverse personnel action because it affected neither the plaintiff's grade nor

his salary); Newman v. Giant Food Inc., 187 F. Supp. 2d 524, 529 (D. Md. 2002)

(conversation with manager concerning sick leave did not constitute adverse employment

action under section 1981).  As the court recognized in Sweeney v. West, 149 F.3d 550,

556-57 (7th Cir. 1998), if these types of workplace interactions were found to be

materially adverse, the courts would be "sending a message to employers that even the

slightest nudge or admonition (however well intentioned) given to an employee can be

the subject of a federal lawsuit."

### b.  Plaintiff Fails To Plead Any Facts That Would Support Finding An Inference Of Discrimination

Second, there is absolutely no allegation in the Amended Complaint that would

support an inference of discrimination.  To state a prima facie case of discrimination, a

plaintiff must plead facts that, if true, would give rise to an inference of discrimination.

Taylor v. Small, 350 F.3d 1286, 1292 (D.D.C. 2003); Brown v. Brody, 199 F.3d 446, 452

(D.C. Cir. 1999).  Plaintiff here, however, does not offer in his Amended Complaint a

single allegation that links the challenged employment actions with his race or "red eye"

condition.  Plaintiff does not, for instance, allege that Pepco treated employees outside of

the protected classes more favorably than him in connection with the alcohol testing

mandated by the CBA or that it replaced him with  an individual outside of his protected

classes after it terminated his employment.  Consequently, Plaintiff cannot satisfy his

burden of pleading a prima facie case.  Kidane v. Northwest Airlines, Inc., 41 F. Supp. 2d

12, 17 (D.D.C. 1999) (plaintiff's discrimination claim failed because he could not show

he was treated differently than those outside of his protected class).

- 14 -

In connection with briefing on the original Complaint, Plaintiff took the position that several alleged statements or imputed statements of Pepco employees evidenced discriminatory intent. Plaintiff amended his Complaint to add these alleged statements, including the allegations that:

(1)    During the August 30, 2003 alcohol testing, Duarte and another Pepco employee, Naguse Birratu, said "you [pause] shut up" and "You [pause] no" and Plaintiff "understood by the infliction and tone" of their voices that they were saying "Niger [sic]" when they paused, Am. Comp. 12, 15-16;

(2)    Dudley, the union shop steward, said "being a white man they would never have done this to him" and Birratu did not deny the statement, id. at 18; and

(3)    Plaintiff told Birratu "that they were doing this to him because he was a black man and that they would never do this to a white man" and Birratu did not deny the statement, id. at 16.

Even accepting these new allegations as true for purposes of this Motion, it is clear that these alleged imputed "statements" are not admissible and are not, in any event, probative of discriminatory intent. The law concerning the admissibility and relevance of "stray comments" is very well-developed. Stray remarks are irrelevant to the analysis of discriminatory intent unless they were made by the decision maker in close proximity to the time of the challenged job action. See Phillips v. Holladay Prop. Servs., Inc., 937 F. Supp. 32, 37 (D.D.C. 1996) (stray comments by a non-decision maker are immaterial to the analysis of a discrimination claim); Garrett v. Lujan, 799 F. Supp. 198, 200 (D.D.C. 1992) ("[s]tray remarks by persons not involved in the employment decision-making process are not material to a finding of discrimination . . ."). For this reason, alleged

- 15 -

comments of low-level employees are not admissible to prove discriminatory intent. <u>See</u> <u>Buchanan v. Consolidated Stores Corp.</u>, 217 F.R.D. 178, 191 (D. Md. 2003) (comments of two low-level field personnel who were not involved in decisions could not be viewed as direct evidence of discrimination).

The alleged statements, pauses and silences on which Plaintiff relies were allegedly made by Pepco employees Duarte and Birratu, both Senior Employee Relations Investigators, and Loman Dudley, a Lead Mechanic who is also a union shop steward. Each of these employees is either a line employee or a low-level management employee who did not have the authority to discipline or fire Plaintiff. Plaintiff does not even allege that any of these employees made or had any influence over Plaintiff's subsequent termination, the one potentially timely adverse employment action. Moreover, these statements, pauses and silences were made over a year prior to the November 2004 termination decision. Thus, even assuming that they were made, they are not probative of discriminatory intent.

Moreover, even putting aside these clear impediments to their admission, these alleged comments do not evidence discriminatory intent. With respect to the first category of challenged statements, Plaintiff seeks to infer discriminatory intent from the fact that Duarte and Birratu paused while they were speaking to him. Plaintiff claims that he "understood" by the "infliction [sic] and tone" of their voices that they were saying "Niger [sic]" when they paused. Am. Comp. ¶¶ 15-16. This kind of rank speculation on the part of a plaintiff is entirely inadmissible and is not probative of discriminatory intent. Even if Duarte and Birratu did in fact pause while they were speaking to Plaintiff, they could have meant anything – from the fact that they needed to breathe or swallow to the

- 16 -

unspoken, racially-neutral word "jerk" or "drunk" – when they paused.  There is absolutely no basis for inferring that Duarte or Birratu were thinking a racially derogatory term while they were speaking to Plaintiff.

Plaintiff also seeks to infer discriminatory intent from the fact that Birratu did not respond when Dudley and Plaintiff suggested that they were treating Plaintiff differently because he was African-American.  See Am. Comp. ¶¶ 16, 18.  Again, even accepting as true that Dudley and Plaintiff made these comments and that there was no response, there is absolutely no basis for inferring discriminatory intent from Birratu's silence.  A party may be deemed to have admitted a proposition by silence "only if it would have been natural under the circumstances to object to the assertion in question."  United States v. Hale, 422 U.S. 471, 476 (1975).

Here, there is absolutely no basis for concluding it would have been "natural" for Birratu to respond to these statements.  Birratu was a low-level management employee who was simply following company policy by taking Plaintiff for reasonable suspicion testing.  See Appuglies Decl., Ex. B.  Importantly, Birratu did not have the authority to discipline Plaintiff based on the test results or to respond to any allegations of discrimination or harassment made by him.  In these circumstances, it undoubtedly would have been more "natural" for him to remain silent than to debate these allegations with the shop steward and Plaintiff during the testing process.  See Menard v. First Security Serv. Corp., 848 F.2d 281, 288 (1st Cir. 1998) (evidence that plaintiff who alleged that his supervisor (a vice president) did not respond when asked if plaintiff was fired because

of his age was insufficient to support claim for age discrimination because supervisor was

not involved in ultimate decision to terminate him).[5]

## 2. **Plaintiff Does Not State A Claim For Harassment**

Plaintiff's hostile environment claim suffers from similar fatal flaws. In order to

establish a prima facie case for racial harassment, a plaintiff must demonstrate that: (1)

he suffered intentional harassment because of his race; (2) the harassment was severe and

pervasive; (3) the harassment detrimentally affected the plaintiff; (4) the harassment

would detrimentally affect a reasonable person of the same race in that position; and (5)

there is a basis for respondeat superior liability. Powell, 300 F. Supp. 2d at 96; see also

Stewart, 275 F.3d at 1132-33; Lester v. Natsios, 290 F. Supp. 2d 11, 22 (D.D.C. 2003).

To satisfy the first element of a prima facie case, a plaintiff must plead that the

challenged conduct occurred "because of" his race. This element is critical because, as

the Supreme Court emphasized in Oncale v. Sundowner Offshore Serv., Inc., 523 U.S.

75, 81 (1998), "Title VII does not prohibit all verbal or physical harassment in the

workplace; [rather,] it is directed only at '***discrimination*** . . . because of . . . [a protected

characteristic].'" See also Richard v. Bell Atlantic Corp., 209 F. Supp. 2d 23, 35 (D.D.C.

---

[5] In addition, it is entirely unclear how Plaintiff can assert that "red eyes" is a protected characteristic. Obviously, such a claim does not fall within the protective cloak of section 1981, which only addresses race discrimination. Leon v. Federal Reserve Bank, 823 F.2d 928, 931 (6th Cir. 1987) (section 1981 only applies to race discrimination claims). Although the DCHRA lists "personal appearance" as a protected class, there is no authority that would support the argument that the definition is broad enough to encompass conditions such as "red eyes." See D.C. Code Ann. § 2-1401.02 (defining "personal appearance" as "the outward appearance of any person, irrespective of sex, with regard to bodily condition or characteristics, manner or style of dress, and manner or style of personal grooming, including, but not limited to, hair style and beards."). If anything, as found by the arbitrator in this case, Plaintiff's allegation that his eyes were "red" at the time of the incident merely serves to support Pepco's determination that there was reasonable cause to test Plaintiff pursuant to its drug and alcohol testing policy. See Flack Decl., Ex. A.

2002) (to establish that harassment was based on a protected characteristic, plaintiff must establish that "had the plaintiff [not been part of a protected class,] she would not have been treated in the same manner").

Under these standards, an actionable hostile working environment only exists when the workplace "is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Powell, 300 F. Supp. 2d at 96 (citations omitted); see also Singh v. United States House of Representatives, 300 F. Supp. 2d 48, 55-56 (D.D.C. 2004). In determining whether a hostile work environment exists, courts look to the totality of the circumstances, "including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Powell, 300 F. Supp. 2d at 96 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)). "This standard is designed to be sufficiently demanding to ensure that Title VII does not become a 'general civility' code." Singh, 300 F. Supp. 2d at 56 (citations omitted).

Plaintiff here failed to plead any facts establishing a viable hostile work environment claim under these well-established standards. The only incidents of alleged "harassment" identified by Plaintiff in his Amended Complaint are the alleged pauses and silences of Duarte and Birratu during the August 30 alcohol testing. However, as explained above, these alleged pauses and silences, even if accepted as true for purposes of this Motion, simply do not evidence any racial animus. Moreover, even if they somehow did, they constitute a single, isolated incident that does not rise to the level of severe and pervasive harassing conduct. See Kidane, 41 F. Supp. at 16 (D.D.C. 1999)

- 19 -

(isolated incidents do not convert conduct that does not otherwise satisfy the elements of a harassment claim into actionable harassment).

Plaintiff does not even attempt to allege that the remaining incidents alleged in the Amended Complaint, such as the denial of leave and his termination, constitute racial harassment. It is clear that these incidents merely constitute "ordinary tribulations of the workplace" that are insufficient as a matter of law to sustain a hostile environment action. See Richard, 209 F. Supp. 2d at 35 (allegations of rude comments, unjust criticism and stressful working conditions are insufficient as a matter of law for hostile environment claim); Brodetski v. Duffey, 141 F. Supp. 2d 35, 48-49 (D.D.C. 2001) (dismissing hostile environment claim that was based on allegations that "amounted to little more than everyday workplace disputes").

### 3.     Plaintiff Does Not State A Claim For Retaliation

Plaintiff's retaliation claim also fails as a matter of law. In order to establish a prima facie case of retaliation, a plaintiff must prove that: (1) he was engaged in a protected activity known to his employer; (2) he was thereafter subjected to an adverse personnel action; and (3) the existence of a casual link between the two. Stewart, 275 F.3d at 1134; see also Duffey, 199 F.R.D. at 19; Roberts v. Segal Co., 125 F. Supp. 2d 545, 549 (D.D.C. 2000). If the plaintiff satisfies his burden of proving a prima facie case, the employer must then articulate a legitimate, non-discriminatory reason for its employment decision. Duffey, 199 F.R.D. at 20; Hanna, 121 F. Supp. 2d at 118. "If the employer meets its burden of production, the presumption of . . . retaliation is rebutted, and the plaintiff bears the burden of showing that the legitimate reasons offered by the defendant were not the true reasons, but were merely pretextual." Hanna, 121 F. Supp. at

118. Moreover, "[i]n the burden-shifting context, 'pretext' is shown not through evidence that an employer's proffered reasons are inaccurate or incorrect, but through evidence that an employer's reasons are false or a lie." Id.

In support of his retaliation claim, Plaintiff offers the bare allegation that he "was subjected to retaliation, after filing a complaint and lawsuit." Am. Comp. ¶ 33. Plaintiff's retaliation claim appears to be founded solely upon his allegations in Paragraphs 25 through 27 of the Amended Complaint that Pepco representatives communicated to Plaintiff on February 25, 2004 and November 4, 2004 that he could return to work "if he dropped the grievance and the lawsuit" and that, when he declined the offer, Pepco terminated his employment on November 9, 2004. Pepco, however, could not have had knowledge of "the lawsuit" that Plaintiff filed in October 2004 when it allegedly made the initial offer in February, many months before the filing. Moreover, Plaintiff could not allege that Pepco representatives had knowledge of this lawsuit, which had not yet been served, either when it allegedly offered to reinstate him or when it terminated him in November 2004.

In any event, these offers of compromise, even if accepted as true for purposes of this Motion, are entirely inadmissible and irrelevant. As courts have repeatedly recognized, an offer of severance or settlement is not probative of discriminatory or retaliatory intent. For instance, in Carney v. American University, 960 F. Supp. 436, 449 (D.D.C. 1997), the plaintiff, much like Plaintiff here, attempted to use evidence of settlement negotiations to support a claim of retaliation. The court rejected the evidence, finding that it was inadmissible and therefore irrelevant to the issue of retaliatory intent. See also Waldemar v. American Cancer Society, 971 F. Supp. 547, 554 (N.D. Ga. 1996)

- 21 -

("the severance pay offer is not evidence from which a factfinder could reasonably infer that defendant terminated plaintiff because of her age").[6]

Thus, even if Plaintiff could offer proof establishing that Pepco made these offers, they could not form the basis for a claim of retaliation.

### 4.    Plaintiff Cannot Sustain A Claim For Negligent Hiring Or Retention

#### a.    Plaintiff Fails To Allege The Elements Of A Valid Negligent Hiring Or Retention Claim

Plaintiff also cannot sustain a claim for negligent hiring, supervision or retention against Pepco.  To sustain a claim in the District of Columbia for negligent hiring, supervision or retention, a plaintiff must show that his "employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that . . . knowledge, failed to adequately supervise the employee." Brown v. Argenbright Security, Inc., 782 A.2d 752, (D.C. 2001); see also Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d 61, 79-80 (D.D.C. 2005).  To satisfy this showing, the plaintiff must present evidence establishing (1) the applicable standard of care; (2) that the employer breached that standard of care;  (3) that the plaintiff has been damaged; and (4) a causal connection between the alleged breach and the resulting injury. Tarpeh-Doe v. United States, 28 F.3d 120, 124 (D.C. Cir. 1994).  In addition, with respect to causation, the plaintiff must demonstrate that the breach of the duty of care was a "substantial factor" in causing the alleged harm to the plaintiff. Id.

---

[6] See also Crabbs v. Copperweld Tubing Prods. Co., 114 F.3d 85, 89 (6th Cir. 1997) (offer of severance benefits is not evidence of discrimination); Partington v. Broyhill Furniture Indus., Inc., 999 F.2d 269, 271-72 (7th Cir. 1993) (no inference of discrimination could be drawn from offer of severance pay in exchange for release of claims); Selby v. Pepsico, Inc., 784 F. Supp. 750, 758 (N.D. Cal. 1991) (severance offer cannot be used to establish inference of discriminatory intent).

Plaintiff plainly has failed to plead these essential elements in his Amended Complaint. Plaintiff appears to rely on three sets of factual allegations to support his negligence claim: (1) that, although unspecified "grievances" were filed against his supervisor (Defendant Duarte), "PEPCO continue[d] to employ him;" (2) that a drug technician employed by Pepco (Larry Huff) allegedly "engaged in acts of fraud" during the course of his employment; and (3) that the contractor who performed alcohol testing on Plaintiff (Thomas Hyde) was not "licensed." Am. Comp. ¶¶ 30, 35, 37. Even if all of these allegations are accepted as true for purposes of this Motion, it is clear that Plaintiff cannot found a negligence claim against Pepco upon them, and equally clear that augmenting these allegations would do nothing to cure the legal deficiencies in Plaintiff's claim.

As an initial matter, Plaintiff's vague assertion that Duarte "has had a number of grievances filed against him," see Am. Comp. ¶ 30, is plainly insufficient to establish that Pepco breached any duty to Plaintiff. Plaintiff does not identify the source or describe the timing or nature of the alleged grievances. Nor does Plaintiff allege that Pepco knew or should have known, by virtue of the alleged "grievances," of the potential risk that Duarte would act in some "dangerous or incompetent manner" toward Plaintiff. Rather, at best, Plaintiff's Amended Complaint is read as an attempt to impose liability on Pepco solely because it retained a supervisor about whom unidentified individuals in unidentified circumstances filed "grievances" concerning unidentified matters. This vague allegation, even if true, is plainly insufficient to state a negligence claim against Pepco under D.C. law. See Phelan v. City of Mount Rainier, 805 A.2d 930, 937-38 (D.C. App. 2002) (plaintiff must allege that "employer knew or should have known its

- 23 -

employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee").

Plaintiff's allegations concerning Larry Huff are equally insufficient to sustain a negligence claim. In his Amended Complaint, Plaintiff alleges that Huff "was under investigation for falsifying and tampering with drug and alcohol tests during the same period that Plaintiff was tested." Am. Comp. ¶ 28. Huff is an independent contractor who was retained by Pepco to perform drug and alcohol testing pursuant to its policies and Department of Transportation regulations. Flack Decl. at ¶ 3. It is undisputed, however, that Huff was *not* the technician who performed the August 30, 2003 testing challenged by Plaintiff in his Amended Complaint.[7] Id. Huff's alleged "acts of fraud," therefore, did not – to the extent they even occurred – contribute to Pepco's decision to terminate Plaintiff or otherwise cause him any harm. The lack of any such causal connection is fatal to Plaintiff's negligence claim against Pepco. See Lancaster v. Canuel, 193 A.2d 555, 558 (D.C. App. 1963) ("no liability attaches to the employer unless the incompetency or unfitness of the servant was the proximate cause of the injury").

Plaintiff similarly cannot sustain a negligent hiring or retention claim based upon his allegations concerning Hyde. In his Amended Complaint, Plaintiff suggests that Pepco was negligent because Hyde was "unlicensed" at the time that he administered the breathalyzer test to Plaintiff. Am. Comp. ¶ 37. Significantly, however, Plaintiff does not

---

[7] Although Huff subsequently tested Plaintiff on October 8, 2003 to determine whether he was fit to return to work, that testing was *negative* and was completed *before* any allegations were raised about Huff's testing. Id. Also, Plaintiff does not purport to assert any claim based on this return-to-work testing.

allege that either the CBA or Pepco's policies required Pepco's contractors to be "licensed."[8]  Furthermore, although Plaintiff takes issue in his Amended Complaint with the *date* of Hyde's test results, he does not allege that Hyde's test results were *incorrect*. Indeed, it is remarkable that nowhere in the Amended Complaint does Plaintiff deny that he was intoxicated on the day in question.  Nor does Plaintiff allege that Hyde was in any way unfit to perform the breathalyzer test, that he administered the test incorrectly, or that Pepco was aware of any lack of competence on Hyde's part.

Under these circumstances, there is no question that Plaintiff has failed to state a valid negligence claim against Pepco.  Ryczek v. Guest Serv., Inc., 877 F. Supp. 754, 764 (D.D.C. 1995) (granting judgment in employer's favor where there was no evidence to suggest that employer "knew or should have known" about any improper activity by its employees); Tarpeh-Doe, 28 F.3d at 124 (rejecting negligent supervision and retention claim where there was no evidence that the defendant's failure to address issues concerning a doctor's availability and attitude caused the injuries caused by his alleged malpractice); Phelan, 805 A.2d at 940 (even assuming the misconduct alleged by plaintiff, he could not show that defendant owed duty to the decedent or that its alleged negligence proximately caused the shooting incident).

**b.    Plaintiff's Negligent Supervision And Retention Claim
Is Barred As A Matter of Law**

Plaintiff's negligence claim is also barred because he has not alleged – nor could he – that Duarte, Huff or Hyde committed any legally cognizable tort in connection with either the alcohol testing or his termination.  As this Court recognized in Daisley,

---

[8] In any event, Hyde was a trained and certified Breath Alcohol Technician.  See Flack Dec. ¶ 7, Ex. C.

- 25 -

negligent supervision claims are not viable unless founded upon some underlying tortious conduct. In Daisley, the plaintiff asserted a negligent supervision claim based on his former employer's decision to place him under the supervision of an individual who, in the plaintiff's opinion, lacked the proper knowledge and experience. 372 F. Supp. 2d at 79. In support of his claim, the plaintiff asserted that, if he had been supervised by "competent and talented individuals," his employment would not have been terminated. Id. at 81. The Court rejected Plaintiff's theory of liability, explaining that the negligent supervision claim must fail because the only underlying injury alleged by the plaintiff was the termination of his employment, which was not actionable given the at-will nature of the employment relationship. Id. That is, because the plaintiff failed to establish that his supervisors committed any legally cognizable tort, the plaintiff could not sustain a claim against his employer under a negligent supervision theory. Id. at 81.

The same result is required in this case. Plaintiff does not allege – and cannot establish – that Duarte engaged in any legally cognizable tortious conduct simply be requiring Plaintiff to undergo a breathalyzer test. Similarly, Hyde's administration of the alcohol test did constitute any actionable legal wrong. Finally, as explained above, Huff did not have any interactions with Plaintiff whatsoever that concern the testing at issue in this case. In fact, the only tort claims, other than negligent supervision, that Plaintiff even asserts in his Amended Complaint are for negligent and intentional infliction of emotional distress. See Am. Compl., Counts III & IV. As explained infra at 27-28, these claims are not viable for several distinct reasons. Consequently, pursuant to Daisley, the Court must dismiss Plaintiff's negligence claim against Pepco for lack of any underlying, legally valid tort.

5.    **Plaintiff Cannot Sustain His Intentional Infliction Claims**

To sustain a claim for intentional infliction of emotional distress in the District of
Columbia, Plaintiff must allege: (1) "extreme or outrageous conduct" which (2)
"intentionally or recklessly" causes (3) "severe emotional distress to another." Kerrigan
v. Britches of Georgetowne, 705 A.2d 624, 628 (D.C. 1997).  To establish the required
degree of outrageousness, the plaintiff must allege conduct that is "so outrageous in
character, and so extreme in degree, as to go beyond all possible bounds of decency, and
to be regarded as atrocious, and utterly intolerable in a civilized community." Id.  In the
employment context, [courts] traditionally have been demanding in the proof required to
support an intentional infliction of emotional distress claim." Id.; see also Lockamy v.
Truesdale, 182 F. Supp. 2d 26, 38 (D.D.C. 2001) ("in an employment context, the proof
required to support a claim for intentional infliction of emotional distress is particularly
demanding").

Even if Plaintiff could somehow survive preemption, there is no question that he
would not be able to plead an intentional infliction claim.  Indeed, cases with far more
egregious facts than Plaintiff alleges in his Amended Complaint have been held to be
insufficient to state such a claim.  For instance, in Lockamy, 182 F. Supp. 2d at 38, the
plaintiff alleged in support of his emotional distress claim that his supervisor intentionally
harassed, intimidated, and threatened him, sabotaged and unfairly scrutinized his work,
denied him the opportunity to work overtime, instructed him that he could not address
white employees by their first names, told him that he could not speak to certain African-
American employees, cursed at him, and told him that he could not use a typewriter that
others in his department could use.  The Court concluded that, although "troubling," the

- 27 -

plaintiff's allegations did not meet "the very stringent level required to qualify as extreme and outrageous." See also Hoffman v. Hill & Knowlton, Inc., 777 F. Supp. 1083, 1095 (D.D.C.1991) (allegations that employer allegedly interfered with employee's ability to do job, stated false, pretextual reasons for dismissing an employee knowing they would be communicated to others, and dismissed employee were not extreme and outrageous).[9]

Here, even accepting his allegations as true for purposes of this Motion, Plaintiff simply does not allege actions on the part of Defendants that rise to the level of "extreme and outrageous" conduct, as interpreted by District of Columbia courts. Plaintiff alleges that, after he filed a grievance challenging his alcohol testing, a supervisor denied him leave and, over a year later, Pepco terminated his employment. It is clear that, these allegations, even accepting them as true, are substantially less egregious than allegations at issue in the long line of decisions in this jurisdiction rejecting emotional distress claims.[10]

Consequently, Plaintiff's emotional distress claims should be dismissed.

---

[9] See also Joyner v. Sibley Hospital, 82 A.2d 362, 273 (D.C. 2003) (allegations that supervisor intentionally closed an office door on plaintiff's hand in an attempt to prevent her leaving a disciplinary meeting were not sufficiently extreme and outrageous); Kerrigan, 705 A.2d at 658 (allegations that supervisor targeted the Plaintiff for a sexual harassment investigation, manufactured evidence against him in order to establish a false claim of sexual harassment, leaked information from the investigation to other employees, and unjustifiably demoted him to the position of store manager in order to promote a woman to his position were not actionable).

[10] With respect to Plaintiff's negligent infliction of emotional distress claim, the claim must certainly fail because, in the District of Columbia, the plaintiff must show either that: (1) the emotional distress resulted from direct physical injury or (2) if there no physical impact, he was present in the zone of physical danger created by the defendant's negligence and feared for his own safety. See Mackey v. United States, 8 F.3d 826, 831 (D.C. Cir. 1993); Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner, 949 F. Supp. 13, 20 (D.D.C. 1996). Plaintiff here does not even attempt to allege that he suffered *any* physical injury or that he was in the "zone of physical injury."

- 28 -

E.    **Plaintiff's DCHRA Claim Against Defendants Duarte And Johnson Also Must Be Dismissed Because They Are Not "Employers" Within the Meaning of the DCHRA**

The DCHRA makes it unlawful for an "employer" to discriminate against employees on the basis of race, among other characteristics. D.C. CODE § 2-1402.11(a)(1).  Courts in the District of Columbia have made it clear that only "employers," and not individuals such as Defendants Duarte and Johnson, are subject to liability under the DCHRA.  See Hunter v. Arkansas Restaurants Corp., 3 F. Supp. 2d 9, 20 (D.D.C. 1998) (dismissing plaintiff's discrimination claim against a co-worker because "liability under the DCHRA does not extend to employees"); Hodges v. Washington Tennis Serv. Int'l, Inc., 870 F. Supp. 386, 387 (D.D.C. 1994) (dismissing plaintiff's discrimination claim against a co-worker because "neither Title VII, § 1981, nor District of Columbia Human Rights law creates grounds for a cognizable claim against a co-worker").  Thus, Defendants Duarte and Johnson should be dismissed from Count One of Plaintiff's Complaint.

III.    **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court enter an

Order dismissing Plaintiff's claims against them with prejudice.

Respectfully submitted,


___/s Connie N. Bertram_____
Connie N. Bertram (Bar No. 435840)
Venable LLP
575 7th Street, NW
Washington, D.C. 20004
(202) 344-4000
(202) 344-8300 (fax)

Jill D. Flack (Bar No. 420020)
Associate General Counsel
Potomac Electric Power Company
701 9th Street, NW
Washington, D.C. 20068
(202) 872-2756
(202) 872-3281 (fax)

Counsel for Defendant

August 5, 2005

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BENJAMIN RAMEY,                      )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        Case No. 1:04CV02088 (RJL)
                                     )
POTOMAC ELECTRIC POWER               )
COMPANY, et al.,                     )
                                     )
            Defendants.              )

### DECLARATION OF EILEEN APPUGLIES

I, Eileen Appuglies, do hereby depose and swear as follows:

1.      I am over the age of eighteen (18) and am otherwise competent to make this Declaration.  The information contained in this Declaration is based on my personal knowledge.

2.      I am currently employed by Potomac Electric Power Company ("Pepco") as a Manager, Human Resources Business Partner.  In this capacity, I am responsible for managing human resource functions, such as staffing, compensation, benefits, and employee relations, for Pepco.

3.      Attached as Exhibit A to this Declaration is a true and accurate copy of relevant portions of the January 24, 1999 collective bargaining agreement ("CBA") between Pepco and Local Union 1900 of the International Brotherhood or Electrical Workers.

4.      Attached as Exhibit B to this Declaration is a true and accurate copy of Pepco's Drug and Alcohol Policy.

5.      Attached as Exhibit C to this Declaration is a true and accurate copy of the December 11, 1996 Agreement between Pepco and Local 1900.

6.      Disputes concerning the Drug and Alcohol Policy which involve bargaining unit employees, are resolved pursuant to the grievance and arbitration provisions of the CBA.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me is willingly false, I am subject to punishment.

Eileen Appuglies

# EXHIBIT A

# CONTENTS

|  |  | Page Number |
|---|---|---|
| Preamble | ...................................................... | 1 |
| Article 1 | Management ................................... | 1 |
| Article 2 | Bargaining Unit .............................. | 1 |
| Article 3 | Union Membership and Dues. | |
| | Deduction ..................................... | 2 |
| Article 4 | Union Business ............................... | 4 |
| Article 5 | Pay Progression, Work Assignments and Job | |
| | Classifications ................................ | 5 |
| Article 6 | Special Premiums ............................ | 10 |
| Article 7 | Overtime ...................................... | 13 |
| Article 8 | Seniority ...................................... | 16 |
| Article 9 | Reduction in Working Forces .............. | 22 |
| Article 10 | General Provisions .......................... | 24 |
| Article 11 | Holidays ...................................... | 25 |
| Article 12 | Vacations ..................................... | 26 |
| Article 13 | Sickness Disability Allowances ........... | 29 |
| Article 14 | Leave of Absence ........................... | 33 |
| Article 15 | Limited Services ............................. | 36 |
| Article 16 | Suspension and Discharge ................. | 37 |
| Article 17 | Grievance Procedure ....................... | 38 |
| Article 18 | Arbitration .................................... | 40 |
| Article 19 | Application Laws and Regulations ........ | 41 |
| Article 20 | Safety and Health ........................... | 41 |
| Article 21 | Unauthorized Work Stoppages, Slowdown, or | |
| | Lockouts ...................................... | 42 |
| Article 22 | Benefit Plans ................................. | 42 |
| Article 23 | Identify of Parties and Complete Agreement .......... | 45 |
| Article 24 | Duration, Reopening and Renewal ....... | 45 |

i

## PREAMBLE

THIS COLLECTIVE BARGAINING AGREEMENT IS MADE BY AND BETWEEN POTOMAC ELECTRIC POWER COMPANY (HEREINAFTER REFERRED TO AS THE "COMPANY") AND LOCAL UNION #1900 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (HEREINAFTER REFERRED TO AS THE "UNION"). THE PARTIES DO HEREBY AGREE AS FOLLOWS:

### ARTICLE 1

### MANAGEMENT

**Section 1.01.** By reason of the nature of the business of the Company it is essential, and is therefore agreed, that the management of the Company, the supervision and control of all operations and the direction of the working forces, including, but not limited to, the right to hire, suspend, furlough, discipline, discharge for cause, promote, demote, or transfer employees, and the right to operate the Company, shall be vested in, and reserved to, the Company, except as herein limited.

### ARTICLE 2

### BARGAINING UNIT

**Section 2.01.** The Union is recognized as the sole collective bargaining agent for the bargaining unit, which is composed of all employees of the Company at all work locations, regardless of the method of pay, excluding only confidential employees, property protection employees (guards), and professional, supervisory and management employees.

**Section 2.02.** Regular employees are employees whose employment is reasonably expected to be permanent at the time they are employed, and it is contemplated that they will work in each calendar week a normal workweek.

**Section 2.03.** Temporary employees are employees whose employment is with the definite understanding that the employment is not of a permanent nature, but it is contemplated that they will work a normal workweek while employed. The Company will inform the Union of the employment and assigned Department of such employees and the expected duration of their employment.

**Section 2.04.** Whenever the terms "employee" or "employees" are used in this Agreement, they shall refer only to employees in the bargaining unit as identified herein unless specifically stated otherwise.

**Section 2.05.** Casual employees are employees who are employed to work part-time or less than a normal workday or a normal workweek. They may be assigned to bargaining unit work but are not in the bargaining unit or subject to this Agreement. These employees will not in any instance deprive qualified regular employees of overtime work. The Company will inform the Union of the employment and assigned Departments of such employees.

**Section 2.06.** Any existing bargaining unit job moved from bargaining unit to non-bargaining unit will be negotiated with the Union by the Company.

**Section 2.07.** The Union and the Company shall keep each other informed as to the individuals authorized to act in Union-Management relationships.

1



determined by the Company's Medical Director, he/she shall be returned to the job in question. Concerning a job in a higher classification or a job in another Occupational Group, if the employee is found to be capable of performing the duties of such job as determined by the Medical Director, the employee shall be given consideration on the next job vacancy.

## ARTICLE 16

## SUSPENSION AND DISCHARGE

**Section 16.01.** The maintenance of discipline is the responsibility of the Company and to that end the Company may discipline employees for cause. A copy of all disciplinary actions issued to Bargaining Unit employees will be forwarded to the Union. This includes all Oral Reminders, Written Reminders, Decision Making Leaves (DML), and notices of meetings regarding continuation of employment (and resulting determinations from such meetings).

**Section 16.02.** In the event the Company believes that a Bargaining Unit employee's problems regarding work performance, conduct & safety, or attendance appears to warrant discharge, a meeting will be scheduled for that employee before his/her General Manager (or designated representative); other Company representatives may also be present.

(a)   The employee and the Union will be notified, in writing, at least two (2) days prior to the meeting. The notification will include the date and time of the meeting, a statement describing the employee's performance problem(s), and a statement to the employee advising of his/her right to Union representation (also included will be the Union's telephone number).

(b)   The Company will endeavor to assure that a Union Steward is available when an employee is notified of the meeting. In the event a Steward is not available, the Union office will be notified as soon as reasonably possible.

(c)   The purpose of the meeting is to assure that an appropriate decision is made regarding the Bargaining Unit employee's continued employment with the Company. A representative of the Union may attend that meeting. If desired, the employee may allow that Union official to represent him/her at that meeting. During this meeting, all parties will make all relevant facts available. Further, the Company may allow witnesses with relevant information to testify at the meeting.

(d)   After the meeting, and after the Company has completed any additional investigation that it deems appropriate, the employee will be advised, in writing, of the Company's final determination. A copy of that determination will be forwarded to the Union. It is understood that employees will remain at work pending the Company's final determination, unless that employee has been placed on Crisis Suspension or Excused With Pay.

**Section 16.03.** In the event a Bargaining Unit employee is placed on Crisis Suspension or Decision-Making Leave, the Company will endeavor to assure that a Steward is present when the employee is notified. In the event a Steward is not available, or it is impractical to have a Steward present, the management representative who places the employee on Crisis Suspension or Decision-Making Leave is responsible for ensuring that the Union office is notified as soon as possible. Additionally, the employee will be provided with the Union's telephone number.

(a)   It is understood and agreed that a Crisis Suspension does not necessitate a meeting before the employee's General Manager (or designated Representative) unless that suspension is expected

to be converted to discharge. However, in the event a Crisis Suspension extends past five (5) days, the Union shall have the right to request a hearing. In the event of such request, the parties shall, within two (2) days, arrange to meet and discuss the employee's employment status.

**Section 16.04.** In the event the Union disagrees with a Company decision to discharge a Bargaining Unit employee, the Union may, within five (5) working days after the determination, appeal the discharge directly to Arbitration in accordance with Article 18. However, prior to Arbitration, the Union may request that a Step 2 meeting be held to discuss the matter.

**Section 16.05.** Crisis Suspensions may be appealed directly to Step 2 of the Grievance Procedure, Article 17.

## ARTICLE 17

### GRIEVANCE PROCEDURE

**Section 17.01.** It is considered by the parties that all grievances should be presented promptly, discussed without delay and answered within a reasonable time. A grievance is defined as a violation of a specific term(s) or provision(s) of this Agreement or of an established precedent in terms and/or conditions of employment. It is also considered that grievances should be settled whenever possible at the levels where the greatest familiarity with the subject matter exists. Any individual employee or group of employees shall have the right to present grievances and to have them considered for adjustment, provided any adjustments are not inconsistent with the terms of this Agreement and a Union representative has been given an opportunity to attend as provided in this procedure. Therefore, it is agreed that all grievances shall be subject to the following grievance procedure.

**Section 17.02.** Any employee who believes that he/she has a grievance shall, within one (1) week after the cause of the grievance is alleged or known to have taken place, discuss it with his/her immediate supervisor. The employee may, if he/she desires, have his/her Steward present during the discussion. The supervisor shall within three (3) workdays after the discussion, notify the employee or Steward (if present at the discussion) of his/her disposition of the matter.

**Section 17.03.** Step 1—If the appropriate supervisor's response does not resolve the grievance, then within two (2) weeks after the cause for the grievance is alleged or known to have taken place, the grievance shall be stated in writing on forms available from the Company or the Union, listing facts, reasons, Agreement provisions in question, and/or established precedent in terms and conditions of employment. The grievance must be numbered (by the Local Union Office), dated and signed and one (1) copy shall be delivered to the Department Head and one (1) copy shall be delivered to Employee Relations and Communications Center. If a grievance is not delivered to the Department Head within two (2) weeks after occurrence of cause for the grievance, it will no longer exist.

**Section 17.04.** Within one (1) week of delivery of the aforesaid grievance to the Department Head, the appropriate supervisor(s), the grievant, Steward, and/or Chief Steward shall meet to resolve the grievance. Within one (1) week after the meeting, the appropriate supervisor(s) shall give written notice to the Steward, with a copy to the Local Union President, of the determination of the grievance. If the grievance is not resolved, it may be taken to Step 2.

**Section 17.05.** Step 2—If the grievance is not resolved in Step 1, the President of the Local Union (or his/her designated representative) may, within two (2) weeks after receipt of the written determination in

Step 1, submit in writing to the Manager - Employee Relations and Communications Center (or his/her designated representative) a request for a meeting to resolve the grievance. Within one (1) week after receipt of such request from the Local Union President (or his/her designated representative), the Manager - Employee Relations and Communications Center (or his/her designated representative) shall arrange to meet with the Union's Grievance Committee (grievant, Steward, Chief Steward, and/or Local Union President or his/her designated representative) to resolve the grievance. Such meeting will be held within four (4) weeks of the receipt of the request unless mutually agreed otherwise. The Union and the Company may have present and eligible to participate in the discussion any persons they so desire. Within two (2) weeks after the meeting, the Manager - Employee Relations and Communications Center (or his/her designated representative) shall give written notice to the Local Union President (or his/her designated representative) of the determination of the grievance. If the grievance is not resolved in Step 2, it may be taken to arbitration as provided in Article 18.

Section 17.06. Discussions regarding grievances shall be conducted as far as practicable during the employee's working hours. Payment for discussions regarding grievances shall be compensated as outlined in Article 4 of this Agreement. All employees shall first obtain permission from their supervisor to be absent for such meetings and must report to him/her upon returning.

Section 17.07. Grievances relating to matters which extend beyond a single Department, Division, or Group may originate in the Step of the grievance procedure where management authority to settle the matter exists, but no grievance may be taken to arbitration until it has been presented in Step 2, except where time limits as described in Section 17.05 have been exceeded and then only if the party seeking to move the matter to arbitration has not caused or contributed to the time limits being exceeded or except as otherwise provided for in Section 16.05 regarding discharges.

Section 17.08. Whenever a grievance involves a group of employees, a committee of not more than three persons, which shall include the appropriate Steward and at least one of the employees affected, may be substituted for an employee wherever the word "employee" is used in the grievance procedure.

Section 17.09. It is agreed that the grievance procedure or time limits may be varied at anytime by agreement of the parties when such action appears to be necessary or desirable.

Section 17.10. The Union and the Company shall inform each other of persons authorized to represent them in grievance matters.

Section 17.11. Grievances of the Company or Union shall originate in the lowest step where authority to take appropriate action exists.

Section 17.12. The grievance procedure is applicable to all employees in the bargaining unit except as otherwise restricted elsewhere in this Agreement, provided, however, that terminations of regular employees during their first year of continuous service and terminations of temporary employees at anytime may not be the subject of a grievance.

Section 17.13. Failure to comply with the time limit provisions by employees or Union representatives shall invalidate the grievance. Failure to comply with the time limit provisions by Management representatives shall permit the grievance to be advanced to the next Step of the grievance procedure.

## ARTICLE 18

### ARBITRATION

**Section 18.01.** Any grievance not resolved in Step 2 of the grievance procedure may be submitted to impartial arbitration.

**Section 18.02.** The Company or the Union shall notify the other party of its desire to proceed to arbitration within two (2) weeks of receipt of the Step 2 answer. Such notice shall be in writing and shall specify the grievance to be arbitrated and state the issue(s) involved.

**Section 18.03.** An impartial Arbitrator shall be selected by mutual consent of the Company and the Union as soon as practicable after receipt of the request for arbitration. If the parties do not agree on the selection of an Arbitrator within two (2) weeks after receipt of the request for arbitration, the American Arbitration Association shall select from a standing panel (agreed to by the parties in the Memorandum of Understanding by which this Agreement was established) the five Arbitrators least recently selected under this Article and shall provide a list thereof to each party. Within one (1) week following receipt of the list of Arbitrators, the parties shall meet and alternate in striking names from the list with the loser of a coin toss striking first. The remaining name, after each party has struck twice, shall be the impartial Arbitrator.

**Section 18.04.** The arbitration hearing shall be held as quickly as possible. The award of the Arbitrator shall be final and binding upon both parties and upon the employee(s) involved. The fees and expenses of the Arbitrator, and any other expenses agreed to by the parties prior to the arbitration hearing, shall be shared equally by the Company and the Union. The Arbitrator shall have power and authority to arbitrate only those matters expressly made subject to arbitration by the terms of this Agreement and shall rule only on the issues submitted to him/her. The Arbitrator shall have power only to interpret this Agreement and shall not have the power to alter or amend it.

**Section 18.05.** At the request of either party, a grievance involving the discharge or discipline of an employee shall be submitted to Expedited Arbitration (as defined below). The Arbitrator for such Expedited Arbitrations shall be appointed from a standing panel of at least ten (10) Arbitrators agreed to by the parties in the Memorandum of Understanding by which this Agreement was established. As soon as practicable after receipt of the arbitration request referred to in Section 18.02 above, the parties shall try to agree on a date(s) to arbitrate the case. If agreement is reached, the parties shall notify the American Arbitration Association (hereinafter "AAA") of the desired date(s). The AAA will then appoint an Arbitrator from the parties' standing panel who is available on the requested date(s). Prior to the parties' selection of a mutually acceptable date(s), neither party shall be informed of the availability of a named Arbitrator on a particular date. If the parties are unable to agree on a date within two (2) weeks after receipt of the request for arbitration, either party may so notify the AAA, requesting that the AAA appoint an Arbitrator who will set the time and date(s) after considering the parties' positions on when the case should be heard. In appointing Arbitrators under this Section, the AAA shall make every effort to evenly distribute the cases among the standing panel of Arbitrators. The Expedited Arbitration will be conducted according to the Expedited Arbitration rules in effect July 1, 1983, except to the extent inconsistent with this Section.

40

# 1999 General Memorandum of Understanding

Whereas, the Potomac Electric Power Company (the "Company" or "Pepco") and Local 1900 of the International Brotherhood of Electrical Workers (the "Union") by mutual agreement conducted early negotiations to establish a successor Collective Bargaining Agreement to the 1998 Collective Bargaining Agreement and,

Whereas, the Company and the Union have agreed to a successor Collective Bargaining Agreement (hereinafter referred to as the "Agreement" or "CBA"), whose terms are set forth below;

It is, therefore, further agreed and understood between the Company and Union that:

I.    Contract Duration
The 1999 Agreement shall be effective upon ratification except as provided otherwise in this Agreement.  The term of this Agreement shall be to and including May 31, 2003 and it shall thereafter continue in full force and effect for succeeding periods of 12 calendar months each, unless either party, prior to April 1, 2003, or April 1 of any year thereafter, shall serve written notice upon the other party of its desire to amend and/or terminate the Agreement as of the following June 1.  The Contract shall read as set forth in the 1993 Collective Bargaining Agreement except to the extent modified herein or modified through other written agreements between the parties.  The Annex shall be modified consistent with written agreements between the parties since the signing of the 1993 Collective Bargaining Agreement.

II.    General Wage Increases
A.    The Company shall provide a general wage increases (GWI) of 3% in 1999, 3% in 2000, and 3% in 2001 to eligible employees.  In 2002, there will also be a 3% increase unless either party, for any reason, provides 60-days notice prior to June 1, 2002 of its intention to reopen the contract. Any such reopener will be limited to wages and benefits.  If no agreement is reached regarding wages and benefits by June 1, 2002, either party may terminate the agreement at any time by giving 48 hours written notice thereof to the other party.

B.    The 1999 increase shall be effective as soon as practicable after ratification.  If the Agreement is ratified in December 1998, the Company shall endeavor to place the GWI in effect by the payroll period beginning February 14, 1999.  The Company further agrees that if the Agreement is ratified in December 1998, each employee employed in the bargaining unit from January 3, 1999, to the beginning of payroll period in which the 1999

# EXHIBIT B

*framey*

# HUMAN RESOURCES
# CORPORATE PERSONNEL POLICIES

---

## Click Below To Return

Corporate Personnel Policies All | Corporate Personnel Policies Recent Changes

---

| | |
|---|---|
| **Policy Section:** | 80: Personnel - General |
| **Policy Title:** | Drug and Alcohol |
| **Policy Number:** | 80.200 |
| **Effective Date:** | 12/23/1999 |
| **Issued Date:** | 03/01/2000 |
| **Supersedes Policy:** | Corporate Personnel Policy No. 80.200 dated 1/1/95 |

---

## ▼Policy Information:

### PURPOSE

The purpose of this policy is to establish and maintain a safe workplace and a healthy and efficient workforce free from the effects of substance abuse.

### GENERAL

A copy of this Corporate Personnel Policy No. 80.200, Drug and Alcohol, should be posted in a conspicuous place in each department and each employee should receive a copy of this Policy.

### INTRODUCTION

The Company is firmly committed to providing a safe workplace and promoting high standards of employee safety and health. Employee involvement with drugs or alcohol, on or off the job, can take its toll in the workplace by increasing absenteeism, by lowering productivity and morale, by undermining public confidence in the Company, and most importantly, by undermining the safety of employees and the public. The use or possession of illegal drugs is particularly unacceptable because, among other things, it involves criminal activity under state and federal laws. A comprehensive policy concerning drugs and alcohol is necessary to ensure that the Company continues to fulfill its special responsibility to provide energy in a safe, economical and reliable manner, and to ensure that employees are made aware of the Company's rules in this area.

### Employee Advisory Service

Early identification and treatment of a substance abuse problem is the best method for protecting the interests of all concerned. Since 1976, the Company has provided an avenue for seeking professional assistance to deal with such problems: the Employee Advisory Service.

Pepco's Employee Advisory Service is available to any employee who needs counseling or assistance in dealing with a drug or alcohol problem. Ultimately, however, it is the employee's responsibility to take the first step. While Pepco encourages voluntary participation in the Employee Advisory Service, such participation will not prevent, or lessen the extent of disciplinary action for violations of the rules set

forth in this or any other policy.

## STANDARDS REGARDING DRUGS AND ALCOHOL

The following minimum action shall occur where an employee has not lived up to the standards set forth below. More severe discipline, however, may be necessary where circumstances warrant it. For instance, if while unfit for duty, an employee is involved in an accident, altercation, or otherwise causes damage to person or property, more severe discipline may be imposed. Previous violations of this or other policies or rules will be considered in determining appropriate discipline and may result in more severe discipline.

### Alcohol Standards

### Use, Possession, Distribution

Employees must not bring alcohol onto Company property or places where they are on duty at any time. An employee who uses, possesses, or distributes alcohol while on duty or on Company property will be subject to appropriate discipline (from Written Reminder to Termination), depending on the circumstances involved.

### Fitness for Duty/Alcohol in System

Employees must report to work and while on duty or on Company property must remain in a condition to perform their duties safely and with maximum efficiency.

- An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property. An employee found to have a to have a blood-alcohol concentration of less than 0.05% (or its equivalent) shall be considered in violation of this standard where it can be determined based on accepted medical ranges that the employee had a concentration of 0.05% or more (or its equivalent) while on duty or on Company property. In either of these circumstances, the employee shall be placed on Decision-Making Leave (DML).

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license may not have a blood-alcohol concentration of 0.02% or more while on duty or on Company property. An employee who has a blood-alcohol concentration of 0.02% but less than 0.04% (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be given an Oral Reminder. In such cases, the employee is unable to work for 24 hours pursuant to federal regulations and shall be placed on crisis suspension absent other arrangements.

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license who has a blood-alcohol concentration of .04% but less than 0.05% (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be given a Written Reminder. In such cases, the employee will be unable to work until certain conditions are met pursuant to federal regulations and shall be placed on crisis suspension. The employee must see a medical health care professional recommended by the Company and must follow his/her recommendations before the employee can return to duty. In

addition, the employee must pass a return-to-work alcohol test. During the next 12 months, the employee will be required to submit to at least 6 random tests for alcohol.

- An employee in a job classification requiring a Commercial Motor Vehicle driver's license who has a blood-alcohol concentration of 0.05% or greater (or has a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property shall be considered in violation of this standard and shall be placed on crisis suspension until certain conditions are met pursuant to federal regulations. The employee must see a medical health care professional and must follow his/her recommendations before the employee can return to duty. In addition, the employee must pass a return-to-work alcohol test and will be subject to 2 years of drug and alcohol testing as set forth in the paragraph below

- An employee who tests positive in violation of any of the standards described above shall initially be placed on crisis suspension until the Company completes its investigation of the matter which normally involves obtaining test results. If as a result of that investigation the Company determines that the employee violated the standards set forth above, the employee will be disciplined accordingly. An employee testing positive in violation of this policy shall not be paid for any time missed due to crisis suspension. Notwithstanding the deactivation periods for disciplinary actions set forth in the Positive Discipline Policy, Pol. No. 30.100, any employee who violates this policy and is not discharged shall be placed on drug/alcohol policy probation for three (3) years and shall be subject to periodic, unannounced drug and alcohol testing during the first two (2) years of probation. If the employee violates any rules set forth in this policy during his or her probationary period, he/she shall be discharged. In addition, consistent with the Positive Discipline Policy, if an employee receives Decision-Making Leave (DML) for violating the Drug & Alcohol Policy, discharge will occur if any performance problem (work performance, conduct & safety or attendance) warranting formal discipline takes place during the 18-month period the DML is active.

## Drug Standard

## Purchase, Sale, Use, Possession, Distribution

Except in cases involving properly prescribed medication, employees may not bring drugs onto Company property or places where they are on duty at any time. An employee who buys, sells, uses, possesses, or distributes drugs while on duty or on Company property shall be discharged on the first occurrence. Illegal substances will be confiscated and turned over to the appropriate law enforcement agency. The law enforcement agency will also be informed of the circumstances under which the drugs were seized and the identity of the individuals involved.

## Drugs in System

The well-known hazards associated with the use of drugs, together with Pepco's policy of providing a safe workplace and a healthy and efficient workforce that is free from the effects of substance abuse, require a policy designed to ensure a drug-free environment. Accordingly, it is the Company's policy that, except for properly prescribed medication, employees may not be at work or on Company property with drugs (or drug metabolites) in their system – regardless of when and where the drugs were taken. Employees should be aware that drugs (or drug metabolites) are present and detectable in the human body for a substantial period of time after each use.

When there is a triggering event or a reason to believe drugs may have been used or in other circumstances necessitating testing, the Company will use diagnostic tests, including blood and/or urine tests, to detect drugs or drug metabolites in an employee's system. When time and circumstances permit, this process may involve a preliminary urine screen. The urine samples collected will also be sent to an independent laboratory for further analysis. If the preliminary urine screen shows the presence of marijuana (or its metabolites), a blood sample will be drawn. This sample will also be sent to the independent laboratory for analysis.

If any such test reveals drugs (or drug metabolites) in an employee's system, the employee will be subject to disciplinary action as set forth below:

- **Heroin, Cocaine, Morphine, PCP an Hallucinogens**

  An employee found to have any detectable concentrations of heroin, cocaine, morphine, phencyclidine (PCP), or hallucinogens (or metabolites of any such drugs) in his or her system shall be discharged on the first occurrence.

- **Other Drugs**

  An employee found to have any detectable concentrations of marijuana in his or her system, as established by a blood test, shall be discharged on the first occurrence.

  o  Where a blood test is not conducted for marijuana or where such a test is conducted but is negative, an employee found to have any detectable concentrations of marijuana (or its metabolites) in his or her system as established by a test other than a blood test (for instance, by urinalysis) or an employee found to have any detectable concentrations of any other illegal drug or drug metabolites (except those listed above) in his or her system as established by any test shall be disciplined as follows:

  o  Where there is corroborating evidence that the employee was unfit for duty, the employee shall b discharged on the first occurrence.

  o  Where there is no corroborating evidence that employee was unfit for duty, the employee shall be placed on (or continued on) crisis suspension pending further investigation. The employee will be retested five (5) working days from the date of the test. Depending on the results of the test, the following action will be taken:

  o  If the employee tests negative for all drugs or drug metabolites, he/she shall be placed on Decision-Making Leave and shall receive no back-pay for time missed due to crisis suspension; or

  o  If the employee tests positive for any drug or drug metabolites, he/she shall be discharged except in circumstances set forth in the paragraph immediately below; or

  o  If the employee tests positive for marijuana (and negative for other drugs), the Company will determine whether, based on the concentrations detected, there is sufficient evidence that the employee has consumed marijuana since his/her initial test. If the Company determines that there is sufficient evidence of such consumption, the employee shall be discharged. If the Company determines there is insufficient evidence of such consumption since the initial test, the employee shall be continued on crisis suspension and subject to

**Employee Benefits Information**
All (Exempt) | Recent Changes (Exempt) | All (Non-Exempt) | Recent Changes (Non-Exempt)

HR Home Page

**EXHIBIT C**

# AGREEMENT

This Agreement is between the Potomac Electric Company (hereinafter, "Company"), the International Brotherhood of Electrical Workers (hereinafter, "Union"), Local 1900 and provides as follows:

1.  Effective January 1, 1995, the Company has incorporated the breathalyzer as part of the testing process for the following tests:

    - Any and All CMV Required Tests as mandated by Department of Transportation (DOT);

    - When there is a triggering event or a reason to believe drugs or alcohol may have been used;

    - When an employee is subject to periodic, unannounced testing in the following circumstances:

        a.  During his/her first year of continuous service with the Company;

        b.  When such testing is required under local or federal legislation, regulation or administrative rule;

        c.  During the first two years following any infractions of the drug and alcohol policy that causes an employee to be placed on Decision-Making Leave.

    - At any other time required under local or federal legislation, regulation or administrative rules.

2.  With the incorporation of the breathalyzer in the above tests the Company and the Union agree to the following for purposes of applying PEPCO's drug and alcohol policy, which will be used for any and all tests when extrapolation is warranted:

    a.  The human body metabolizes "burns off" alcohol at a rate of 0.01 to 0.03g/dL per hour. The Company will use 0.015g/dL per hour for all extrapolations when deemed necessary. When the test is performed one (1) hour or less after an employee has reported to work an extrapolation will not be done.

RECEIV
DEC 16 1
INDUSTRIAL R

Extrapolation Agreement
December 6, 1996
Page 2


_____          12-11-96
For the Company                              Date


_____          12-11-96
For the Union                                Date

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BENJAMIN RAMEY,           )
                             )
          Plaintiff,     )
                             )
v.                          )    Case No. 1:04CV02088 (RJL)
                             )
POTOMAC ELECTRIC POWER    )
COMPANY, et al.,            )
                             )
          Defendants.   )

## DECLARATION OF JILL FLACK

I, Jill Flack, do hereby depose and swear as follows:

1.      I am over the age of eighteen (18) and am otherwise competent to make this Declaration. The information contained in this Declaration is based on my personal knowledge.

2.      I am currently employed by Potomac Electric Power Company ("Pepco") as an Associate General Counsel.

3.      I appeared as counsel for Pepco in arbitration number 16 300 00643 04 between Pepco and Plaintiff's union, the International Brotherhood of Electrical Workers, Local 1900 ("Local 1900").

4.      On December 14, 2004, arbitrator Charles Feignebaun rendered a decision in that arbitration. A true and accurate copy of the decision is attached as Exhibit A.

5.      I also appeared as counsel for Pepco in arbitration number 16 300 E 00137 05 between Pepco and Local 1900.

6.     On July 18, 2005, arbitrator Jerome H. Ross rendered a decision in that arbitration. A true and accurate copy of the decision is attached as Exhibit B.

7.     I have enclosed as Exhibit C true and correct copies of certifications provided to me by Thomas Hyde, a contractor retained by Pepco to perform alcohol testing.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willingly false, I am subject to punishment.

_____/s_____
Jill Flack

::ODMA\PCDOCS\DC1DOCS1\200544\1

# EXHIBIT A

---

POTOMAC ELECTRIC POWER
COMPANY

and

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
LOCAL 1900

---

AAA No. 16 300 00643 04

President's Grievance
Benjamin F. Ramey

### Appearances

For the Company

Jill D. Flack, Esq.
David A. Duarte

For the Union

Joseph E. Hawkins
John A. Coleman
Benjamin F. Ramey, Grievant

Arbitrator

Charles Feigenbaum

The parties to this dispute are the Potomac Electric Power Company [Company], and the International Brotherhood of Electrical Workers, Local 1900 [Union]. The Arbitrator was selected under the procedures contained in the parties' collective bargaining agreement. The hearing was held in Washington, D.C., on December 10, 2004.

Both parties were represented and had full opportunity to examine and cross-examine witnesses, to offer evidence, and to set forth their positions. All witnesses were sworn. Both parties made oral closing argument at the hearing. Based on the evidence, the positions argued by the parties, and the observation of witnesses while testifying, I make the following findings and Award.

### ISSUE

The parties stipulated the issue as:

Did the Company have just cause to issue the Grievant Decision Mak-

ing Leave? If not, what shall be the remedy?

## RELEVANT GOVERNMENT REGULATIONS AND COMPANY RULES

### I.  U.S. DEPARTMENT OF TRANSPORTATION FEDERAL MOTOR CARRIER SAFETY REGULATIONS

**§40.225  What form is used for an alcohol test?**

(a) The DOT Alcohol Testing Form (ATF) must be used for every DOT alcohol test beginning February 1, 2002. . . .

**§40.227  May employers use the ATF for non-DOT tests, or non-DOT forms for DOT tests?**

(a) No, as an employer, BAT, or STT,[1] you are prohibited from using the ATF for non-DOT alcohol tests. You are also prohibited from using non-DOT forms for DOT alcohol tests. Doing either subjects you to enforcement action under DOT agency regulations.

**§382.307  Reasonable suspicion testing**

(a) An employer shall require a driver to submit to an alcohol test when the employer has reasonable suspicion to believe that the driver has violated the prohibitions of subpart B of this part concerning alcohol. The employer's determination that reasonable suspicion exists to require the driver to undergo an alcohol test must be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the driver.

(c) The required observations for alcohol and/or controlled substances reasonable suspicion testing shall be made by a supervisor or company official who is trained in accordance with §382.603. The person who makes the determination that reasonable suspicion exists to conduct an alcohol test shall not conduct the alcohol test of the driver.

(d)  Alcohol testing is authorized by this section only if the observations required by paragraph (a) of this section are made during, just preceding, or just after the period of the work day that the driver is required to be in compliance with this part. A driver may be directed by the employer to only undergo reasonable suspicion testing while the driver is performing safety-sensitive functions, just before the driver is to perform safety-sensitive functions, or just after the driver has

---

[1] BAT (Breath Alcohol Technician), STT (Screening Test Technician).

PEPCO/IBEW 1900
AAA 16 300 00843 04 (Benjamin Raney)
Page 3 of 10

ceased performing such functions.

(e)(1) . . . If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

## II.  HUMAN RESOURCES -- CORPORATE PERSONNEL POLICIES -- NO. 80.200  DRUG AND ALCOHOL

### Alcohol Standards

### Fitness For Duty/Alcohol in System

Employees must report to work and while on duty or on Company property must remain in a condition to perform their duties safely and with maximum efficiency.

> An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more (or have a concentration equal to, or in excess of, a corresponding level as determined by a different diagnostic test such as a Breathalyzer) while on duty or on Company property. An employee found to have a to have a blood-alcohol concentration of less than 0.05% (or its equivalent) shall be considered in violation of this standard where it can be determined based on accepted medical ranges that the employee had a concentration of 0.05% or more (or its equivalent) while on duty or on Company property. In either of these circumstances, the employee shall be placed on Decision-Making Leave (DML).

### Other Rules

### Testing

Employees will be required to submit to blood, urine, breathalyzer or other diagnostic tests to detect alcohol and/or drugs (or drug metabolites) in their system under any of the following circumstances:

> When there is a triggering event or a reason to believe drugs or alcohol may have been used;

- When such testing is required under local or federal legislation, regulation or administrative rule;

## BACKGROUND

The Grievant, Benjamin F. Ramey, is employed by the Company as a Conduit Installer A. His work requires him to drive commercial vehicles and he has a Commercial Driver's License (CDL). He is covered by the U.S. Department of Transportation (DOT) Federal Motor Carrier Safety Regulations.

He worked the midnight to noon shift on August 30, 2003. His supervisor was Gregory M. Johnson. Shortly after the Grievant reported for work at the Benning Service Center, he asked Mr. Johnson if he could go off-site and buy cigarettes; Mr. Johnson permitted him to do so. Mr. Johnson testified that he saw nothing unusual about the Grievant at this time.

At or about 2 a.m., Mr. Johnson needed the Grievant to operate a 26,000 pound dump truck. Mr. Johnson asked some of the Grievant's fellow employees to find him and have him report to Mr. Johnson so he could give him the assignment. They could not locate him at first and Mr. Johnson told them to look for him in the parking lot. After a little while, first one employee, and then a second, told Mr. Johnson that the Grievant was in no condition to drive. One of them described him as being "out of it."

The Grievant came into Mr. Johnson's office some 15 minutes later. Mr. Johnson said he smelled of alcohol, his speech was slurred and incoherent, he was unsteady on his feet and his eyes were very bloodshot.

Mr. Johnson concluded that the Grievant was under the influence of alcohol. He called his general manager for instructions and also spoke to other Company officials. Eventually, he spoke with Senior Business Partner David A. Duarte, who told him to bring the Grievant with him and report to Company headquarters at Edison Place. When they arrived, Mr. Duarte and Union steward Loman Dudley were there. They were joined by Human Resources Business Partner Negussie B. Birratu at about 5 to 5:30 a.m. Both Mr. Duarte and Mr. Birratu have Labor Relations responsibilities.

Mr. Duarte stated that it was about 3:30 to 4 a.m. when the Grievant and Mr. Johnson arrived at Edison Place. He spoke with the Grievant at this time and said there was a very strong odor of alcohol about him. He had trouble maintaining his balance, his speech was slurred and his eyes "were very, very bloodshot." He asked the Grievant if he had been drinking and said that the Grievant told him that he had had "a couple of beers" before coming to work. Mr. Johnson corroborated that the Grievant made this statement. Mr. Duarte decided that there were grounds for reasonable suspicion that the Grievant had been drinking and that testing was appropriate.

Mr. Birratu testified that he considered the Grievant to be under the influence of alcohol based on his observation of his unsteady gait, slurred speech and very bloodshot eyes. He, Mr. Duarte and Mr. Johnson, all testified that they had been trained in alcohol and controlled substance use as specified in DOT regulation §382.603.

Mr. Duarte attempted to contact the Company's on-duty tester so that the Grievant could be tested. There was no response. He tried some three or four times without success. He called a Benefits Department supervisor and said there was need to make some alternative arrangement for testing. She told him she would make calls and get back to him, which she did about an hour later. She gave him a location in Northern Virginia where she said the testing could be conducted. Mr. Duarte then arranged for Mr. Birratu, Mr. Johnson, Mr. Dudley and the Grievant to drive from Edison Place to that location. By this time it was about 6 a.m.

The trip was one misadventure after another. First, the men got lost. Then, when they arrived, it was at the wrong location. They had gone to Inova Hospital; it did not administer tests. They were told they should have gone to its clinic, a satellite facility. There were administrative problems at the clinic and no testing was done there. All of this took some hours, during which time they kept in telephone contact with Mr. Duarte. It was decided that they

would all meet at Edison Place and the men drove back there.

When it was evident that the trip to Northern Virginia had been unsuccessful, the benefits supervisor attempted to arrange for someone to come to Edison Place to test the Grievant there. She was able to get Thomas Hyde, a self-employed certified Drug Screen Collector and Breath Alcohol Technician. He arrived at Edison Place at about 10 a.m. It took some time before he was ready to administer the tests. There was a problem with getting the correct forms and he did not begin testing until after 11 a.m.

The Company's original intention had been to have the Grievant tested under the DOT rules. However, it was now more than eight hours since Mr. Johnson and Mr. Duarte had reached their "reasonable suspicion" conclusions. Mr. Hyde stated, as the others were already aware, that it was now too late for application of DOT testing. Based on Corporate Personnel Policy No. 80.200, Mr. Duarte told Mr. Hyde to give the Grievant non-DOT tests.[2]

Mr. Hyde tested the Grievant twice. The first Breathalyzer result was 0.070%. This was at 11:09 a.m. He did a confirmatory test at 11:32 a.m., with a score of 0.065%. The Grievant was issued Decision-Making Leave (DML) based on the 0.065% Breathalyzer result. DML is the disciplinary step one level below termination. It is required by Policy No. 80.200 when an employee has a concentration of 0.050% or more while on duty or Company property.

At the hearing, the Grievant vigorously denied that he had been drinking before coming to work or that he had said anything about having a couple of beers. He also stated he had not had anything to drink while on his shift. Mr. Dudley testified that he did not see signs of alcohol impairment and said that a doctor at the clinic had told him that the Grievant didn't look drunk to him.

Both the Grievant and Mr. Dudley said that the Grievant had not been al-

---

[2] Mr. Hyde tested the Grievant for both drugs (urine test) and alcohol (Breathalyzer). However, because the discipline given him was based solely on the results of the Breathalyzer test there is no need for further mention of the drug test.

lowed to go to the bathroom while at Edison Place before going to Virginia.
Mr. Dudley said he was allowed to go at the second location only after Mr.
Dudley protested when Mr. Birratu refused the Grievant's request. The
Grievant said he was never *allowed* to go. He took it upon himself to do so in
Virginia when he felt he could no longer hold himself in. He also said Mr.
Duarte had shouted "Shut up" at him when he made a second request at Edison Place.

Mr. Duarte denied having told the Grievant to shut up, but agreed that he
had not allowed him to visit the bathroom at Edison Place when he first re-
quested to do so. That was when he was still hoping that they could reach the
on-duty tester and have DOT tests performed. He reasoned that allowing the
Grievant to relieve himself at the time might result in a lengthy wait for him
to provide another urine sample when the tester arrived. He said, however,
that once it was apparent that the tester was not coming, the Grievant was
permitted to go to the bathroom. Mr. Birratu stated that the Grievant had
gone to the bathroom twice; once at Edison Place and then at the second Vir-
ginia location.

Mr. Dudley testified that Mr. Hyde told the group that he did not have the
correct forms and it would be illegal to administer the test under the circum-
stances. Then, after Mr. Hyde and Mr. Duarte met separately, Mr. Hyde pro-
ceeded to conduct the test. When Mr. Dudley questioned him about this, Mr.
Hyde reiterated that this was illegal, but said he was going to do it anyway.
The Grievant testified that after Mr. Hyde stated there was a problem, Mr.
Duarte motioned for him to follow him and they went into a separate room
and closed the door. They came out after about five minutes and he was told
to take the Breathalyzer test.

Both Mr. Duarte and Mr. Hyde denied any separate meeting. Mr. Hyde also
denied having said that testing would be illegal. He testified that the testing
had been legally performed. He stated that the DOT regulations recognize

that non-DOT testing can be done so long as non-DOT forms are used.

## DISCUSSION AND FINDINGS

There are two key questions here. The first is, was the testing of the Grievant improper, making the results of the Breathalyzer null and void? In the event that the testing was not improper, the second question is, was he in violation of Corporate Personnel Policy No. 80.200? The answers to these questions are "No" and "Yes." That is, there was nothing improper in the administration of the Breathalyzer test, and the Grievant was in violation of Corporate Personnel Policy No. 80.200. For that reason, there was just cause for the DML.

The Company stipulated at the hearing that more than eight hours had elapsed between the time when Mr. Duarte and Mr. Johnson reached their "reasonable suspicion" conclusions and when the Grievant was given the Breathalyzer test. Because of this, a DOT alcohol test could not be administered, see §382.307(e)(1).

The Union concludes from this that this provision made it impermissible to test the Grievant for alcohol concentration. Period. It argues that once the eight hours had passed, he should not have been tested and the test result is null and void. The record does not support this reasoning.

The DOT regulations specify the circumstances under which DOT alcohol testing is to be done. Nothing that has been brought to my attention indicates that if the requirements for DOT testing are not met, other, non-DOT alcohol testing, is also prohibited.

It is true that the last sentence of §382.307(e)(1) states:

> If an alcohol test required by this section is not administered within eight hours following the determination under paragraph (a) of this section, the employer shall cease attempts to administer an alcohol test and shall state in the record the reasons for not administering the test.

However, the context makes it plain that the mandate to employers to cease

attempts to administer an alcohol test after eight hours applies *to a DOT alcohol test*. The regulations, §40.227(a), recognize that an employer may administer a non-DOT test. The only prohibition in this regard is that the DOT alcohol testing form (ATF) may not be used for a non-DOT alcohol test. Conversely, a non-DOT form may not be used for a DOT alcohol test.

The Grievant was given a non-DOT alcohol test and Mr. Hyde used a non-DOT form. I find, therefore, that there was nothing illegal about conducting the Breathalyzer test as Mr. Hyde did and I credit his testimony that he never said that it was.

Corporate Personnel Policy No. 80.200 furnishes authority, separate from the DOT regulations, for conducting "reasonable suspicion" alcohol tests. It does not contain time limits.

There was a valid basis for the Company to require the Grievant to undergo "reasonable suspicion" alcohol testing under this policy. Mr. Duarte, Mr. Johnson and Mr. Birratu all testified credibly that they observed that the Grievant's speech was slurred, his eyes were very bloodshot and he was unsteady on his feet. These were observations any layman could make. In addition, all three had received training under §382.603.

Mr. Hyde testified credibly about the manner in which he administered the test and the calibrations he made. I find that the test was accurate and that, at 11:32 a.m. on August 30, 2003, the Grievant had an alcohol concentration of 0.065%. That being the case, the discipline of DML was required under Policy No. 80.200.

Finally, there is disputed testimony about whether Mr. Duarte shouted "Shut up" at the Grievant and the degree to which the Company barred him from going to the bathroom to relieve himself. I make no finding about these matters because, even if the testimonies of the Grievant and Mr. Dudley on these points are fully credited, the Company's alleged actions would not warrant

overturning the DML in these circumstances. The overwhelming evidence in this case is that the Grievant was under the influence of alcohol while on duty and on Company property.

### AWARD

This grievance is denied.

Charles Feigenbaum

December 14, 2004
Date

# EXHIBIT B



In the Matter of the Arbitration )

Between )

POTOMAC ELECTRIC POWER )
COMPANY )

and )

LOCAL UNION NO. 1900, )
INTERNATIONAL BROTHERHOOD )
OF ELECTRICAL WORKERS )

Post-It® Fax Note  7671 | Date 7-12-05 |

To AMBEA CALL | From JEROME ROS

Co/Dept | Co.

Phone # | Phone #

AAA No. 16-300 E 00137 05
Grievant: Benjamin F. Ramey
Issue: Termination

Before:

Jerome H. Ross, Arbitrator

Date of Hearing:

July 11, 2005

Appearances

For the Company:

Jill D. Flack, Esq.

For the Union:

Joseph E. Hawkins

### Statement of the Case

In this grievance, dated November 4, 2004, the Union protests the termination of
Benjamin F. Ramey, a Conduit Installer A, with a seniority date of October 7, 1991.  As a
remedy, the Union requests that the grievant be reinstated and made whole for all lost
wages and benefits.

In the early morning hours of August 30, 2003, the grievant's supervisor on the
midnight shift informed Dave Duarte, a Sr. Business Partner in human resources, that the
grievant appeared under the influence of alcohol or drugs.  Duarte determined to have the
grievant tested for drugs and alcohol under the U.S. Department of Transportation (DOT)

2

regulations. The grievant's job duties involve the operation of commercial motor vehicles in excess of 26,000 pounds, and he is required to hold a commercial drivers licence (CDL). Due to the holiday weekend and a storm, difficulties were encountered in arranging for the tests. When the tests were finally administered, the grievant tested positive with a blood-alcohol concentration (BAC) of 0.065. The Company's Drug and Alcohol Policy states:

> "An employee in any job classification may not have a blood-alcohol concentration of 0.05% or more...while on duty or on Company property. In...these circumstances the employee shall be placed on Decision-Making Leave (DML).

On September 10, 2003, after retesting negative and determined to be drug-free, the grievant was returned to work with no driving duties. An appointment was made for him to discuss entry into a rehabilitation program with the Corporate Nurse, Stacy Saucier.

On September 15, 2003, the grievant met with Russ Wade, a licensed psychiatric social worker, who serves as a substance abuse professional for the Company and other companies in the Washington, D.C. metropolitan area. Wade is referred through a managed care company, Value Options, which provides employee assistance program services to employers. Wade's role is to meet with an individual to assess and match up the person with an appropriate treatment or educational facility. After two-to-four weeks in a treatment or educational program, Wade again sees the person to ensure that he or she is "doing what they are supposed to do." He sees the person a third time after the program has ended to ensure satisfactory completion of its requirements. During the course of the program, Value Options is in touch with the program provider and alerts Wade if a person does not complete the program.

3

By letter dated September 15, 2003, Wade informed Saucier that he had evaluated the grievant in accordance with the DOT Substance Abuse Guidelines after the grievant's violation of DOT rules with a positive substance abuse screen on August 30, 2003. Wade recommended enrollment at the Kolmac Clinic in an intensive outpatient alcoholism treatment program.[1]

In a memorandum dated September 30, 2003, and titled Decision-Making Leave, Bill Sigafoose, then the Division Manager for Underground Maintenance and Construction, confirmed for the grievant the events that led up to placement on the DML on September 10, 2003.[2] The memorandum further states:

> ...While you are on DML, the final level of Positive Discipline, it is necessary for you to maintain your total job performance at a fully acceptable level in every area, since any further problem in the next eighteen (18) months in any performance category (work performance, conduct and safety, or attendance) that require disciplinary action, will result in your discharge.

> You are also being placed on drug and alcohol probation for a period of three (3) years and shall be subjected to random drug and alcohol testing during the first two (2) years of the probation period. This testing is in addition to the CMV Drug Testing of Policy 10.00. If you fail to meet any of the provisions set forth during the probationary period, you will be discharged.
> You must meet and consult with the Corporate Nurse as to an appropriate rehabilitation program. You must make a good faith and successful effort to complete any recommended rehabilitation program, including counseling. If you fail to attend, participate in or complete rehabilitation activities which are required by the health care professionals to whom you are referred, you shall be discharged.

---

[1] DOT regulations and Company policy require enrollment in a rehabilitation program before an employee who has violated DOT rules is allowed to drive a commercial motor vehicle.

[2] An arbitration award, dated December 14, 2003, denied the Union's grievance protesting the issuance of the DML in connection with the incident on August 30, 2003.

4

Although the grievant continued to report to work and perform duties that did not involve the operation of commercial motor vehicles, he did not contact Kolmac. After Duarte and Saucier learned that the grievant had not enrolled in the program, Saucier sent the grievant a memorandum, dated October 8, 2003, stating:

> In response to recent information regarding your recommended treatment program, Pepco has been informed that you have refused to schedule and [sic] appointment at the KOLMAC.
> At this time, you are required to schedule and [sic] appointment with the KOLMAC program that has been recommended to you by Mr. Russ Wade. Once you have scheduled an appointment, you are to call me to give me the date and time of the appointment.
> Once you have attended the first appointment you are also required to call to notify me that you have attended the appointment and provide the dates of subsequent schedule of sessions in the KOLMAC program....
> Upon receipt of this requested information, I will notify the Compliance department and they will be in contact with you regarding return to work.

On October 13, 2003, the grievant tested negative on a urine drug screen, as reported on October 16, 2003, in connection with entry into the Kolmac program. Kolmac's intake sheet for the grievant, which appears to have been completed by a Kolmac interviewer, states under "Reason for seeking treatment at this time": "Pt took breathalyzer 12 hours after admitting to employer that he had been drinking....Referred here by employer (PEPCO)." The sheet further states under "Problems and stresses including work": "Work  Went to work drunk – EAP Stacey Saucier – Cannot return to work until completes Program. Denies all other stressors. Denies he is alcoholic." The grievant's Kolmac medical file notes indicate that he began taking antabuse in conjuction with his treatment.

While continuing to work and perform non-DOT related duties, the grievant attended all scheduled evening sessions at Kolmac during the two-week of period October 13-27, 2003 (excluding Saturday and Sunday), after which he was discharged

from the program. The Session Notes, which are completed by the Kolmac counselor at each session, indicate that the grievant reported having been abstinent on all dates except before the October 20 and 27 sessions. The counselors' narrative notes for each session, which are not totally legible, state:

> October 13 – introduced [illegible] himself to the group
> October 14 – not clear of necessity of [illegible]
> October 15 – doesn't see himself as a recovering alcoholic[.] Hopes to take advantage of the treatment.
> October 16 – hasn't admitted his alcoholism yet, probably [because] hasn't had typical withdrawal symptoms – any [illegible] these sessions interfere with his routines
> October 20 – relapsed over weekend; doesn't see himself as "alcoholic"
> October 21 – different outlook than before – more energized with abstinence & likes the feeling – has some alcohol in the house but doesn't bother him [-] usually drank on weekends – so far so good
> October 22 – admits he is a "recovering alcoholic" – last weekend didn't drink & it was OK
> October 23 – doing alright. Evenings are full around home
> October 27 – drank on feelings of reacting to others.

On October 28, 2003, at about 1:00 a.m., the grievant went to the emergency room at Howard University Hospital, where he was diagnosed with high blood pressure and referred to his personal physician who, it appears, in turn referred him to a psychiatrist. The grievant called in to report off work and was on sick pay until the end of April 2004, after which he filed for workers compensation.

By letter dated November 10, 2003, Wade informed Saucier that the grievant was discharged from the Kolmac treatment program as of October 27, 2003. The letter further states that "Rhonda of Value Options in Texas" told Wade that she had received the copy of the termination letter, and the grievant was terminated for having a positive breathalizer reading while in attendance.

6

On March 4, 2004, the grievant was examined by Dr. Schulman, an occupational psychiatrist, after referral by Colonial Health, the Company's health care administrator, for an independent medical evaluation. Dr. Schulman's 11-page report, dated March 12, 2004, concludes with the following recommendations:

> A. Mr. Ramey is close to, but not quite yet at, [sic] maximum medical improvement (MMI). I recommend that he remain compliant with the treating psychiatrist's medical recommendations.
> B. In all medical likelihood, Mr. Ramey should recover without a residual impairment. I advise that he consult again with his treating psychiatrist, follow the doctor's recommendations for treatment, and then be released to return to work effective within the next two weeks.
> C. Finally, Mr. Ramey has had a long history of addiction. His recent violation of the company's drug and alcohol policy indicates that Mr. Ramey does require alcohol rehabilitation treatment as a condition of his return to work. I recommend he resume appropriate treatment.

By memorandum dated July 16, 2004, Sigafoose directed the grievant to report to a Continued Employment Meeting on July 22, 2004. The memorandum states:

> On September 30, 2003, you were issued a Decision Making Leave (DML) for violating the Company's Drug and Alcohol Policy. At that time you were informed that you must enter into and successfully complete an approved rehabilitation program. You were also informed that failure to do so would result in your termination from the Company. This requirement was further documented in my memorandum to you of September 30.
> On November 10, 2003, the Company was notified that you had been discharged from the approved rehabilitation program that you had entered. You were terminated from the program for having a positive Breathalizer reading while in attendance. This was a program violation.
> As a result of the above incident, you have not fulfilled your obligation to successfully complete an approved rehabilitation program as required by your DML agreement, consequently, it appears discharge is warranted.

At the Continued Employment Meeting on July 22, 2004, John Coleman, the Union President, produced the document dated October 16, 2003, which reflects the grievant's negative test results for drugs. Duarte pointed out that the test was not for

alcohol. Coleman replied that it was the only test administered to the grievant while he was in the Kolmac program. The meeting was adjourned pending further investigation regarding the grievant's testing and documented results while in the program.

Duarte called Value Options and learned that people in rehab programs are tested frequently by breathalizer for alcohol, but the test results are not disclosed to employers or outsiders, because participants occasionally "fall off the wagon" and records are not kept. Value Options sent Duarte a copy of the grievant's Kolmac Clinic Discharge Summary, dated November 6, 2003, which states:

> Significant Findings: The patient had a 12 year history of pathological use of alcohol. Manifestations of this included:
> *Reduced internal control over use
> *Abnormally high tolerance
> *Continued use despite adverse consequences (continued drinking despite job suspension)
> Course of Treatment:
> Detoxification and Medication: Detoxification was not required. Antabuse was administered on a daily basis. No other medications were prescribed.
> Rehabilitation Phase: Attempts to stabilize the patient were unsuccessful because of repeated relapses.
> Continuing Care Phase: The patient did not enter this phase of the treatment program.
> Discharge Description: Did Not Complete Rehabilitation: Staff Initiated. The patient continued to deny an alcohol problem, did not feel that he needed treatment, and continued drinking alcohol.

By memorandum of November 8, 2004, Sigafoose informed the grievant that his employment was terminated. The memorandum states in part:

> Subsequent to the [Continued Employment] meeting the Company contacted Kolmac Clinic regarding your performance in the rehabilitation program. The clinic stated that you did not complete the Rehabilitation Phase due to repeated relapses. Consequently, you did not enter the Continuing Care Phase of the program. Further, they indicated that you continued to deny an alcohol problem, that you did not feel you needed treatment, and that you continued to drink alcohol. Consequently, it was

8

determined that you could not be successfully treated under the program at that time and your participation was terminated.

As you are aware, one of the conditions of the DML that was issued to you on September 30, 2003, is that you must enter into and successfully complete an approved rehabilitation program for drugs and alcohol. Additionally, failure to do so would result in your termination from the Company. As indicated above, you did not complete the program at Kolmac Clinic. Consequently, you have failed to meet your obligation to the Company as agreed to as a part of the DML.

On January 6, 2005, a Step Two meeting was held to discuss the instant grievance. Coleman produced a letter, dated July 27, 2004, from Kolmac Clinic to an investigator in the D.C. Defender Services Office, stating that the grievant "was given a random urinalysis on October 13, 2003. The results were negative." During the meeting, Coleman emphasized that the letter does not indicate the grievant's failure to pass a breathalizer test, as asserted in several other documents.

<u>Issue</u>

Whether the grievant was discharged for just cause; and if not, what is the appropriate remedy?

<u>Company Position</u>

The Company asserts that the grievant's testimony was incredible with regard to drinking one beer prior to reporting to work on August 30, especially because he tested positive at a BAC of 0.065 and admitted to heavier drinking in interviews with Kolmac, Dr. Schulman and Duarte. It further maintains that the grievant refused to enroll in the Kolmac Clinic, and he never contacted Wade. In this regard, it points out, the choice of a rehab program was Wade's, not the grievant's. The Company submits that the Union's

reliance on the grievant's October 13 urinalysis test results for entry into the Kolmac program means little, given that he did not successfully complete the program. Further, it contends, the grievant's testimony that he never admitted to being an alcoholic and did not drink while in the program is contrary to the Kolmac records, Wade's understanding and Dr. Schulman's report. The Company emphasizes that the grievant understood the DML terms concerning successful completion of the program to avoid termination of employment. Moreover, it notes, his job duties required a CDL in the operation of commercial motor vehicles. It points out that although initially there was confusion concerning the reasons for the grievant's discharge from the program, the Discharge Summary, which management later received, establishes the reason as his noncompliance with the program's requirements. The Company points to the grievant's contradictory testimony that he had determined to leave the program anyway when Kolmac coincidently had issued the termination action, yet he would have completed the program. It says that management gave the grievant numerous chances to enter and successfully complete a program. The Company observes that, notwithstanding the DML's clear admonition that further infractions within the next 18 months would result in termination, he violated the requirement to attend and successfully complete the Kolmac treatment program.

## Union Position

The Union contends that the grievant was attempting to complete his rehabilitation prior to his termination on October 27. It labels as coincidental his hospital visit on October 28, after which, it notes, he remained on sick pay under a doctor's care

through April 2004. Moreover, it says, Dr. Schulman released him to return to work. The Union emphasizes that Wade's letter to Saucier and the notice of Continued Employment Meeting dated July 16, 2004, are totally wrong in citing a positive breathalizer test as the reason for the grievant's discharge from the Kolmac program. The Union observes that management waited nine months after the grievant's discharge from the program to issue the Continued Employment Meeting letter, and then management waited another four months after that meeting to issue the termination letter -- totaling more than one year from the grievant's discharge from the program. During that period, it submits, Duarte learned of the information in Kolmac's letter to the D.C. Defender Services Office, stating that the grievant had no positive tests while in the program. The Union maintains that the Session Notes are contrary to the reasons for discharge that are given in the Discharge Summary and the Company's termination memorandum, because the notes reflect only one relapse, midway through his participation, and contain several positive comments concerning his progress. Additionally, it observes, a Kolmac counselor initially determined that his history was not so serious as to require detoxification. It rhetorically questions how the grievant could have relapsed in light of his testimony that he had stopped drinking prior to entering the program and absent a positive alcohol or drug test. For these reasons, the Union argues, the grievant was erroneously terminated from the program and never given an opportunity to complete rehabilitation. It concludes that had management fully investigated the matter and found these inconsistencies, the termination memorandum would not have been issued.

11

### Discussion and Findings

I find the grievant's testimony to have been inconsistent and generally incredible in the face of strong contradictory evidence. The grievant testified to having had "maybe a beer" at about 6:00 p.m. before reporting to work at 11:00 p.m., yet he tested positive with a BAC level of 0.065 on the morning of August 30, 2003, and Wade testified that he reported drinking after 7:00 p.m., and Dr. Schulman's report states: "Mr. Ramey acknowledged that he had been drinking prior to coming to work, in violation of company policy." The grievant testified that he waited several weeks for Wade to receive documents from the Company after the meeting on September 15, 2003, yet Wade testified that he expected the grievant to contact Kolmac after the meeting. The grievant testified that he drank one beer one time while in the Kolmac program before the October 20 session, yet the Session Notes for October 20 and 27 respectively state, obviously based on his self-reporting, that he "relapsed over weekend" and "drank on feelings of reacting to others." The grievant testified that he denied being a "recovering alcoholic" and said he was an "assumed alcoholic" in the Kolmac sessions, yet the Session Notes for October 21 – 23 reflect otherwise. The grievant's testimony that he refused management's offers to return to work after discharge from Kolmac because he didn't need the treatment program is supported by Dr. Schulman's report,[3] yet he testified that on October 27 his intent was to complete the rehab program.

---

[3] Dr. Schulman's report states, under a section titled "History of his Subsequent Alcohol Rehabilitation Treatment":

On October 20, 2003, Mr. Ramey began treatment at the Kolmac Clinic. Meanwhile, he was continuing to work during the day. He attended the program from 5:30 p.m. to 8:30 p.m. Although he felt that he did not have a problem with alcohol, he initially agreed to attend the program.

It was Mr. Ramey's contention, however, that he had to "get out of the program." On October 24, 2003, he advised program personnel that he had had a beer,

12

I further find that the assertions of the grievant and the Union mischaracterize the information contained in Kolmac's letter of July 27, 2004, to the D.C. Defender Services investigator. The letter states that "Mr. Ramey was given a random urinalysis on October 13, 2003." It does not address the frequency of breathalizer tests or other tests for alcohol. Accordingly, there is no basis for the assertion made in the Continued Employment Meeting held on July 22, 2004, five days before the date on the Kolmac letter, that the grievant had tested negative on all tests administered to him at Kolmac. In this regard, based on the inconsistencies and contradictions with other evidence in the grievant's testimony concerning other factual questions, I have not credited his testimony that he took one breathalizer test early in the program. Indeed, the grievant's inconsistent testimony reaches to this question, given his acknowledgement that in the Step Two meeting he "might have said" he'd taken a breathalizer test at every session. Finally, I find no evidentiary basis for the Union's assertion that Duarte knew the contents of the July 27 letter prior to the termination memorandum of November 8, 2004. In this regard, I find credible Duarte's hearsay testimony, based on a Value Options representative's statements to him during his inquiry following the Continued Employment Meeting on July 22, 2004, that in the interest of patient rehabilitation, the test results for group session participants are not disclosed or retained.

I also find of little moment the facts that Wade's letter and the notice of the Continued Employment Meeting wrongly cite a positive breathalizer test as the reason for

_____

although when he began the program, he had been placed on Antabuse, a drug that interferes with the metabolism of alcohol, producing a rather adverse physiological response to drinking.

When Mr. Ramey returned to the program, on October 27, 2003, he was discharged because of noncompliance. It was his contention that drug addicts were allowed to continue in the program after they had experienced relapses. He felt that his dismissal was discriminatory.

13

the grievant's discharge from the treatment program. The Company's termination action ultimately was based upon the reasons contained in the Summary Discharge, dated November 6, 2003, and received by Duarte after July 22, 2004. The Union has not argued that it did not have a fair opportunity to defend the grievant against the actual grounds for the termination of his employment.

I find unconvincing the Union's assertion that the Session Notes are contrary to the reasons for discharge in the Discharge Summary and the Company's termination memorandum. Even the grievant has admitted his continuing denial, during the sessions, of an alcohol problem. Absent any expert testimony to support the Union's assertion, I shall not review determinations ultimately made, as Wade testified, by Kolmac medical staff in consultation with the counseling staff regarding an individual's continued participation in treatment sessions. My rendering of arbitral findings on medical questions based upon the brief Session Notes written by different counselors would not be appropriate.

In the same vein, I find unpersuasive the Union's contention that if management had conducted a thorough investigation, it would have uncovered the inconsistencies resulting in the grievant's erroneous discharge from the program. The original incorrect reason for the action stemmed from administrative error in the part of Value Options or Kolmac. As Duarte testified, the Company relies upon those organizations for the management of its employee assistance program and related operations.

The final question is whether the delays in issuing disciplinary action after Wade's notification to management of the grievant's discharge from the program violate notions of fairness or industrial due process. The Continued Employment Meeting

14

memorandum was issued nine months after the Kolmac discharge and four months after Dr. Schulman's report. The termination memorandum was issued almost four months after the Continued Employment Meeting.

The lengthy delay can be attributed to both management and the grievant. After discharge from the program, the grievant was on sick pay until the end of April 2004. During this period and before the DML arbitration award issued in mid-December 2003, management, the Union and the grievant were discussing settlement of the dispute. Also, the grievant, represented by private counsel, and management unsuccessfully attempted to resolve the dispute in mediation. Duarte testified without contradiction that he had called the Union over a period of time regarding two different Company offers of reinstatement which, the Union said, the grievant was still discussing. It appears that the parties' impasse concerned the implementation of Dr. Schulman's finding that the grievant "does require alcohol rehabilitation treatment as a condition of his return to work" and the recommendation that "he resume appropriate treatment."

Even assuming that the settlement discussions continued through April 30, 2004, while the grievant was out on sick pay, management took no action until July 16, 2004, when the Continued Employment Meeting memorandum was issued. Shortly after the meeting was adjourned on July 22, 2004, Duarte received a copy of the Discharge Summary, presumably before the end of July 2004. The record contains no specific explanation for management's delay of more than three months in issuing the termination memorandum.

Absent a specific showing, or even an argument, that the delays in implementing the discipline prejudiced the grievant in his defense, I find no basis for overturning the

termination on procedural grounds. The grievant understood the DML's terms and conditions regarding entry into and successful completion of a treatment program. Restoration of his CDL following completion of the program was required for the performance of his job duties. He failed to meet these requirements after discharge from the Kolmac treatment program. Accordingly, the termination of his employment must stand.

## AWARD

The grievance is denied.

Jerome H. Ross, Arbitrator

July 18, 2005
McLean, Virginia

# EXHIBIT C



*Certificate of Training*

This is to certify that

**Thomas Hyde**

has successfully completed the

**BREATH ALCOHOL TECHNICIAN RETRAINING COURSE**

provided by N.I.F.C., Inc on the date listed below

(✓)Proficient in 49 CFR Part 40 Procedures

(✓)Proficient in Operation of Draeger Breathalyzer Model 7410

Date 9/16/02

Instructor

# Certificate of Training

*This is to certify that*

## Thomas Hyde

Certificate No.900I519

*Has successfully completed the*

## BREATH ALCOHOL TECHNICIAN TRAINING COURSE
### Provided by N.I.F.C., on the date below.

- Proficient in Operation of Draeger Breathalyzer Model 7410

April 23, 1999
Date

*Nancy Schultz*
Instructor

# EXHIBIT 6

1          SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                        CIVIL DIVISION

3    ------------------------X

     PEPCO

4
            v.                    Civil Action No. 5435-06
5

     BENJAMIN F. RAMEY
6    4251 Clay St., NE
                Defendant
7    ------------------------X

8                              Washington, D. C.
                               Wednesday, August 9, 2006
9


10

11       The above-entitled action came on for a preliminary
     injunction before the Honorable JUDITH RETCHIN, Associate
12   Judge, in Courtroom Number 216, commencing at approximately
     9:55 a.m.

13       THIS TRANSCRIPT REPRESENTS THE PRODUCT OF
     AN OFFICIAL REPORTER, ENGAGED BY THE COURT
14   WHO HAS PERSONALLY CERTIFIED THAT IT
     REPRESENTS TESTIMONY AND PROCEEDINGS OF THE CASE
15   AS RECORDED.

16              APPEARANCES:

17       On behalf of PEPCO:

18       Carter Delorme, Esquire
         Jill Flack, Esquire
19       Washington, D.C.

20       On behalf of the Defendant:

21       Pro Se
         Washington, D. C.

22

23

24

25   Robert L. Salazar
     Official Court Reporter        Telephone (202) 897-1044

1     the potential for losing your job.  But Mr. Ramey chose to

2     go with PEPCO.  So there was no illegal kidnapping of Mr.

3     Ramey.

4          The next question is whether the -- and this was

5     not a question that I was specifically asked to address, but

6     I will address it.  And that is whether the taking of the

7     breath sample was illegal.

8          I understand Mr. Ramey contends that it was

9     illegal because it was outside of DOT guidelines that say

10    that the breath sample should be taken within eight hours

11    after there is a reasonable suspicion to believe that the

12    person might be under the influence.

13         But as I read the regulation, that did not

14    preclude testing, or non DOT testing.  That PEPCO is free to

15    do its own testing if it has reason to believe, or a

16    reasonable suspicion that an employee is impaired.  And I

17    presume the reason for that is because they want to protect

18    the safety of all when they are asking an employee to

19    operate heavy equipment.  So I don't believe there was any

20    illegal taking of a breath sample from Mr. Ramey.

21         Now the question then becomes, were the test

22    results altered?  Because that is an allegation that Mr.

23    Ramey is making.

24    ~~Mr. Ramey appears to be contending that they~~

25    ~~were altered because a copy that was given to him did not~~

1    a certified technician?

2          And Ms. Flack testified that she saw the papers

3    indicating that he was certified and that he did have

4    incorporation papers.

5          Ms. Davis testified that Ms. Flack acknowledged to

6    her that she knew that Mr. Hyde was an uncertified

7    technician.  I do not believe that Ms. Davis is

8    intentionally misrepresenting.  I believe that Ms. Davis

9    misinterpreted what Ms. Flack said.  And Ms. Flack did not

10    acknowledge that Mr. Hyde was an uncertified technician.

11          It makes no sense that they went to all this

12    effort to find a certified technician for Ms. Flack to have

13    acknowledged that he was uncertified.  The fact finder in

14    the earlier proceeding found that he was a certified

15    technician.  And I just have not been presented with any

16    evidence that he was uncertified except for Ms. Davis'

17    statement that she alleges Ms. Flack made.  I find Ms. Davis

18    misinterpreted what Ms. Flack said.

19          So, I believe the plaintiff is able to prove by a

20    substantial likelihood that plaintiff would prevail on the

21    merits on the claim that those statements were false.

22          Now, the next issue the Court needs to decide is

23    whether there is irreparable harm.  And although the Court's

24    personal opinion is that a passerby and even an employee

25    might be able to give the appropriate weight to a

1    disgruntled employee's leafleting, there may be people who

2    take the statement seriously.  And I see how it can affect

3    the relationship with employees and potentially the good

4    will of the customers.  So it is not something that is

5    capable of redress through economic recovery.  So I think

6    plaintiff is able to show irreparable harm.

7            And when I balance the harm to the plaintiff

8    against the harm to the defendant, I see no harm to Mr.

9    Ramey, provided Mr. Ramey is still permitted to exercise his

10   First Amendment right to talk about and to leaflet about his

11   displeasure with his treatment by PEPCO.

12           But I don't see that Mr. Ramey loses any of his

13   rights by being enjoined from making statements that the

14   Court finds are not true, and that another proceeding

15   determined to be untrue.  And when I balance or consider

16   what the public interest is here, I believe the public does

17   not benefit by being told about misinformation.

18           Are there any other factual or legal issues either

19   side would like the Court to address?

20           MR. DELORME:  No, Your Honor.

21           THE COURT:  Do you have any questions, Mr. Ramey?

22           MR. RAMEY:  No, ma'am.

23           THE COURT:  All right.  So I will grant plaintiff

24   an injunction.  But I want to make it very narrowly tailored

25   so that if Mr. Ramey wishes to exercise his First Amendment

# EXHIBIT 7

ORIGINAL

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

POTOMAC ELECTRIC POWER CO.,    :

    Plaintiff    :

    v.    :

                            :    Case No.: 06CA5435
BENJAMIN RAMEY,    :    Judge Judith E. Retchin
                             :    Next Event: Preliminary Injunction
    Defendant.    :    Hearing - August 9, 2006

FILED
IN OPEN COURT
AUG 9 2006
SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, DC

## PRELIMINARY INJUNCTION ORDER

UPON CONSIDERATION of the Motion of Plaintiff Potomac Electric Power Company ("Pepco") for a Preliminary Injunction in this matter, any Opposition thereto, and the record herein, and Pepco having shown that they will likely prevail on its claim; that if its Motion is denied Pepco will suffer irreparable injury, loss or damage; that the harm to Pepco in the denial of its Motion will outweigh any substantial harm to Defendant Benjamin Ramey or other interested persons; and that the public interest will be served by granting such relief; it is hereby

    ORDERED that Plaintiff's Motion for a Preliminary Injunction is GRANTED; and it is further

    ORDERED that Defendant Benjamin Ramey is enjoined from making, whether in writing or orally, false and defamatory statements against Pepco; and it is further

    ORDERED that this Preliminary Injunction shall remain in effect until further Order of this Court; and it is further

    ORDERED that the Clerk of this Court shall forward copies of this Order to all counsel or parties of record.

*[handwritten:]* *including, but not limited to, statements that Pepco, or its employees, agents or attorneys kidnapped, falsely imprisoned, illegally altered his breathalyzer results, used an uncertified technician to administer the breathalyzer test or committed any other illegal act against him in connection with his termination from PEPCO or the filing of this action.*

ENTERED this 9th day of August, 2006.

Judith E. Retchin
District of Columbia Superior Court Judge

To be delivered to:

Connie N. Bertram
M. Carter DeLorme
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006

Attorneys for Plaintiff

Benjamin Ramey
4251 Clay Street, NE
Washington, DC 20019

Defendant

- 2 -

# EXHIBIT 8

IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

CIVIL DIVISION

POTOMAC ELECTRIC POWER CO.,    :
                                                             :
      Plaintiff,                           :
                                                             :
v.                                                         :        Case No.: 06CA5435
                                                             :        Judge Judith E. Retchin
BENJAMIN RAMEY,                          :
                                                             :
      Defendant.                         :


<u>ORDER</u>
(April 11, 2007)


UPON CONSIDERATION of plaintiff Potomac Electric Power Co. ("Pepco")'s Motion

for Summary Judgment, defendant's opposition, plaintiff's reply, and the entire record herein, it

is hereby

      ORDERED that plaintiff's Motion for Summary Judgment is **GRANTED** for the reasons

stated in plaintiff's motion and reply; and it is further

      ORDERED that judgment is entered as a matter of law in favor of Pepco and against

Defendant Benjamin Ramey ("Ramey") on all counts of its Complaint; and it is further

      ORDERED that an injunction shall issue forthwith, permanently enjoining Ramey from

publishing false and defamatory statements about Pepco, through leaflets or otherwise; and it is

further

      ORDERED that defendant's motion for plaintiff to verify certification and submit

originals is **DENIED AS MOOT**; and it is further

      ORDERED that plaintiff's motion to compel discovery is **DENIED AS MOOT**; and it is

further

ORDERED that plaintiff's motion to continue mediation is **DENIED AS MOOT**; and it

is further

ORDERED that the Mediation Session scheduled for April 26, 2007, is **VACATED**

**CASE CLOSED**.

ENTERED this 11th day of April, 2007.

Judith E. Retchin
Associate Judge

Copies to:

Benjamin Ramey, *Pro Se*
4251 Clay Street, N.E.
Washington, D.C. 20019

Connie N. Bertram, Esq.
M. Carter DeLorme, Esq.
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006

Jill D. Flack, Esq.
Pepco Holdings, Inc.
701 9th Street, N.W., Suite 1100
Washington, D.C. 20068